## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HARRIS COUNTY, TEXAS**,
  1001 Preston Street
  Houston, Texas 77002;

**COLUMBUS, OHIO**,
  90 West Broad Street
  Columbus, Ohio 43215;

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE**,
  1 Public Square
  Nashville, TN 37201;

**KANSAS CITY, MISSOURI**,
  414 E 12th Street
  Kansas City, Missouri 64106; and

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO**
  1625 L Street NW
  Washington, D.C. 20036

*Plaintiffs*,

v.

**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of the United States Department of Health and Human Services,
  200 Independence Avenue S.W.
  Washington, D.C. 20201;

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**,
  200 Independence Avenue S.W.
  Washington, D.C. 20201;

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

**SUSAN MONAREZ,** in her official capacity
as Acting Director of the Centers for Disease
Control and Prevention,
  1600 Clifton Road
  Atlanta, Georgia 30329; and

**CENTERS FOR DISEASE CONTROL
AND PREVENTION**,
  1600 Clifton Road
  Atlanta, Georgia 30329

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Harris County, Texas; Columbus, Ohio; Nashville, Tennessee; and Kansas City, Missouri (together, "Plaintiff Local Governments"); and American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") (collectively, "Plaintiffs") bring this action against Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("HHS"); Susan Monarez, in her official capacity as Acting Director of the Centers for Disease Control and Prevention; and the Centers for Disease Control and Prevention ("CDC") (collectively, "Defendants"). Plaintiffs state and allege as follows:

### INTRODUCTION

1.     The COVID-19 pandemic ravaged American society, killing over a million people, decimating the economy, and forever shifting our understanding of public health. In response, Congress appropriated billions of dollars for programs designed to remedy the effects of that pandemic and to prepare for similar threats to the public health from infectious diseases. Some of this money (e.g. the American Rescue Plan Act) went to rebuilding the American economy. And some went to fund important public health programs around the country and prepare governments

2

and other stakeholders to respond to other public health emergencies, especially those involving infectious diseases. Having seen the devastation of the COVID-19 pandemic, Congress understood that America needed to be better prepared for potential outbreaks of communicable disease.

2.      Counties and cities across the United States benefitted from this funding. The money has supported the important and cutting-edge public health work of identifying, monitoring, and addressing infectious diseases; ensuring access to necessary immunizations, including immunizations for children; and strengthening emergency preparedness to avoid future pandemics. Because local governments are often the first line of defense during a public health emergency, these programs allowed local governments to expand and improve their ability to identify and respond to public health crises like communicable disease outbreaks.

3.      Like many issues these days, the COVID-19 pandemic—and governments' responses to it—became politicized. Debates over mask mandates, vaccinations, remote schooling, and other issues have raged since the early days of the COVID-19 pandemic and have continued after the public health emergency ended. When President Donald Trump took office for his second term, he made dismantling the federal government's approach to COVID-19 a priority. He issued a rescission of executive orders issued by President Joe Biden related to the COVID-19 pandemic, including orders designed to prevent future pandemics and build a sustainable public health workforce.[1]

4.      And on March 24, 2025, President Trump's picks to lead the Department of Health and Human Services and the Centers for Disease Control unilaterally eliminated congressionally appropriated federal grants that provide over $11 billion to Plaintiff Local Governments and other

---

[1] *See* Exec. Order No. 13,996, 86 Fed. Reg. 7197 (Jan. 26, 2021); Exec. Order No. 13,997, 86 Fed. Reg. 7201 (Jan. 26, 2021); Exec. Order No. 14,002, 86 Fed. Reg. 7229 (Jan. 27, 2021).

entities for programs designed to address the effects of the pandemic and to prepare communities for future potential outbreaks. The funding, which Plaintiff Local Governments received both through existing and new grant programs during the COVID-19 pandemic, was not limited to the duration of the pandemic. Indeed, the funding was generally expected to address the effects of the pandemic and prepare Plaintiff Local Governments for future public health crises.

5.    Defendants' decision to terminate these "COVID-related" CDC grant programs *en masse* (the "Mass Termination Decision") was done in one fell swoop. Contravening Congress's decision to extend funding for pandemic preparedness, Defendants announced that they would "no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Brandy Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, NBC News (Mar. 25, 2025), https://perma.cc/35SS-V2WE. Needing cover for their obviously illegal actions, Defendants provided a cursory basis for termination of the programs: they had been terminated for "cause." Defendants explained their decision to summarily terminate the programs by stating threadbare variations of: "The end of the [COVID-19] pandemic provides cause to terminate COVID-related grants."

6.    But Defendants' belief that the end of the COVID-19 pandemic justifies an end to all COVID-related expenditures cannot be a lawful basis to terminate the programs at issue "for cause."    If Defendants wanted to terminate any of the Plaintiff Local Governments' funding "for cause," they were required to do so via individual determinations—determinations that ordinarily require some form of noncompliance with the U.S. Constitution, federal statutes, regulations, or terms and conditions of the federal award. *See* 45 C.F.R. §§ 75.371-75.375 ("Remedies for Noncompliance"). The termination letters issued to Plaintiff Local Governments do not identify

any failures to comply on their part; nor could they, as Plaintiff Local Governments have complied with the terms of the respective grants, something which Defendants do not dispute.

7.    Defendants' proffered reason for the Mass Termination Decision makes even less sense given the way in which Congress appropriated the funds. Congress did not limit this funding to the period of the COVID-19 emergency nor even to COVID-19-specific projects. Instead, motivated by the fact that public health departments were unprepared for the COVID-19 pandemic, Congress made wide-ranging investments in U.S. public health infrastructure designed to extend beyond the immediate public health emergency. Moreover, after the end of the COVID-19 public health emergency, Congress reviewed the COVID-19-related appropriations and rescinded certain funds but decided not to rescind any of the funds at issue.

8.    The Mass Termination Decision has been devastating to Plaintiff Local Governments' public health departments and their employees, including public health employee members of Plaintiff AFSCME. With the cessation of these grant programs, the public health departments run by Plaintiff Local Governments will need to cease critical operations and lay off staff—and indeed these layoffs have already begun, with AFSCME members losing their jobs. The Mass Termination Decision is also a massive blow to U.S. public health generally, at a time where state and local public health departments need to address burgeoning infectious diseases and chronic illnesses, like the measles, bird flu, and mpox.

9.    The Mass Termination Decision is unlawful for multiple reasons. First, unilaterally terminating funds as Defendants have done violates the U.S. Constitution. Nothing in the Constitution empowers agencies—or the President—to usurp Congress's exclusive power of the purse and refuse to spend appropriated funds for the purposes Congress specified.

10.    Second, Defendants' actions violate Congress's appropriation statutes, which make no mention of termination upon the conclusion of the COVID-19 public health emergency. Indeed, Congress's actions after the emergency was declared over indicate that Congress did not want the funding to end in the way Defendants terminated it.

11.    Third, Defendants' actions violate HHS's own regulations, which narrowly limit the grounds for terminating federal grants. The regulation certainly does not give Defendants authority to renege *en masse* on their grant obligations or to effectively impound appropriated funds in defiance of Congress.

12.    Finally, the Mass Termination Decision is arbitrary and capricious and lacks reasoned explanation. Among other things, the explanation given for the terminations—Defendants' uninformed conclusion that the grants are "no longer necessary" because the COVID-19 public health emergency ended—is based on factors that Congress did not intend Defendants to consider and improperly assumes without support that the funds were only intended for pandemic-related use.

13.    Defendants' actions have caused Plaintiffs multiple, ongoing harms. The terminations will lead to immediate cessation of grant-funded projects and threaten to deprive Plaintiff Local Governments' residents of essential public health services—all in the midst of continuing dangers posed by COVID-19 and other diseases, including deadly measles outbreaks in Texas, Ohio, Tennessee, Missouri, and other states across the country. The abrupt, retroactive termination of programs that provide millions of dollars in funding that Plaintiffs have relied upon for years threatens to halt Plaintiff Local Governments' necessary and lifesaving ongoing public health work, including work to keep deadly infectious diseases from spreading. Absent prompt relief from this Court, the consequences of Defendants' actions will be devastating.

14.     Accordingly, through this lawsuit, Plaintiffs bring this action against Defendants HHS, HHS Secretary Robert F. Kennedy, Jr., CDC, and CDC Acting Director Susan Monarez seeking to: vacate and set aside the wholesale elimination of CDC's COVID-19-related grant programs; preliminarily and permanently enjoin Defendants to reinstate the eliminated grant programs and to continue to administer the grant to the same extent and in the same manner as prior to the unlawful terminations, as provided in the notices of award and HHS regulations; and to declare that the terminations violate the U.S. Constitution and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under Article I and Article II of the Constitution and laws of the United States, including the APA, 5 U.S.C. §§ 701–706.

16.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The Administrative Procedure Act further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

17.     Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, Defendants are United States agencies and officers sued in their official capacities, and at least one Plaintiff and at least one Defendant resides in and has its principal place of business in this district.

**PARTIES**

18.    Plaintiff Harris County ("Harris County") is a local government entity located in the state of Texas. With a population exceeding 4.8 million people, Harris County is the most populous county in Texas and the third most populous county in the United States. The county's governing body is the Harris County Commissioners Court, which is responsible for "all county business," Tex. Const. art. V, § 18(b), including "protect[ing] the public health." Tex. Health & Safety Code § 121.003(a). The grants at issue in this action enable Harris County to fulfill its duty to protect the health and welfare of its residents. Harris County administers the projects funded by these grants through the Harris County Public Health Department ("Harris County Public Health" or "HCPH"), a county agency. HCPH provides a broad range of critical public health services to Harris County residents.

19.    Plaintiff the City of Columbus ("Columbus") is a municipal corporation organized under Ohio law. *See* Ohio Const., art. XVIII. Columbus is the capital of Ohio. It is the largest city in the state and the fourteenth largest city in the United States, with a population of over 905,000, according to 2020 Census estimates. Columbus's public health department, Columbus Public Health, provides a wide range of health care services on behalf of its residents including infectious disease investigation, mitigation, and community response coordination. Columbus receives funding from CDC to strengthen its disease response, workforce capacity, and health information systems.

20.    Plaintiff the Metropolitan Government of Nashville & Davidson County ("Nashville") is a combined municipal corporation and county government organized and existing under Tennessee law. Nashville is the largest city in Tennessee, with a population of more than 650,000 people. Nashville's Public Health Department's mission is to protect, improve and sustain

the health and well-being of all people in Nashville and Davidson County. It provides a long list of services to residents, including clinical health services, epidemiological tracking of health status and health surveillance, public education, and emergency preparedness coordination. Nashville receives funding from CDC to provide immunizations to children, conduct health screenings and resource navigation, and educate its residents to prevent spread of communicable diseases.

21.    Plaintiff the City of Kansas City ("Kansas City") is a municipal corporation organized and existing under and by virtue of the laws of the State of Missouri. Its population is approximately 508,090, according to 2020 Census estimates. The Kansas City Health Department is a city agency with about 290 employees that works to improve the health outcomes of Kansas City residents through community-directed programs, services, and collaboration. Kansas City receives funding from CDC to support critical public health work including to develop laboratory capacity for infectious disease testing, to connect vulnerable populations to health care, to vaccinate uninsured adults, and to train various actors in the community on public health best practices.

22.    Plaintiff AFSCME is a labor union representing approximately 1.4 million members in 46 states, the District of Columbia, and Puerto Rico in both the public and private sectors. AFSCME's public employee members work for a wide array of state, county, and municipal employers, including many state and local health departments. AFSCME members who work in public health rely on the grants at issue in this case to fund their positions, and cancellation of these grants has led directly to layoffs of AFSCME members as well as worsened working conditions for AFSCME members who continue to be employed in public health work. AFSCME brings this suit on behalf of its state and local employee members who have been injured, as well

as in AFSCME's own right as an organization harmed by the loss of members due to layoffs stemming from the grant cuts.

23.     Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and that agency's highest-ranking official. He is charged with the direction, supervision, and management of all decisions and actions of that agency and of HHS's subordinate agencies, including CDC. *See* 42 U.S.C. § 242c(b). Plaintiffs sue him in his official capacity.

24.     Defendant HHS is an agency of the federal government headquartered in Washington, D.C.

25.     Defendant Susan Monarez purports to be the Acting Director of CDC. Plaintiff sues her in her official capacity. Although there appears to be a serious question about whether Monarez is eligible to continue serving as Acting Director following the President's nomination of her to be CDC Director,[2] Plaintiffs name her as a defendant out of an abundance of caution but reserve the right to substitute an officer authorized to perform the duties of the Acting Director. Fed. R. Civ. P. 25(d) (providing that when a public officer "ceases to hold office," the "officer's successor is automatically substituted as a party" and "any misnomer not affecting the parties' substantial rights must be disregarded").

---

[2]  The President named Monarez as Acting Director of CDC on January 23, 2025. His subsequent nomination of her to serve as Director of CDC on March 24 should render her ineligible to continue serving as Acting Director under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3345(b). Nonetheless, the CDC website continues to list her as Acting Director, and it has been reported that official CDC communications continue to identify her as Acting Director. *Acting Director, First Assistant to the Director, Principal Deputy Director*, U.S. Ctrs. for Disease Control & Prevention (Jan. 24, 2025), https://perma.cc/HCF7-P58N; Jeremy Faust, M.D., *Snoop: CDC Has No Acting Director, Sources Confirm*, Inside Med. (Apr. 9, 2025, 11:05 PM), https://perma.cc/27SX-2VMM. In the absence of an Acting Director, it appears that the functions of the position devolve upon Secretary Kennedy. *See* 42 U.S.C. § 242c(a)–(b) (providing that the functions of the position shall be performed by "[t]he Secretary, acting through the Director").

26.     Defendant CDC is an agency of the federal government and a subordinate agency of HHS. It is headquartered in Atlanta, Georgia.

## FACTUAL ALLEGATIONS

### I. Congress appropriates billions of dollars in public health funding.

27.     Congress provided funding for grants-in-aid to local and state governments through the passage of several COVID-related appropriations acts, including:

- The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020);

- The Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSAA"), Pub. L. No. 116-260, 134 Stat. 1182 (2021) (Division M of a larger consolidated appropriations act);

- The American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021);

- The Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020); and

- The Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020).

28.     These laws were a direct response to the outbreak and devastation of COVID-19. Congress sought to respond to the nationwide public health crisis and economic devastation, promote recovery, and ensure that the nation would be better prepared for future public health threats. In addition to directing funds toward ameliorating the immediate effects of the COVID-19 outbreak, Congress sought to address the longer-term challenges it knew the country would face in COVID-19's wake, including gaps in the public health system and the need for investment in critical public health infrastructure.

29.    In the CARES Act, Congress appropriated $4.3 billion to Defendants "to prevent, prepare for, and respond to coronavirus," requiring that: no less than $1.5 billion "shall be for grants to or cooperative agreements with States, localities," and other entities, "including to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities"; and that no less than $500 million "shall be for public health data surveillance and analytics infrastructure modernization." CARES Act, 134 Stat. at 554–55. The Act states that "the term 'coronavirus' means SARS-CoV-2 or another coronavirus with pandemic potential." 134 Stat. at 614.

30.    In the CRRSAA, Congress appropriated $8.75 billion to Defendants "to prevent, prepare for, and respond to coronavirus," providing that the appropriated amounts "shall be for activities to plan, prepare for, promote, distribute, administer, monitor, and track coronavirus vaccines to ensure broad-based distribution, access, and vaccine coverage." 134 Stat. at 1911. Congress instructed that no less than $4.5 billion of that amount should go to states, localities, and certain other designated entities, that at least $300 million be used "for high-risk and underserved populations, including racial and ethnic minority populations and rural communities," and specified that funding requirements could be satisfied "by making awards through other grant or cooperative agreement mechanisms." 134 Stat. at 1911–12. The CRRSAA provides that the term "coronavirus" "means SARS–CoV–2 or another coronavirus with pandemic potential." 134 Stat. at 1185.

31.    ARPA provided billions to HHS and CDC "to plan, prepare for, promote, distribute, administer, monitor, and track COVID-19 vaccines"; "strengthen vaccine confidence in the United States"; "improve rates of vaccination throughout the United States"; and "strengthen and expand activities and workforce related to genomic sequencing, analytics, and disease surveillance,"

among other objectives. 135 Stat. at 37–41. Out of that amount, and to fulfill those objectives, Congress required that the CDC award grants or cooperative agreements to state and local public health departments. *Id.* at 37, 40-42. Congress specifically appropriated funds so that HHS would "award grants to, or enter into cooperative agreements or contracts with, State, local, and territorial public health departments to establish, expand, and sustain a public health workforce." *Id.* at 41.

32.    The Coronavirus Preparedness and Response Supplemental Appropriations Act provided $2.2 billion to CDC "to prevent, prepare for, and respond to COVID-19 domestically and internationally." Not less than $950,000,000 of the amount was required to be used for grants to or cooperative agreements with states and localities so that they could "carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities." 134 Stat. at 147.

33.    The Paycheck Protection Act appropriated billions to be transferred to HHS and CDC for states and localities to "develop, purchase, administer, process, and analyze COVID–19 tests, including support for workforce, epidemiology, use by employers or in other settings, scale up of testing by public health, academic, commercial, and hospital laboratories, and community-based testing sites, health care facilities, and other entities engaged in COVID–19 testing, conduct surveillance, trace contacts, and other related activities related to COVID–19 testing." 134 Stat. at 624.

34.    Congress did not limit the expenditure of the funds appropriated by these provisions to the duration of COVID-19's status or designation as a "pandemic."

35.    In contrast, when Congress intended to tie the availability of funds to a declaration of a public health emergency, it did so expressly within the laws themselves. *E.g.*, American Rescue Plan Act of 2021, § 9402, 135 Stat. at 127 ("during the emergency period . . . and the 1-

year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 211–12 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency . . . expires").

## II. HHS/CDC uses the money appropriated by Congress to fund grants that support Plaintiff Local Governments' critical public health projects.

36.    Consistent with the Congressional mandate, Defendants used the appropriated funds to offer grant awards and cooperative agreements to states and localities, including Plaintiff Local Governments.

## Harris County, Texas

37.    Defendants awarded four grants to Harris County. Two (the Embrace HOPE Grant and the CHW Grant) were awarded directly to the County. Two more (the IMMU Grant and the IDCU Grant) came through the Texas Department of State Health Services ("Texas DSHS"), which acted as a pass-through entity for the funds. Harris County administered the projects funded by these grant awards through its department, Harris County Public Health.

### A.  Embrace HOPE Grant

38.    On May 27, 2021, Defendants awarded the Harris Cares: Embrace HOPE (Healing, Opportunity, Prosperity, Equity) Grant (the "Embrace HOPE Grant") to Plaintiff Harris County. The grant provides $27,627,507 in federal funding to the county over a budget and performance period running from June 1, 2021 to May 31, 2026. On the date Defendants terminated this grant, over $4 million of funding remained to be distributed to Harris County. The Embrace HOPE Grant is funded by money that Congress appropriated through CRRSAA.

39.    The initial grant period for the Embrace HOPE Grant was June 1, 2021 to May 31, 2023. On December 15, 2022, Defendants amended the notice of award to extend the end date to

May 31, 2024, and Harris County approved that extension on January 10, 2023. On February 22, 2024, Defendants amended the notice of award to reflect a further extension of the end date to May 31, 2026, and Harris County approved that extension on May 7, 2024.

40.     Harris County uses Embrace HOPE Grant funds for projects including: the establishment of a wastewater surveillance program, which provides critical surveillance data for emerging and infectious diseases; the revitalization and modernization of epidemiologic surveillance systems; data modernization and visualization; the development of community health worker training; enhanced workforce development; and the release and maintenance of a public data hub. The grant also supports Harris County in addressing COVID-19-related health disparities, enabling it to prevent and control the transmission of COVID-19 and other diseases among high-risk and underserved populations in the County. Prior to its termination, the grant had enabled Harris County to test 961 wastewater samples, investigate over 8,000 reported conditions, and respond to 65 outbreaks in the county.

41.     The Embrace HOPE Grant supports the work of four full-time and ten temporary Harris County employees, as well as thirteen vendors.

**B. Community Health Workers (CHW) Grant**

42.     On August 23, 2021, Defendants awarded the Community Health Workers for Public Health Response and Resilient Communities Grant (the "CHW" grant) to Plaintiff Harris County. The CHW grant is funded with money appropriated by Congress in the CARES Act.

43.     The initial grant award provided $2,999,755. to Harris County for a budget and performance period running from August 31, 2021, until August 30, 2024. On July 13, 2022, Defendants issued a second award under the CHW grant that provided an additional $2,999,755 to Plaintiff Harris County. On July 3, 2023, Defendants issued a third award under the CHW grant,

providing an additional $3,749,982 to Harris County. On July 15, 2024, Defendants issued a notice of award extending the grant period end date to August 30, 2025. All told, the CHW grant obligated Defendants to provide a total of $9,749,492 in funding to Plaintiff Harris County over a period extending from August 31, 2021, until August 30, 2025.

44.    When Defendants terminated this grant, over $1 million had yet to be paid.

45.    The CHW grant funds activities involving outreach, canvassing, and education. The grant supports the training and deployment of community health workers, whose efforts address health disparities in Harris County by strengthening partnerships with community members and organizations. The grant directly supports a team of resource navigators who help community members sign up for public benefits programs, as well as a team that uses a data-driven approach to organize community events and conduct canvassing activities that reach over 40,000 Harris County residents every year. The work supported by the CHW grant prioritizes outreach to residents with the greatest need for public health services in order to increase awareness and utilization of Harris County's programs and services. Notably, the project title listed in the various notices of award for this grant is "Before Always Has an After: Navigating Beyond the Pandemic," underscoring the fact that the availability of the grant funds was never intended to be restricted to a narrow window based on Defendants' opinion about COVID-19's status as a "pandemic."

46.    The CHW grant funds the work of twelve full-time employees and nineteen vendors.

C.  **Immunization (IMMU) and Infectious Disease Control Unit (IDCU) Grants**

47.    Defendants awarded millions of dollars in grant funding through an award titled "National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities." The

Texas DSHS, acting as a pass-through entity for the funds pursuant to 42 U.S.C. § 247b, subsequently entered into two grant agreements with Harris County. The funds were appropriated by Congress in the CARES Act and the CRRSAA.

### *The IMMU Grant*

48.     On May 25, 2021, Harris County received $26,500,670 from Defendants (via Texas DSHS) through the Immunization COVID-19 Grant Program (the "IMMU Grant"). On October 12, 2021, Texas DSHS increased the IMMU Grant award by an additional $19,347,909. In total, Harris County's IMMU Grant budget was $45,848,579. The IMMU Grant is funded by money that Congress appropriated in the CARES Act to expand the Immunization Cooperative Agreement program, as well as money appropriated in the CRRSAA. When Defendants terminated this grant, more than $13 million of those funds remained to be paid to Harris County.

49.     The IMMU Grant's funding period was initially set to run from May 26, 2021, through June 30, 2024. On May 7, 2024, Harris County and Texas DSHS extended the program's end date to June 30, 2025.

50.     The purpose of the IMMU Grant is to support vaccine administration, call center operations (for questions about vaccines, vaccine appointments, and vaccine-preventable diseases such as perinatal hepatitis B), data analytics and informatics, disease and health reporting, immunization-related media campaigns, and community outreach and education. The grant assists Harris County in reducing health disparities related to vaccine access and increasing vaccine uptake, including COVID-19 vaccines (including yearly boosters), particularly among populations disproportionately affected by the outbreak of COVID-19. This funding strengthens Harris County's immunization planning and implementation and assists it in evaluating vaccine behaviors and perceptions. The IMMU Grant has enabled Harris County to administer 7,364 mobile

immunizations, conduct 340 data analysis projects, investigate 1,142 reported cases of vaccine-preventable diseases, and achieve 31 million media impressions related to immunization campaigns.

51.    From the start, it was understood by all that the activities funded by the IMMU Grant were not focused exclusively on COVID-19. In the October 2021 amendment, for example, the statement of work recognized that part of Harris County's work would "focus on COVID-19, influenza, and other necessary vaccines." This understanding continued, even after the expiration of the COVID-19 "public health emergency" declaration in May 2023. For instance, on August 29, 2023, Harris County accepted an amendment to its agreement with Texas DSHS that modified the statement of work to be performed under the IMMU Grant to include, inter alia, ensuring "high quality and safe administration of *all* vaccines" and "equitable distribution and administration of *all* vaccines" (emphasis added), neither excluding COVID-19 from this work nor confining the work to COVID-19.

52.    The IMMU Grant funds the work of 33 full-time employees, 31 temporary employees, and 25 vendors.

### *The IDCU Grant*

53.    On August 11, 2020, Harris County accepted $1,227,447 in grant funding from Defendants, with the Texas DSHS acting as a pass-through entity, via the Infectious Disease Control Unit Grant (the "IDCU Grant"). On September 15, 2021, the grant budget was increased by $1,534,309. On August 6, 2024, the grant budget was further increased by $1,150,732. In all, the IDCU Grant budget totaled $3,912,488.

54.    The funding for the IDCU Grant comes from the CARES Act, and at least part of the funding was distributed via CDC's Epidemiology and Laboratory Capacity ("ELC") program,

which was established long before the COVID-19 outbreak and oversees an array of projects that strengthen the ability of public health agencies to respond to, prevent, and control known and emerging (or re-emerging) infectious diseases. CDC's ELC Cooperative Agreement is a mechanism that funds the nation's state and local health departments and has funded local responses to a variety of pathogens including H1N1 (swine flu), Zika, and Ebola. The program provides resources to strengthen epidemiologic capacity, enhance laboratory capacity, improve health information systems, and promote cooperation among various components of public health departments. When Defendants terminated the grant, over $1 million remained to be paid to Harris County.

55.    The IDCU Grant period was initially set to begin on August 12, 2020, and end on April 20, 2022. On September 14, 2021, the end date was extended to July 31, 2023. On April 5, 2022, an amendment to the agreement between Harris County and the Texas DSHS extended the end date further to July 31, 2024. Finally, on March 26, 2024, an amendment to the agreement between Harris County and Texas DSHS extended the end date to July 31, 2026.

56.    The IDCU Grant funds infectious disease surveillance, case intake, and investigation (of COVID-19 and other notifiable conditions). The grant supports Harris County in responding to the COVID-19 outbreak by enhancing case identification, improving disease surveillance, and strengthening specimen collection operations. This funding enables HCPH to conduct infectious disease case intake and investigation, including COVID-19, to mitigate the spread of the virus and protect public health. Through the grant, HCPH has investigated over 8,000 reported conditions and responded to 65 outbreaks countywide.

57.    As with the other grants, it was understood that the activities funded by the IDCU Grant would not be focused exclusively on COVID-19, and it was clear that the grant was intended

to fund activities (both COVID- and non-COVID-related) even after the COVID-19 "public health emergency" declaration expired in May 2023. For example, the revised statement of work in the August 6, 2024, amendment provided that "COVID-funded laboratory, surveillance, epidemiology, and informatics personnel may work on other respiratory pathogens and syndromes more broadly, in addition to SARS-CoV-2 and COVID-19, as long as COVID-19 testing or surveillance is included in the effort." That same revised statement of work also stated that "where COVID-19 is referenced, it will now include other respiratory pathogens and syndromes."

58.    The IDCU Grant funds the work of four full-time employees and one vendor.

**Columbus, Ohio**

59.    Defendant CDC, through the Ohio Department of Health, which acted as a pass-through entity for the funds, awarded the City of Columbus Enhanced Operations grant funding for the City's public health department, Columbus Public Health, and for its CelebrateOne initiative, operated out of the mayor's office. Columbus Public Health used this funding to strengthen its disease response, workforce capacity, and health information systems. CelebrateOne used the funding, locally known as the Ohio Health Improvement Zones grant, to reduce infant mortality and improve maternal health in the most underserved zip code in the City of Columbus.

60.    Columbus Public Health first received the funding award for the Enhanced Operations grant on August 1, 2022. This first round of funding lasted through July 31, 2023. Then, on August 1, 2023, Columbus Public Health applied for and received additional Enhanced Operations funds. This initial award was for $2.1 million, to be used by July 31, 2024. Over the coming year, Columbus Public Health received more than $2.7 million in additional funding along with an extension of the grant period until December 31, 2025. Later, on December 24, 2024, Columbus Public Health received another $1.2 million in Enhanced Operations funds to use by

the end of 2025. In total, Columbus Public Health had over $6 million in Enhanced Operations grant funding, to be spent by December 31, 2025.

61.    Columbus Public Health used these funds to hire disease intervention specialists, who conduct infectious disease tracing, investigations, and community response coordination, and upgrade Columbus's electronic health records system. Though the distribution of these grants was spurred by the COVID-19 pandemic, it was clear to Columbus Public Health that the money was not meant to be used solely, or even largely, for purposes related to COVID-19. In fact, the funding was distributed to Columbus Public Health after the end of the declared Public Health Emergency associated with COVID-19. Instead, Columbus Public Health, with permission of the Ohio Department of Health, used the funding to increase their preparedness for any future pandemic or disease outbreak, such as the current measles outbreak. At the time of the mass terminations, Columbus Public Health had more than $3 million left in Enhanced Operations funding and had already planned for the money to be spent by December 31, 2025, on full-time staff, such as Disease Intervention Specialists, and health information system modernization.

62.    Columbus's CelebrateOne initiative received Enhanced Operations federal funding in the form of an Ohio Health Improvement Zones grant. CelebrateOne first received an award of $200,000 in July of 2022 with an initial performance period ending on May 31, 2023. CelebrateOne later received $156,000 in supplemental funds from CDC and an extension on the grant performance period, as well as an additional no-cost extension. In total, CelebrateOne had $356,000 to spend by June 30, 2025. CelebrateOne used CDC funding to contract with community partners that provide critical services related to infant and maternal health, including lactation and breastfeeding services, mental health support, and free prenatal care, among others. The Ohio Health Improvement Zones grant allowed CelebrateOne to provide targeted interventions to the

43232 zip code in Columbus, an underserved area with the highest infant mortality rate in the city. Families in this zip code previously lacked access to healthcare and other support systems that other communities had, but with CDC funding, CelebrateOne was able to fund service providers with an intensive focus on this underserved area. At the time of the termination, CelebrateOne still had $103,000 of federal funds remaining and had already contracted with community partners to use these funds to pay for services through June of 2025.

**Nashville, Tennessee**

63.    In 2021 and 2022, Defendant CDC, through the State of Tennessee, which acted as a pass-through entity for the funds, provided Nashville with two grants related to COVID-19: the ELC grant and the Immunization and Vaccines for Children ("VFC") grant.

64.    Nashville initially received $9 million in VFC funds and later amended and renewed the grant contract for over $4.3 million effective July 2023 through June 30, 2026. The contract included supplemental COVID vaccination funding to support vaccines for children. The VFC funding enabled the creation of Nashville's mobile health unit, or "strike team," which was very effective in reaching communities hardest hit by the COVID-19 epidemic. The strike team discovered and addressed issues beyond the pandemic, including barriers to enrollment to public school due to lack of health services.

65.    Nashville received approximately $26 million in ELC funding, including a renewal for $8.3 million that was meant to last for a grant period of July 1, 2023, through July 31, 2026. This grant provided significant COVID-19 response funding, for contact tracing, laboratory costs, and testing. In partnership with 85 community organizations, Nashville distributed COVID-19 and flu combination tests to residents to help prevent the spread of illness. The ELC grant also provided funding to address homelessness issues, particularly at the height of the pandemic.

66.     In 2021, Nashville applied for and was awarded a total of $3 million through the CHW grant from Defendant CDC. The grant agreement has changed over time, but generally Nashville used the funds to provide COVID-19- related services, testing, contact tracing and immunizations, particularly in high-risk communities. Nashville had been using the CHW grant to fund health screening and resource navigation across five health clinics in the county in partnership with two trusted community partners. It has also planned to incorporate resource navigation and health screening into its homeless services.

**Kansas City, Missouri**

67.     Defendant CDC awarded four total grants to Kansas City in connection with COVID-19. One was awarded directly to Kansas City: the National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities ("Health Disparities") grant. Three were awarded through the State of Missouri, which acted as a pass-through entity for the funds, provided Kansas City with three grants related to the COVID-19 pandemic: the ELC-ED Epidemiology & Laboratory Capacity Enhancing Detection Expansion ("ELC-ED") grant, the CHW grant, and the COVID-19 Adult Vaccination Supplemental ("AVS") grant.

68.     The ELC-ED grant was first awarded in 2021 and set to expire in June of 2023. However, it was later renewed through July 31, 2025, with a total grant amount of $3.8 million. Kansas City used the ELC-ED grant as part of a multi-year project to develop capacity to test for infectious diseases like COVID-19, influenza, and measles at the city level, rather than relying on county facilities. Kansas City presently does not have the capacity to run these tests, and has to send results to the state government in Jefferson City which delays time for test results. Pursuant to this project, Kansas City used ELC-ED funds to train staff on testing procedures and to undergo

a certification process for its facilities. It was at the final step of purchasing lab equipment for its facilities when the ELC-ED grant was cancelled.

69.     The CHW grant awarded Kansas City $607,200 in 2023, and it was renewed for another $607,200 in 2024 for a grant period ending in June 2025. The City used CHW funds to hire community navigators to screen residents of public housing complexes for common untreated health issues, such as high blood pressure, and connect them with access to health care.

70.     The AVS grant funded vaccinations for uninsured adults. The funding was initially used primarily for COVID-19 vaccinations, but more recently Kansas City used it to administer other vaccinations, such as the Hepatitis B vaccination.

71.     In 2021, Kansas City applied for and received $3,674,514 from Defendant CDC through the Health Disparities grant. It was originally scheduled to end May 31, 2023, but was ultimately extended until May 31, 2025. Kansas City used this grant to train workplaces, community-based organizations, and other entities on best practices to avoid the spread of illness, including how to use personal protective equipment. Funding also supported public education on vaccinations, including the importance of the COVID-19 vaccine and the measles vaccine.

**AFSCME Members**

72.     AFSCME and its members around the country have felt the brunt of these grant cancellations in various ways: layoffs and terminations from employment, reshuffling into new jobs, and more. These include not only AFSCME-represented employees who have been terminated from their jobs working for Plaintiff City of Columbus' Public Health Department, but also numerous state and local employees represented by AFSCME in other states and municipalities.

24

73.     For example, the State of Alaska received a number of HHS COVID-era grants, valued at $172 million. One, worth $40 million, funded the immunization and vaccination of children. Another provided $96 million to improve epidemiology laboratories in the state that work to control the spread of infectious diseases. Alaska also applied for and received an award under the Health Disparities grant. The Alaska State Department of Health used these grants to administer programs for improving public health access and increasing laboratory capacity for monitoring disease rates, and to hire employees to create and distribute public health programming related to vaccination. Much of the CDC funding used by the Alaska State Department of Health was set to expire in 2027. However, due to the early termination of this funding, 23 employees represented by AFSCME at the Alaska State Department of Health were laid off. Some of these employees were moved to new positions within the department that they had not applied for or sought, while others were terminated from employment entirely.

74.     Another example: Jackson County, Ohio also received Enhanced Operations funds from CDC, through the Ohio Department of Health. Jackson County Health Department received the CHW grant on August 31, 2021, totaling $4.4 million. This funding was scheduled to expire on August 30, 2025. Over the past four years, this funding was used to hire community health workers who engaged in public health outreach, vaccination, and pairing individuals with healthcare providers in counties across Ohio. Although the funding was initially allocated during the height of the COVID-19 pandemic, its purpose was to bolster community resilience generally for public health emergencies, not limited to COVID-19. When this funding was cut by HHS, three AFSCME members were laid off and are currently out of work receiving no pay.

**III.    Congress and Defendants continue funding the grants, even after the COVID-19 "public health emergency" declaration expires in May 2023.**

75.    On May 11, 2023, the HHS Secretary's final extension of the public health emergency declaration pursuant to 42 U.S.C. § 247d expired. However, the effects of the COVID-19 pandemic continued, as did Congress's desire to promote public health measures related to COVID and pandemics generally, as well as preparations for future public health outbreaks and crises.

76.    Subsequent Congressional action reaffirmed what was already clear: that the funding provided by the COVID-19-related appropriations laws was to remain available regardless of COVID-19's continuing status as a "pandemic" or as a declared "public health emergency." In early June 2023, shortly after the expiration of the public health emergency declaration, Congress canceled $27 billion in related appropriations through the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, Div. B, 137 Stat. 10, 23 (June 3, 2023). In that Act, Congress reviewed various COVID-related laws and rescinded those funds that it determined were no longer necessary. *Id.*, Div. B §§ 1–81. Congress chose not to rescind the funding for the grants at issue in this case.

77.    Defendants implicitly acknowledged that the funding for these grants remains available even after the COVID-19 public health emergency declaration expired in May 2023. Defendants never attempted to terminate the grants until March 2025 and continued to affirm their support of the programs funded by the grants. For example, Defendants extended a number of Plaintiff Harris County grants' end dates. In February 2024, Defendants extended Embrace HOPE grant's end date to May 2026. Defendants granted an additional $3.7 million in funding for the CHW Grant in July 2023, and in July 2024 they extended the grant period to August 2025.

IV.    **Defendants suddenly eliminate COVID-19-related grant programs and terminate Plaintiff Local Governments' grant funding.**

A.    **Defendants eliminate public health funding through a mass purge of "COVID-related" CDC grants.**

78.    On March 24, 2025, in connection with the Mass Termination Decision, Defendants terminated approximately $11.4 billion in CDC grants to states, localities, and other entities. Plaintiff Local Governments' grants were among those terminated.

79.    The terminations are nationwide in scope, have a massive financial impact, and were abruptly implemented. Defendants did not engage in any individualized consideration of the affected grants. Instead, Defendants apparently deemed the CDC grant programs to be "COVID-related" and designated them for immediate elimination based on one criterion: their funding derived from COVID-era appropriations acts passed by Congress.

80.    On March 25, 2025, HHS Director of Communications Andrew Nixon issued a public statement confirming that the terminations were all based on the single Mass Termination Decision. The statement read: "The COVID-19 pandemic is over, and HHS will no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago. HHS is prioritizing funding projects that will deliver on President Trump's mandate to address our chronic disease epidemic and Make America Healthy Again." Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, https://perma.cc/35SS-V2WE. The statement's reference to Defendants' "prioritizing funding [alternative] projects" suggests that Defendants intend to use the money that was appropriated for the terminated grants for other purposes, in contravention of Congress' appropriations.

81.    On March 29, 2025, a spreadsheet was uploaded to the HHS website titled "HHS_Grants_Terminated."[3] The document identifies over a thousand grants terminated by HHS, including those that were part of the mass termination of CDC grants on March 24. The spreadsheet lists detailed information for each grant. The last two columns are labeled "Presidential Action" and "For Cause (Put X if applicable)." Notably, only one of the grants listed is identified as having been terminated "For Cause," and it was not a CDC grant terminated in accordance with the Mass Termination Decision. All of the CDC grants in the document list "N/A - Departmental Authority" under "Presidential Action." The government has continued to update this list through the date of filing of this complaint. All of the CDC grants in the document continue to be designated "N/A – Departmental Authority" instead of "for cause."

82.    The Mass Termination Decision, and Defendants' implementation of that decision, inflicted massive disruption upon grant recipients and hampered critical public health work. The grant terminations were effective immediately, and Defendants gave no prior notice or advance warning to grantees of their decision, which deprived Plaintiff Local Governments and others of the opportunity to plan for a huge loss of funding.

83.    Defendants' Mass Termination Decision did not entail any particularized consideration of the targeted grants, let alone reasoned evaluation of the permissible grounds for terminating the grants. As already noted, none of the CDC grants that Defendants terminated are identified in the HHS spreadsheet as having been terminated "for cause." And, as demonstrated by the notices of termination received by Plaintiff Local Governments, and by public reporting,

---

[3] The version of the document uploaded on March 29, 2025 is located at https://perma.cc/V73X-RP5J. The government continues to update this list at https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

Defendants recited essentially the same boilerplate reason for terminating all the grants. "The CDC reviewed a list of HHS-provided Covid grants and cooperative agreements and identified the *programs* that were no longer needed." Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, https://perma.cc/35SS-V2WE.

### B. Defendants implement the Mass Termination Decision and notify Plaintiff Local Governments of the termination of their grants.

84.    Defendants' terminations of Plaintiff Local Governments' grants resulted directly from the implementation of the Mass Termination Decision. Because Plaintiff Local Governments' grants were funded by money appropriated by Congress in COVID-related appropriations laws, including the CARES Act and the CRRSAA, Defendants marked them for elimination, without any consideration of whether termination was permissible or warranted.

85.    On March 25, 2025, Plaintiff Harris County received notice that Defendants had terminated the Embrace HOPE Grant, effective immediately. The amended notice of award stated in relevant part:

> **Termination**: The purpose of this amendment is to terminate this award which is funded by COVID-19 supplemental appropriations. The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of this award is effective as of the date set out in your Notice of Award.
>
> No additional activities can be conducted, and no additional costs may be incurred. Unobligated award balances will be de-obligated by CDC.

The termination notice forbids the grantee from performing compensable work after the date indicated.

86.     On March 25, 2025,  Harris County received notice that Defendants had terminated the CHW Grant. The amended notice of award contained a termination provision with language identical to that contained in the Embrace HOPE Grant termination. It, too, listed an effective termination date of March 24, 2025.

87.     On March 25, 2025, the Texas DSHS notified Harris County that Defendants had terminated the IMMU and IDCU Grants. Texas DSHS wrote that it was "issuing this notice to pause all activities immediately" because it had been "notified that the federal grant funding for Immunization/COVID Epidemiology Laboratory Capacity (ELC/COVID), and Health Disparities/COVID, is terminated as of March 24, 2025."

88.     The termination notices for the Embrace HOPE and CHW Grants also contain the following directive requiring complete closeout within 30 days:

> **Closeout**: In order to facilitate an orderly closeout, we are requesting that you submit all closeout reports identified below within thirty (30) days of the date of this NoA. Submit the documentation as a "Grant Closeout" amendment in GrantSolutions. The reporting timeframe is the full period of performance. Please note, if you fail to submit timely and accurate reports, CDC may also pursue other enforcement actions per 45 CFR Part 75.371.

The regulations, however, provide 90 days for closeout. *See* 45 C.F.R. § 75.381.

89.     On March 26, 2025, Columbus Public Health received email notice that CDC was terminating its Enhanced Operations grant more than eight months early. Columbus Public Health was informed that "[o]n March 25, 2025, Ohio Department of Health (ODH) staff were notified through revised Notices of Award placed in the [grant] portal that" the Enhanced Operations grant was "revised to change the period of performance end date to March 24, 2025."  The notice indicated that the Ohio Department of Health had been given less than 30 days to submit its closeout report and thus Columbus Public Health would need to prepare and submit its final paperwork by April 4, 2025.

90.    On March 25, 2025, CelebrateOne received an email notice from the Ohio Department of Health, notifying it that the federal government had unilaterally terminated several CDC grants to the state, and that the Ohio Health Improvement Zones funding was included in those terminations. CelebrateOne was told that the grant had been cancelled as of the previous day, March 24th, and that, due to the premature cancellations, the Ohio Department of Health could not compensate contractors for any work completed after March 24, 2025.

91.    Similarly, on March 25, 2025, Nashville received an amended "Notice of Award" from CDC dated March 24, 2025, terminating its CHW grant for cause. The termination language in the notice was identical to that received by Harris County.

92.    Nashville also received a short memorandum dated March 25, 2025, from the State of Tennessee that both of its passthrough grants, ELC and VFC, were terminated effective March 24, 2025. According to the memorandum, "[d]ue to [a] decision by the federal government, the funding source for [Nashville's] services ha[d] been eliminated." The Tennessee Department of Health acknowledged that this was an "abrupt shift in plans" and reiterated that this was solely "due to the decision to engage in an immediate termination of funding from the federal government." Nashville was instructed to stop all activities related to these grants and to submit all invoices by Friday, April 11, 2025.

93.    On March 25, 2025, Kansas City heard from colleagues in other cities that CDC funding had been terminated and checked the federal grant portal for status, only to locate the notice of termination. The notice was effective the previous day, March 24, and indicated that their Health Disparities grant was terminated "for cause" with the cause being "the end of the pandemic." The termination language in the notice was identical to that received by Harris County and Nashville and reproduced above.

94.     On March 25, 2025, Kansas City also received communications from the Missouri Department of Health and Senior Services similarly notifying them that their CHW and AVS grants had been terminated, and on March 28, Kansas City received a letter indicating the same regarding the ELC-ED grant. The Missouri Department of Health and Senior Services had not received advance notice of the CDC grant terminations and stated in its communications to Kansas City that it was "not clear if additional awards will be terminated in the future." The Department acknowledged that the "unexpected termination of awards by CDC leaves the department and [their] valued partners in a very difficult situation," and thanked Kansas City for its "partnership and understanding."

## C. Defendants also notify other public health employers of AFSCME members of the terminations of their grants.

95.     AFSCME represents public employees affected by these grant terminations at state and local governments around the country, in addition to those at Plaintiff City of Columbus. To take just one example of an affected local government employer of AFSCME members, on March 24, 2025, Jackson County, Ohio's "Community Health Workers for COVID Response and Resilient Communities" (CCR) grant was terminated. This grant was worth $4 million.

96.     To take one example of a state government employer of AFSCME members, on March 24, 2025, the Alaska Department of Health was notified that the following CDC grants, originally awarded to it during the COVID-19 pandemic, would be terminated: the ELC grant, the VFC grant, and the Health Disparities grant. These grants allocated $172 million to the State of Alaska.

## D. Defendants did not terminate the grants "for cause."

97.     Defendants stated that "the end of the [COVID-19] pandemic" constituted "cause." Defendants do not identify any authority in support of the Mass Termination Decision.

Termination notices allude vaguely, without citation, to "HHS regulations." 45 C.F.R. § 75.372(a)(2)[4] does permit for cause termination, but Defendants did not cite this regulation as their basis for termination. Nor could they: the end of the COVID-19 public health emergency does not satisfy it.

98.     Nothing in 5 C.F.R. § 75.372(a)(2)'s text, history, or interpretation supports Defendants' assertion that the "end of the [COVID-19] pandemic" supports a "for cause" termination. When HHS has examined what "for cause" means in the past, it has explained that it generally involves noncompliance of the grantee. Even though Plaintiff Local Governments were in compliance, Defendants' apparent classification of their grant terminations as being "for cause" likely triggers the requirement that "the HHS awarding agency must report the termination to the OMB-designated integrity and performance system" pursuant to 45 C.F.R. § 75.372(b). Grantees may also have requirements to report compliance to their respective states. Nashville, for example, is required to certify to the State of Tennessee that it has "not within a three (3) year period preceding… had one or more public transactions (federal, state, or local) terminated for cause or default." A failure to so certify may make Nashville less competitive for future grant awards. Defendants' baseless and illegal Mass Termination Decision thus has serious potential consequences for future grant-funding opportunities.

99.     Defendants' stated reason for the Mass Termination Decision—the claim that the COVID-19 pandemic is "over" and that "COVID-related grants and cooperative agreements" are therefore "no longer necessary"—is a policy disagreement with Congress. That such a

---

[4] 45 C.F.R. § 75.372(a)(2) lists four grounds for terminating a grant: (1) if the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; (3) "with the consent of" the grantee; and (4) by the grantee. 45 C.F.R. § 75.372(a). Defendants did not invoke any of the other grounds, and none applies to Plaintiff Local Governments.

disagreement is not a "for cause" basis for terminating grants is underscored by Defendants' grant termination spreadsheet, which indicates that these grants were terminated based on "Departmental Authority," and not "for cause."

**V.    Defendants' elimination of COVID-19-related grant programs—and the resultant terminations of grants—has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs.**

100.    Defendants' immediate and unlawful termination of millions of dollars in grant funding that provides critical support to Plaintiff Local Governments' vital public health programs is causing, and will continue to cause, significant and irreparable harm to Plaintiffs. For years, Plaintiff Local Governments have operated their programs in reliance on the fact that, as long as they complied with the terms and conditions of the grants, they would receive the promised funds for the time periods stated in the awards.

101.    The sudden loss of these funds creates immediate harm to Plaintiff Local Governments' crucial public health projects. It threatens Plaintiff Local Governments' ability to protect the health of their residents and makes Plaintiff Local Governments vulnerable to imminent public health threats like the ongoing measles outbreak in Texas and elsewhere across the country. *See Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 702 (E.D. Pa. 2022) ("An increased risk of contracting a life-threatening disease like COVID-19 easily constitutes an irreparable injury.").

102.    Defendants' classification of Plaintiff Local Governments' grants as having been terminated "for cause" will likely have an adverse impact on consideration of Plaintiff Local Governments' applications for future federal funding opportunities.

103.    In addition, the terminations are imposing immediate and irreparable constitutional harms on Plaintiffs. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017)

(recognizing irreparable harm in the form of constitutional injury due to violation of the separation of powers doctrine and deprivation of Tenth and Fifth Amendment rights).

104.    It is also unclear whether the appropriated funds will remain available. Defendants' public statements have indicated that the funds will be used for other purposes, likely making their recovery impossible.

105.    Plaintiff Local Governments are not named plaintiffs in *Colorado v. HHS*, No. 1:25-cv-121 (D.R.I. complaint filed Apr. 1, 2025), and they have not received any relief from the injunctions  entered and in that case, *id.* (TRO entered Apr. 5, 2025, ECF No. 54; motion for preliminary injunction filed Apr. 8, 2025, ECF No. 60). As to the members of Plaintiff AFSCME, while AFSCME members in states covered by the *Colorado* litigation have seen some benefit from that case in those states—for example, AFSCME members in Washington State who had been told they would be laid off have since been informed those layoffs are paused as a result of the litigation—AFSCME members outside the covered states continue to be harmed, including but not limited to the AFSCME members terminated by Plaintiff City of Columbus's Public Health Department, and only an order in this case can provide the funds necessary to redress those AFSCME members' harms.

**Harris County, Texas**

106.    Defendants' termination of Plaintiff Harris County's Embrace HOPE Grant threatens to drastically decrease the County's disease surveillance capacity, which will undercut its ability to rapidly detect emerging diseases and outbreaks and develop timely public health interventions to safeguard the health and well-being of Harris County residents. This will lead to slower public health response and interventions (vaccine distribution, outreach, awareness campaigns, etc.) to prevent the spread of communicable diseases and ensure the safety of county

residents. Without funding, Harris County's wastewater surveillance program will cease in its entirety.

107.    Beginning in late January 2025, Texas began to see a deadly outbreak of measles. Hundreds of cases have been identified, with many resulting in hospitalization. Two school-aged children who lived in Texas have died. Measles is a highly contagious disease, and cases of measles have recently been detected in Harris County. Losing the ability to perform wastewater monitoring will diminish Harris County's ability to respond effectively to this public health crisis.

108.    The terminated grant funding has also enabled Harris County to conduct epidemiological and surveillance activities for over 80 notifiable disease conditions, including measles, outbreaks of sexually transmitted infections, mpox, Zika, and tuberculosis. It is especially important that Harris County continue to be able to monitor and respond to outbreaks of these diseases due to the county's large population and status as an international and domestic travel hub.

109.    Defendants' termination of Harris County's CHW Grant will also directly impair the County's community outreach efforts, including the HCPH Connect and Outreach Programs. Through the HCPH Connect program, Harris County deploys a team of state-certified resource navigators who provide vulnerable county residents with both over-the-phone and in-person, one-on-one assistance in applying for federal, state, and local benefit programs including: SNAP food benefits; WIC program; TANF cash help; various healthcare benefits including Medicaid, Medicare Savings Program, and CHIP to help residents pay for medical bills and medications; the Healthy Texas Women program, which helps individuals pay for health exams, screenings, and family planning services; and the Harris Health System's Financial Assistance Program, which provides financial assistance for medical care for low-income county residents who have no other

public or private health care benefits. HCPH Connect also secures linkages to additional resources and service providers for community members' needs. Without funding, the HCPH Connect program will no longer be able to operate due to the loss of staff and the team and will not be able to support residents, adversely affecting nearly 2,000 community members who apply for state and federal benefits annually.

110.    The HCPH Outreach Team consists of CHWs who engage with community members in many important ways. Through community events, they partner with businesses and organizations to engage in public spaces such as grocery stores, bakeries, flea markets, health fairs, food distribution sites, schools, clinics, and universities. They also distribute "care kits" that contain up-to-date information in both English and Spanish on COVID-19, Mpox, other HCPH programs, and additional community resources. They provide in-person and virtual presentations in English and Spanish, engage in community canvassing and phone calls, publish a bi-monthly newsletter, and run conferences, workshops, and internships. Without these grants, the number of events the Outreach team can sustain and support will be reduced, ultimately lowering the overall number of community members they can see each year. In turn, this will lead to negative public health outcomes, including the potential spread of highly contagious diseases.

111.    Defendants' termination of Harris County's IMMU Grant threatens to significantly reduce Harris County's vaccination outreach activities. This will decrease vaccine access for many vulnerable populations in Harris County, including children, elderly community members, individuals with compromised immune systems, and individuals with chronic conditions. Harris County's disease helpline (call center) will have significantly reduced ability to offer necessary services to the community and support broad services across HCPH, including scheduling clinic

and vaccines appointments, providing disease guidance, and supporting community needs during disasters.

112.     Defendants' termination of the IDCU Grant reduces Plaintiff's ability to rapidly detect emerging diseases and outbreaks across Harris County. This will lead to slower public health responses and interventions (vaccination distribution, outreach, and awareness campaigns, etc.) to prevent the spread of communicable diseases and ensure the safety of the county's residents. Defendant's termination of the Embrace HOPE Grant exacerbates these effects.

113.     The terminations create severe and immediate budget uncertainty for Harris County and interfere with the county's ability to budget and plan for the future and to properly serve residents. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 508, 537 (recognizing immediate, irreparable harm due to order that created "budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions" and explaining that this "uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents" and that counties' need to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services . . . will cause the Counties irreparable harm").

114.     The terminations are requiring Harris County to divert its limited resources to immediately respond to the chaos created by Defendants' actions; they are likely to result in the loss of dozens of grant-funded employees; and they threaten imminent and irreparable injury to Plaintiff's reputation and goodwill among adversely affected employees, residents who lose access to vital health services, and vendors providing goods and services in support of grant-funded work.

**Columbus, Ohio**

115.    Due to the grant terminations, Columbus Public Health was forced to terminate, due to lack of funding, eleven employees working in infectious disease investigations: nine disease investigation specialists and two office assistants. These critical staff members were hard at work protecting the community from measles and other infectious disease outbreaks. Without them, Columbus Public Health has only one disease investigation specialist left. These layoffs have significantly weakened Columbus Public Health's ability to conduct disease investigation and mitigation during an active measles outbreak in the state of Ohio. Additionally, Columbus Public Health has also been forced to cover the expenses of six additional staff members, previously largely funded with CDC dollars, through its general fund, pulling funding away from other important operational and service budgets.

116.    Without the previously awarded CDC funds, Columbus Public Health will also no longer be able to modernize its health information system. Columbus Public Health is currently using an electronic health information system different and more out of date than that of most hospitals and health centers. This makes it difficult for Columbus Public Health clients to access medical records regarding care received at city-run clinics when they travel or visit other providers. Without centralized electronic health records, patients that turn to a new hospital or clinic for urgent medical care may struggle to receive efficient and effective care because their providers cannot access up to date health information including allergies and prior existing health conditions. Without the Enhanced Operations funding, Columbus Public Health cannot upgrade to a modern record-keeping system that allows for providers to easily share critical health and treatment information between different clinics and hospitals.

117.    Similarly, parents and children in Columbus's most underserved neighborhood will suffer due to the early termination of CelebrateOne's federal grant. CelebrateOne used Enhanced Operations funding to target critical healthcare and other services to a community that faced significant barriers in accessing prenatal and infant care and had the highest infant mortality rate in the city. Without Enhanced Operations grant funding, CelebrateOne will be unable to offer important and effective interventions that are proven to lower infant mortality, and families in the neighborhood will be left without sufficient services and care.

118.    AFSCME members have been terminated due to the grant terminations. Eleven bargaining unit employees of Columbus Public Health represented by AFSCME, including three AFSCME members, were terminated effective May 2, 2025. Columbus Public Health has agreed that it will prioritize these employees to fill vacancies as funding permits. Without the grant funds previously allocated to Columbus Public Health, these AFSCME members are without employment and pay, and can only hope to be reinstated to their previous jobs if funding returns.

**Nashville, Tennessee**

119.    As a result of the loss of ELC and VFC grant funds, Nashville has had to lay off three employees and have had several programs disrupted.

120.    One employee funded through the ELC grant managed COVID and flu testing in partnership with 85 organizations was let go, and the loss of funding has forced an end to the program. This means that thousands of tests will not be distributed through trusted community groups and at-risk populations in Nashville will have less protection against COVID-19.

121.    Nashville's mobile health unit, which the VFC helped create during COVID, will now have less reach than planned—both because the team is no longer able to purchase the vehicle they planned to use as a mobile medical unit, but also because they had to quickly find alternate

funding for the staff under the grant. At this juncture, the new funding tied to staff means that they will no longer be able to attend certain community gatherings they had previously served or provide services to children outside of the public school system. This budget disruption could mean a decrease in services elsewhere a result of the budget adjustments, including the school nursing program.

122.    Nashville Public Health lost funding for sixteen full time positions as a result of the termination of its CHW grant.

123.    Nashville conducted much of the work for this grant through two local clinics, so in addition to losing its own staff, the community health clinic partners are also harmed by Nashville's inability to continue to provide funding for their staff.

124.    The staff under the CHW grant conducted health and resource barrier screenings across the city—providing hundreds of resource navigations and screenings a year, and all of these efforts are now stymied.

125.    Nashville also had a homelessness services project that they had already begun to launch—including advertising six open positions—that can no longer move forward. These positions would have provided essential resource navigation and health screening for the unhoused population in Nashville.

126.    In the grant awards process, the State of Tennessee requires Nashville to certify that they "have not within a three (3) year period preceding… had one or more public transactions (federal, state, or local) terminated for cause or default." Because the CHW grant termination designates the termination as "for cause", Nashville can no longer certify to this effect and will have to include an addendum for the next three years to explain this termination.

**Kansas City, Missouri**

127.    Without its ELC-ED funding, Kansas City's plan to test for infectious diseases at the city level have been frustrated. It already used funds to train staff on testing and obtain required certifications for the labs. Kansas City needed only to complete the purchase of the actual lab equipment, which it planned to do before the June 30, 2025 expiration of the funds. Now it cannot purchase this equipment, which renders useless its significant prior work on this project.

128.    Kansas City has also lost funding for its adult vaccination program due to the loss of the AVS grant. This program offered vaccinations to protect against a variety of serious illnesses, such as Hepatitis B.

129.    Kansas City is further unable to expand its successful community navigator program, which was funded by the CHW grant. Because of the program's success in improving access to preventative health care, Kansas City successfully applied for other funding to grow the program, but that additional funding is now merely keeping the existing program afloat.

130.    Finally, Kansas City has also been forced to cancel its public health education programs, funded by the Health Disparities grant, that trained workplaces on avoiding the spread of illnesses. The reduction and cancellation of these programs make Kansas City more vulnerable to the spread of any infectious disease.

**AFSCME Members at Non-Plaintiff Public Health Employers**

131.    AFSCME members employed in public health by state and local governments other than the Plaintiff Local Governments are also being irreparably harmed. For example, as a result of its loss of federal funding from the grants at issue in this case, Jackson County Health District laid off three grant-funded employees and AFSCME members, effective on April 18,

2025. These employees were Community Health Workers who engaged in public health outreach to improve community resilience to public health emergencies. The loss of funding has resulted in three AFSCME members' loss of employment and pay in Jackson County.

132.    To take a state government example, due to its loss of over $50 million in unspent federal grant funding at issue in this case, the Alaska State Department of Public Health has laid off AFSCME-represented employees across the state of Alaska, including in Anchorage, Juneau, and Wasilla. Twenty-three of these employees were members of AFSCME. Sixteen of these AFSCME members have lost their jobs entirely, with their last day of working having been April 4, 2025. These employees included Public Health Specialists, Nurse Consultants, Program Coordinators, Research Analysts, and Administrative Assistants; they have lost their jobs, their benefits including health insurance, and their ability to perform the meaningful public health service to which they had dedicated their lives. The other seven AFSCME members were given the option to be reassigned to other positions they had not applied for or requested, and all seven were reassigned, forcing them to lose the employment they initially applied for and work in unfamiliar and less favorable jobs moving forward.AFSCME as an organization is also experiencing irreparable harm through the loss of its members' public health employment. The greatest loss to the union from the loss of these members is the loss of seeing colleagues and fellow public servants out of work and unable to help the communities they love, but there are other practical harms to the union as an organization as well: lost dues revenue that the union relies upon to perform its critical representational work and, due to the resulting loss in size to its bargaining units, reduced strength at the bargaining table where it negotiates wages, benefits, and other erms and conditions of employment for these public servants.

## CLAIMS FOR RELIEF

### <u>Count I</u>

### U.S. Constitution – Separation of Powers
### (Against Defendants Kennedy and Monarez)

133.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

134.    The federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

135.    The Constitution separates the powers of the federal government "into three defined categories, Legislative, Executive, and Judicial." *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). The purpose of the constitutional separation of powers is to "diffus[e] power the better to secure liberty." *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

136.    The Constitution vests "[a]ll legislative Powers" exclusively in Congress. U.S. Const., art. I, § 1. The Executive Branch has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause) (specifying the President's limited role in enacting laws).

137.    The Constitution also grants the "power of the purse"—the authority to raise and spend public money—exclusively to Congress. The Spending Clause gives to Congress alone the power to raise revenue and to "pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. The Appropriations Clause reinforces Congress's exclusive control over the public fisc: it prohibits the payment of any money from the Treasury unless the specific funds in question have been "appropriated"—that is, authorized for

expenditure for an identified purpose —by an act of Congress. *Id.* § 9, cl. 7. The "fundamental" purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (observing that the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department").

138.    The separation of powers prohibits the Executive from usurping Congress's exclusive authority to legislate, to spend, and to appropriate public funds. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("[The] Constitution exclusively grants the power of the purse to Congress, not the President."). The Executive can no more refuse to spend money that Congress has directed it to spend—in the amount and for the purpose that Congress has specified in an appropriations act—than it can spend money without Congressional approval. If it does so, the Executive violates the separation of powers and its own constitutionally mandated duty to "take Care that the Laws be faithfully executed." Art. II, § 3.

139.    As Executive Branch officers, Defendants Kennedy and Monarez have no constitutional authority to unilaterally amend or repeal any appropriations laws, including the CARES Act, the CRRSAA, and other acts passed during the height of the COVID-19 outbreak. Nor has Congress given Defendants any such power by statute. *Cf.* Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 682 *et seq.* (specifying procedures, not applicable here, by which the President may propose certain withholdings of budget authority, subject to Congressional review). Even if the Executive has "policy reasons" "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it "does not have

unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (noting that, even in circumstances where statute permits the President to "propose the rescission of funds," it remains with Congress to "decide whether to approve a rescission bill" (citing 2 U.S.C. § 683 and *Train v. City of N.Y.*, 420 U.S. 35 (1975))).

140.    Defendants' Mass Termination Decision, and its implementation, constitute a unilateral cancellation of Congressional appropriations by the Executive and therefore violates the constitutional separation of powers. By terminating grant programs *en masse* because Congress authorized the funding of those programs through "COVID-related" laws, Defendants have effectively repealed those laws, in contravention of Congress's exclusive power of the purse and the Executive's duties under the Take Care Clause.

141.    Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision. Plaintiffs are further entitled to a declaratory judgment that the Mass Termination Decision and its implementation are unlawful and violate the constitutional separation of powers.

## Count II

### U.S. Constitution – Spending Clause
### (Against Defendants Kennedy and Monarez)

142.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

143.    The federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

144.    Congress's exercise of its Spending Clause power is limited. Congress may not place conditions on grants to state and local governments unless those conditions are expressly and unambiguously stated in advance. *Pennhurst State Sch. and Hosp. v. Haldermann*, 451 U.S. 1, 17 (1981) (explaining that there can be no voluntary and knowing acceptance if the recipient of

46

federal funding "is unable to ascertain" the conditions). The conditions must also relate to the federal interest in the particular program. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).

145.    What the Spending Clause prevents Congress itself from doing, it also *a fortiori* prohibits Executive Branch officers—including Defendants Kennedy and Monarez—from doing.

146.    Defendants' Mass Termination Decision, and their implementation of it, violates the Spending Clause because it retroactively conditions the receipt of federal funds in a manner unrelated to the federal interest in the affected programs.

147.    The Mass Termination Decision imposes a retroactive and ambiguous condition on the affected grant programs: it unilaterally alters the terms of those programs, requiring their immediate and total cancellation based on Defendants' sudden announcement of their opinion that the programs are no longer necessary because the COVID-19 pandemic has ended. This condition was not expressly or unambiguously stated in advance; indeed, it contravenes the relevant Congressional appropriations acts, which do not make funding contingent on COVID-19's status as a pandemic or authorize unilateral termination of funding based on Defendants' views about COVID-19. The condition also contradicts the federal government's reaffirmations of the affected programs after the COVID-19 public health emergency declaration expired in May of 2023.

148.    The condition imposed by the Mass Termination Decision is not reasonably related to the federal interest in the affected programs. No authority, including the applicable appropriations laws, makes COVID-19's status as a "pandemic" relevant to the accomplishment of the grant programs' purposes. In fact, that condition contradicts the federal interest in the affected programs, which are intended to support a range of public health initiatives, including long term investments in public health infrastructure.

149.    Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision. Plaintiffs are further entitled to a declaratory judgment that the Mass Termination Decision and its implementation are unlawful and violate the Constitution.

## Count III

### Equitable *Ultra Vires* Claim
### (Against Defendants Kennedy and Monarez)

150.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

151.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

152.    Defendants Kennedy and Monarez lacked constitutional and statutory authority to issue or implement the Mass Termination Decision. As explained above, their actions violate the Constitution's separation of powers, exceed the limits of the Spending Clause, and have no basis in any federal statute.

153.    Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision. Plaintiffs are further entitled to a declaratory judgment that Defendants' actions, including the issuance and implementation of the Mass Termination Decision, are unlawful and exceed Defendants' constitutional and statutory authority.

## Count IV

### APA – Defendants' Mass Termination Decision – Unconstitutional and Contrary to Statute
### (Against All Defendants)

154.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

155.    Defendants' Mass Termination Decision, and its implementation, constitutes final agency action subject to APA review.

156.    The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(C).

157.    The Executive Branch has no inherent constitutional authority to amend or repeal legislation, including by refusing to spend funds in contravention of Congressional appropriations. Defendants' Mass Termination Decision, and its implementation, does just that: it eliminates, wholesale, federal grant programs because they are funded through COVID-related appropriations laws. Defendants' assertion that the grant programs are no longer necessary is, at most, an ordinary policy disagreement and does not give Defendants "unilateral authority to refuse to spend the funds" that Congress has appropriated. *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

158.    Defendants' Mass Termination Decision, and its implementation, violates the constitutional separation of powers, and limitations on the Spending Clause power, and is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

159.    Defendants' Mass Termination Decision and its implementation is also unauthorized by statute. It defies the relevant appropriations acts and is not permitted by any other statute, including the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 682 *et seq*. Defendants' nationwide termination of billions of dollars in critical public health funding also runs afoul of the major question doctrine, which requires Congress to "speak clearly" if it intends to authorize agencies to exercise powers of "vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021).

160.    Defendants' Mass Termination Decision, and its implementation, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and contrary to law. 5 U.S.C. § 706(2)(A), (C).

161.    Accordingly, Plaintiffs are entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5 U.S.C. § 706. Plaintiffs are also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Plaintiffs are further entitled to a declaratory judgment that the Mass Termination Decision is contrary to law, contrary to constitutional right and power, outside of Defendants' statutory authority, and violates the APA.

<u>Count V</u>

**APA – Defendants' Mass Termination Decision – Violation of Agency Regulations
(Against All Defendants)**

162.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

163.    An agency violates the APA's bar on arbitrary and capricious action, 5 U.S.C. § 706(2)(A), "if it acts in a manner that is contrary to its own regulations." *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.). An agency "is not free to 'ignore or violate its regulations while they remain in effect.'" *Id.* (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)); *accord United States v. Nixon*, 418 U.S. 683, 693–96 (1974); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

164.    The sole authority that Defendants allude to in support of the Mass Termination Decision and its implementation is a regulation, issued by HHS, which states that a "Federal

award may be terminated . . . for cause." 45 C.F.R. § 75.372(a)(2) (the "HHS For-Cause Regulation"). But nothing in that regulation's history or prior interpretation by HHS supports Defendants' use of it to terminate federal grant programs *en masse*, and in contravention of Congressional mandate, in order to advance their own policy views about COVID-19 or the continuing worth of critical public health programs.

165.    Because the HHS For-Cause Regulation does not authorize Defendants' Mass Termination Decision and its implementation, those agency actions are "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

166.    Accordingly, Plaintiffs are entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5 U.S.C. § 706. Plaintiffs are also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Plaintiffs are further entitled to a declaratory judgment that the Mass Termination Decision is arbitrary, capricious, otherwise not in accordance with law, and violates the APA.

## Count VI

### APA – Defendants' Mass Termination Decision – Arbitrary and Capricious
### (Against All Defendants)

167.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

168.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action violates this requirement

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

169.    Defendants' Mass Termination Decision, and its implementation, is arbitrary and capricious for multiple reasons. For example, Defendants' reliance on the purported end of COVID-19's status as a "pandemic" for its decision to terminate the funding at issue is unexplained and inconsistent with appropriations laws and Congressional and agency actions following the expiration of the COVID-19 public health emergency declaration in May of 2023.

170.    Defendants' stated reason for the Mass Termination Decision is also unreasonable on its face. Defendants stated that the purpose of the terminated grant programs is to ameliorate the effects of COVID-19, and then asserted in conclusory fashion that the end of COVID-19's "pandemic" status negates that purpose, even though that status says nothing about the continuing *effects* of COVID-19 or the need to ameliorate those continuing effects.

171.    Congressional and agency actions have also made clear that the grant programs were intended to respond to the long-term effects of the COVID-19 outbreak and to advance broader public health purposes beyond COVID-19, including investment in public health infrastructure. Defendants failed to consider these important aspects of the problem when issuing and implementing the Mass Termination Decision.

172.    Accordingly, Plaintiffs are entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5 U.S.C. § 706. Plaintiffs are also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Plaintiffs are further entitled to a declaratory judgment that the Mass

Termination Decision is arbitrary, capricious, otherwise not in accordance with law, and violates the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare unlawful and vacate Defendants' Mass Termination Decision;

(B) Declare unlawful and vacate Defendants' terminations of Plaintiffs' grants;

(C) Enjoin Defendants to reinstate the eliminated grant programs and to spend the funding appropriated by the following laws for the purposes specified by Congress: The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020); the Coronavirus Response and Relief Supplemental Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2021); the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021); the Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020); and the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020);

(D) Enjoin Defendants to reinstate Plaintiffs' grants for the awarded project periods and to continue to administer the grants to the same extent and in the same manner as prior to the unlawful terminations, in accordance with the governing statutes and regulations;

(E) Award Plaintiffs their costs and reasonable attorney fees; and

(F) Grant such other and further relief as the Court may deem just and proper.

Dated: April 24, 2025                          Respectfully submitted,


                                               **CHRISTIAN D. MENEFEE**
                                               Harris County Attorney


                                               */s/ Jonathan G.C. Fombonne*
                                               **JONATHAN G.C. FOMBONNE**
                                               Deputy County Attorney and First Assistant
                                               Texas State Bar No. 24102702
                                               D.D.C. Bar ID: TX0090
                                               jonathan.fombonne@harriscountytx.gov

                                               **TIFFANY BINGHAM**
                                               Managing Counsel
                                               Texas State Bar No. 24012287
                                               D.D.C. Bar ID: TX0087
                                               tiffany.bingham@harriscountytx.gov

                                               **EDWARD D. SWIDRISKI III**\*
                                               Senior Assistant County Attorney
                                               Texas State Bar No. 24083929
                                               Edward.Swidriski@harriscountytx.gov

                                               Office of The Harris County Attorney
                                               1019 Congress Plaza, 15th Floor
                                               Houston, Texas 77002
                                               Telephone: (713) 274-5101
                                               Facsimile: (713) 755-8924

                                               *Counsel for Harris County, Texas*


                                               AISHA RICH\*
                                               KATHERINE COURTNEY
                                               ALEXANDRA KLIGER\*
                                               Public Rights Project
                                               490 43rd Street, Unit #115
                                               Oakland, California 94609
                                               (510) 214-6960 (phone)
                                               aisha@publicrightsproject.org
                                               katiec@publicrightsproject.org
                                               sasha@publicrightsproject.org

*Counsel for Columbus, Ohio, Nashville, Tennessee, and Kansas City, Missouri*

JOEL McELVAIN
POOJA BOISTURE*
SKYE L. PERRYMAN
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jmcelvain@democracyforward.org
pboisture@democracyforward.org
sperryman@democracyforward.org

*Counsel for Columbus, Ohio, Nashville, Tennessee, Kansas City, Missouri, and AFSCME*

*Motion to appear *pro hac vice* forthcoming

55