**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HARRIS COUNTY, TEXAS**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01275-CRC |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………...1

BACKGROUND ...................................................................................................................3

   I.      Congress Appropriates Billions of Dollars in Public Health Funding..............3

   II.     The Public Health Care Programming of Plaintiff Local Governments and of State and Local Governments Employing AFSCME Members Arising from Congressionally Appropriated COVID-19 Funding ........................................ 6

   III.    Congress and CDC Continue Funding Programs with Plaintiff Local Governments, and Other State and Local Employers of AFSCME Members, After the COVID-19 Public Health Emergency Ends ................................... 12

   IV.    Defendants Unlawfully Terminate Their Grants and Cooperative Agreements with Plaintiff Local Governments and Other State and Local Employers of AFSCME Members. ...................................................................................... 13

   V.     Defendants' Termination of Funds is Causing Plaintiffs Substantial, Irreparable Harm. ..............................................................................................15

LEGAL STANDARD............................................................................................................18

ARGUMENT ........................................................................................................................19

   I.      Plaintiffs are Likely to Succeed on the Merits...............................................19

       A.  Plaintiffs are likely to succeed on their constitutional claims...................19

       B.  Plaintiffs are likely to succeed on their APA Claims ...............................22

           1.   Defendants' decision to terminate the funding at issue is final agency action ...............................................................................22

           2.   Defendants' termination decision is unconstitutional...................23

           3.   Defendants lack statutory authority to withhold the appropriated funds..............................................................................................23

           4.   Defendants' actions are arbitrary and capricious...........................24

   II.     This Court Has Jurisdiction Over All of Plaintiffs' Claims............................29

       A.  The Court has jurisdiction over the constitutional and ultra vires claims (Counts I-III)...........................................................................................29

B.  This Court has jurisdiction over the APA claims because this case does not seek to enforce any contract between the parties ......................................30

III.    Plaintiffs Face Irreparable Harm..........................................................................34

IV.    The Balance of Equities and Public Interest Favor Relief..............................39

V.    The Court Should Not Require a Bond..............................................................40

VI.    Requested Relief .................................................................................................41

CONCLUSION..................................................................................................................42

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ............................................................................................................................ 33

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-00702-JRR, --- F. Supp. 3d ---, 2025 WL 833917 (D. Md. Mar. 17, 2025) .................................................................... 34

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126 (D.D.C. 2023) ......................................................................................................................... 33, 34

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ..................................... 22

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................ 23

*Bowen v. Massachusetts*, 487 U.S. 879 (1988).................................................... 30, 31, 33

*California v. U.S. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ............................................................................................................................ 32

*Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308, 1982 WL 189587 (H.H.S. June 8, 1982) .............................................................................................................. 25

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................ 20

*Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412 (D.D.C. Apr. 16, 2025) .................................................................... 20, 33, 34, 38

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)........................... 39

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ........................................................... 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................... 28

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) .............................................. 40

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).............................................. 28

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)................................................ 26

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)........................................................... 20

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)................................... 22

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............ 34, 39, 40

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) .............................. 30

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................... 31

*Michigan v. EPA*, 576 U.S. 743 (2015) .......................................................................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................................................................................................................... 26

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ....................... 41

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 25-cv-00239, 2025 WL 368852
(D.D.C. Feb. 3, 2025) ............................................................................................ 34

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-00239, 2025 WL
597959 (D.D.C. Feb. 25, 2025) ....................................................... 19, 23, 41

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ....... 25

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ................................................. 23

*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009) ............... 32

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................ 39

*Ohio v. EPA*, 603 U.S. 279 (2024) ..................................................................................... 26

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ............ 41

*Pennhurst State Sch. & Hosp. v. Haldermann*, 451 U.S. 1 (1981) .................................... 21

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C.
2018) ..................................................................................................................... 25, 29

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) ........................................................... 30

*R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642, 1998 WL 42538 (H.H.S. Jan. 15,
1998) ........................................................................................................................... 25

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ................................................... 40

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ..................................................... 40

*Sedita v. United States*, No. 24-cv-00900 (TNM), 2025 WL 387962 (D.D.C. Feb. 4,
2025) ........................................................................................................................... 30

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349 (D.D.C.
2012) ........................................................................................................................... 37

*Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735 (1996) .............................................. 28

*South Dakota v. Dole*, 483 U.S. 203 (1987) ..................................................................... 21

*Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247 (D.C. Cir. 2021) ....................... 29

*State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) ............. 39

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ................................................... 34

*Train v. City of New York*, 420 U.S. 35 (1975) ................................................................. 20

*U.S. Department of Education v. California*, 145 S. Ct. 966 (2025) ................................ 32

*Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528 (D.C. Cir. 1988) .......................... 33

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...................................................................... 24

*Widakuswara v. Lake*, No. 25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025)
......................................................................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................... 19

iv

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ................................................ 41

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................... 20

**Statutes**

28 U.S.C. § 1346 ............................................................................................................ 31

28 U.S.C. § 1491 ............................................................................................................ 31

42 U.S.C. § 1396s ............................................................................................................. 8

42 U.S.C. § 300x-55 ...................................................................................................... 25

5 U.S.C. § 702 ........................................................................................................... 29, 30

5 U.S.C. § 704 ................................................................................................................ 22

5 U.S.C. § 705 ................................................................................................................ 19

5 U.S.C. § 706 ................................................................................................ 22, 23, 24, 25

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) ...... 5, 6, 24, 27

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ...................................................................................... 4, 6, 7, 8, 9, 10, 24, 27

Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020) .................................................................................... 4, 5

Coronavirus Response and Relief Supplemental Appropriations Act, 2021, Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021) ....................................................................... 4, 5

Fiscal Responsibility of Act of 2023, Pub. L. No. 118-5, 31 Stat. 10 (2023) ......... 2, 13, 27

Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993) . 8

Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020) .................................................................................................. 6, 10

Public Health Service Act, 42 U.S.C. § 247b ................................................................... 9

Public Health Service Act, 42 U.S.C. § 301(a) ..................................................... 8, 9, 10

**Rules and Regulations**

10 C.F.R § 600.25 .......................................................................................................... 25

45 C.F.R. § 75.371 ......................................................................................................... 25

45 C.F.R. § 75.372(a) ................................................................................................. 2, 25

45 C.F.R. § 75.391 ......................................................................................................... 40

**Other Authorities**

Appl. to Vacate the Order Issued by the U.S. Dist. Ct. for the Dist. of Mass. & Req. for an Immediate Admin. Stay, *U.S. Dep't of Educ. v. California*, 2025 WL 945313 (U.S. Mar. 26, 2025) ............................................................................................................. 33

Brandy Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, NBC News (Mar. 25, 2025), https://www.nbcnews.com/health/health-news/cdc-pulling-back-11b-covid-funding-sent-health-departments-us-rcna198006, *archived at* https://perma.cc/35SS-V2WE ................................................................... 14

CDC et al., *2025 Recommended Immunizations for Birth Through 6 Years Old* (Apr. 2025), https://www.cdc.gov/vaccines/imz-schedules/downloads/parent-ver-sch-0-6yrs.pdf, *archived at* https://perma.cc/DL99-8R7W ...................................................... 8

CDC, *About the Vaccines for Children (VFC) Program* (June 26, 2024), https://www.cdc.gov/vaccines-for-children/about/index.html, *archived at* https://perma.cc/52YQ-V8MX ......................................................................... 8

CDC, *COVID-19 Funding* (Apr. 23, 2024), https://www.cdc.gov/readiness/php/funding/covid-19-funding.html, *archived at* https://perma.cc/GU5H-RYGK ...................................................................... 4

CDC, *The Epidemiology and Laboratory Capacity (ELC) Program* (Jan. 31, 2025), https://www.cdc.gov/epidemiology-laboratory-capacity/php/about/index.html, *archived at* https://perma.cc/46D9-7JMW ...................................................... 7

HHS, *HHS Grants Policy Statement* (Apr. 16, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf, *archived at* https://perma.cc/82TZ-SJED ...................................................... 40

HHS, *HHS Grants Terminated* (Apr. 25, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf, *archived at* https://perma.cc/8YYL-69JW .......................................................... 10, 11

Mem. Supp. Mot. for TRO, *California v. U.S. Dep't of Educ.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7 ............................................................... 32

NAFSA: Ass'n of Int'l Educators, *COVID-19 Executive Declarations and Determinations* (Apr. 18, 2023), https://www.nafsa.org/regulatory-information/covid-19-executive-declarations-and-determinations, *archived at* https://perma.cc/Y85A-PLXS .................................................................................... 13

Nat'l Ctr. for Chronic Disease Prevention & Health Promotion, CDC, *Community Health Workers for COVID Response and Resilient Communities*, https://www.cdc.gov/covid-community-health-workers/pdfs/CCR-fact-sheet-H.pdf, *archived at* https://perma.cc/KF6Y-AZEK (last visited Apr. 28, 2025) ........................................ 9

Order Granting Mot. for TRO, *RFE/RL, Inc. v. Lake*, No. 25-cv-00799 (D.D.C. Mar. 25, 2025), ECF No. 14 ............................................................................. 41

**Treatises**

U.S. Const. art. I, § 8 ................................................................................ 20

U.S. Const. art. I, § 9 ................................................................................ 20

## INTRODUCTION

On March 24, 2025, the U.S. Department of Health and Human Services ("HHS") and the Centers for Disease Control and Prevention ("CDC") unilaterally determined that they would cancel public health funding for states, cities, and localities that Congress appropriated under several statutes to respond to the COVID-19 pandemic (hereinafter referred to as the "Mass Termination Decision"). Defendants then implemented this Mass Termination Decision by sending letters to states, cities, and localities abruptly terminating $11 billion worth of federal health care funding that was critical to their public health work of identifying, monitoring, and addressing infectious diseases; ensuring access to necessary immunizations, including immunizations for children; and strengthening emergency preparedness to avoid future pandemics. The termination notices uniformly were sent without any real substantiation for why the funding was ending so abruptly; indeed, none listed any failures by grantees to follow the terms and conditions of their grants. The sole stated basis for Defendants' decision to terminate the funding "for cause" was that the funding for these grants or cooperative agreements was appropriated through one or more COVID-19 related laws, and, according to Defendants, "[n]ow that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out." *See* HHS, *Amended Notice of Award* (Mar. 24, 2025) (Maddox Decl., Exs. A, B).

Defendants' actions are blatant violations of the Spending Clause and the principle of separation of powers enshrined in the Constitution, as well as of federal statutes and regulations. Defendants had no authority to second-guess Congress's judgment as to whether funding for pandemic preparedness remains "necessary." Congress, which maintains exclusive power over the purse, never limited the funding at issue here to the

duration of the COVID-19 pandemic. Instead, Congress made investments in research, outreach, education, and health care that extended beyond the COVID-19 emergency, in part, so that the grant recipients could strengthen their health care infrastructures to help prevent the next pandemic from happening. Even after the declaration of the COVID-19 public health emergency was lifted, Congress reviewed the COVID-19 related laws, rescinded $27 billion in other funds, but determined not to rescind any of the funding at issue here. *See, e.g.*, Fiscal Responsibility of Act of 2023, Pub. L. No. 118-5, div. B, tit. I, 31 Stat. 10, 23 (2023). Defendants' actions are unconstitutional and violate statutory appropriations, they are ultra vires, and they are unlawful under the Administrative Procedure Act ("APA").

Defendants' actions also violate the APA because they are arbitrary and capricious. Defendants' unfounded belief that the funding was no longer necessary does not constitute the type of "cause" that would be needed to terminate this funding. Defendants do not contend that the fund recipients failed to comply with the applicable terms and conditions of the funding agreements and grants. Moreover, nothing in the history or interpretation of HHS's own "for cause" regulation in 45 C.F.R. § 75.372(a)(2) supports Defendants' *en masse* termination of the federal grant programs, in contravention of a congressional mandate. Defendants' unilateral decision to terminate the funding because of the purported end of the COVID-19 pandemic—the only reason Defendants provided for the termination—is also arbitrary and capricious because it is inconsistent with congressional action on the continuing need for these appropriations beyond the period of the COVID-19 public emergency. Defendants' reason for the termination thus is unfounded and relies on factors Congress never intended Defendants to consider.

As a result of the Mass Termination Decision, local governments suffered immediate harm, and many health departments have already had to fire employees, cancel agreements with independent contractors, terminate critical public health programs that could no longer be financially supported, and quickly determine how to continue to perform mission critical functions with far less. Absent injunctive relief, Harris County, Texas; Columbus, Ohio; Nashville, Tennessee; Kansas City, Missouri (together, "Plaintiff Local Governments"); and American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") (collectively, "Plaintiffs") and the constituents they represent and serve will continue to suffer serious harm. The loss of these programs will lead to considerable public health risks, including decreased vaccination rates and increased occurrence of currently spreading infectious diseases such as measles and the bird flu, among other preventable diseases.

## BACKGROUND

I.     **Congress Appropriates Billions of Dollars in Public Health Funding**

In the midst of the 2020 Coronavirus pandemic ("COVID-19 pandemic"), Congress appropriated funds to states, localities, and organizations to bolster the public health response to that pandemic, and to ensure that the nation would be better prepared for future public health threats. In addition to directing funds toward ameliorating the immediate effects of the COVID-19 pandemic, Congress sought to address the longer-term challenges it knew the country would face in COVID-19's wake, including gaps in the public health

system and the need for investment in critical public health infrastructure. Congress approved these funds for "state and local readiness"[1] through various appropriation acts:

1.      **The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")**, Pub. L. No. 116-136, 134 Stat. 281 (2020), appropriated $4.3 billion to Defendants "to prevent, prepare for, and respond to coronavirus," requiring that no less than $1.5 billion "shall be for grants to or cooperative agreements with States, localities," and other entities, "including to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities"; and that no less than $500 million "shall be for public health data surveillance and analytics infrastructure modernization." 134 Stat. at 554–55. The Act states that "the term 'coronavirus' means SARS-CoV-2 or another coronavirus with pandemic potential." *Id.* at 614.

2.      **The Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSAA")**, Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021), appropriated $8.75 billion to Defendants "to prevent, prepare for, and respond to coronavirus," providing that the appropriated amounts "shall be for activities to plan, prepare for, promote, distribute, administer, monitor, and track coronavirus vaccines to ensure broad-based distribution, access, and vaccine coverage." 134 Stat. at 1911. Congress instructed that no less than $4.5 billion of that amount should go to states, localities, and certain other designated entities, that at least $300 million be used "for high-risk and underserved populations, including racial and ethnic minority populations and rural communities," and

---

[1]     *See* CDC, *COVID-19 Funding* (Apr.     23,     2024), https://www.cdc.gov/readiness/php/funding/covid-19-funding.html,     *archived    at* https://perma.cc/GU5H-RYGK.

specified that funding requirements could be satisfied "by making awards through other grant or cooperative agreement mechanisms." *Id.* at 1911–12. The CRRSAA provides that the term "coronavirus" "means SARS–CoV–2 or another coronavirus with pandemic potential." *Id.* at 1185.

3.    **The American Rescue Plan Act of 2021 ("ARPA"),** Pub. L. No. 117-2, 135 Stat. 4 (2021), provided billions to HHS and CDC "to plan, prepare for, promote, distribute, administer, monitor, and track COVID–19 vaccines"; "strengthen vaccine confidence in the United States"; "improve rates of vaccination throughout the United States"; and "strengthen and expand activities and workforce related to genomic sequencing, analytics, and disease surveillance," among other objectives. 135 Stat. at 37–41. Out of that amount, and to fulfill those objectives, Congress required that the CDC award grants or cooperative agreements to state and local public health departments. *Id.* at 37, 40–42. Congress specifically appropriated funds so that HHS would "award grants to, or enter into cooperative agreements or contracts with, State, local, and territorial public health departments to establish, expand, and sustain a public health workforce." *Id.* at 41.

4.    **The Coronavirus Preparedness and Response Supplemental Appropriations Act ("2020 Supplemental Act")**, Pub. L. No. 116-123, 134 Stat. 146 (2020), provided $2.2 billion to CDC "to prevent, prepare for, and respond to coronavirus, domestically or internationally." 134 Stat. at 147. Not less than $950 million of that amount was required to be used for grants to or cooperative agreements with states and localities so that they could "carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities." *Id.*

5.        **The Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act")**, Pub. L. No. 116-139, 134 Stat. 620 (2020), appropriated billions to be transferred to HHS and CDC for states and localities to "develop, purchase, administer, process, and analyze COVID–19 tests, including support for workforce, epidemiology, use by employers or in other settings, scale up of testing by public health, academic, commercial, and hospital laboratories, and community-based testing sites, health care facilities, and other entities engaged in COVID–19 testing, conduct surveillance, trace contacts, and other related activities related to COVID–19 testing." 134 Stat. at 624.

Importantly, none of this funding was limited to the duration of the COVID-19 public health emergency. Where Congress intended to limit the application of programs or appropriations in COVID-19 related laws, it did so expressly. *See, e.g.*, ARPA, 135 Stat. at 127 (appropriating funds to states to create "strike teams" of health care providers that could be deployed to nursing facilities with diagnosed or suspected cases of COVID-19 "during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* at 210–12 (medical assistance for vaccines "ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 305 (provision of paycheck protection program to provide loans can be administered "until the date on which the national emergency . . . expires").

II.        **The Public Health Care Programming of Plaintiff Local Governments and of State and Local Governments Employing AFSCME Members Arising from Congressionally Appropriated COVID-19 Funding**

Many of the appropriations that spawned from COVID-19 supplemented existing vaccine, infectious disease, and other programs that states and localities maintained with

HHS and CDC prior to the COVID-19 outbreak. For example, long before the 2020 public health emergency, CDC established the Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks.[2] These agreements have funded local emergency responses to epidemics such as H1N1, Zika, and Ebola. *Id.* The program provides financial and technical resources to: (1) strengthen epidemiologic capacity; (2) enhance laboratory capacity; (3) improve health information systems; and (4) enhance collaboration among epidemiology, laboratory, and public health departments.[3] During COVID-19, CDC used the ELC agreements to provide additional support to local health jurisdictions, using funds Congress appropriated through the ARPA, CRRSAA, and CARES Act.[4]

---

[2] CDC, *The Epidemiology and Laboratory Capacity (ELC) Program* (Jan. 31, 2025), https://www.cdc.gov/epidemiology-laboratory-capacity/php/about/index.html, *archived at* https://perma.cc/46D9-7JMW.

[3] CDC, *Strengthening the Nation's Capacity to Respond to Domestic Infectious Diseases*, https://www.cdc.gov/epidemiology-laboratory-capacity/media/pdfs/2024/11/ELC-Fact-Sheet-2024-2025.pdf, *archived at* https://perma.cc/CY6F-TDWA (last visited Apr. 28, 2025).

[4] The ARPA provides additional relief via ELC to address COVID-19's continued impact on the economy, public health, State and local governments, individuals, and businesses. CDC, through the ELC program, provided $10 billion in ARPA funding to States to support COVID-19 screening testing for teachers, staff, and students to assist schools in reopening safely for in-person instruction. Off. of Inspector Gen., HHS, *Audit of the Centers for Disease Control and Prevention Grants to Recipients for COVID-19 Screening Testing at Schools*, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000657.asp, *archived at* https://perma.cc/B95U-49AL. The CRRSAA awarded $19.11 billion to health departments through the ELC program for testing and contract tracing. CDC, *Novel Coronavirus (COVID–19)* (Sept. 4, 2024), https://www.cdc.gov/budget/covid-19/index.html#:~:text=Coronavirus%20Response%20and%20Relief%20Supplemental,%2C%20access%2C%20and%20vaccine%20coverage, *archived at* https://perma.cc/4287-

Similarly, since the 1990s, states and localities have participated in an existing program with CDC designed to increase vaccine access for children ("VFC Program"). The VFC Program was created in 1993 in response to the measles epidemic at that time, and it became operational in 1994 through Section 1928 of the Social Security Act. Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993); 42 U.S.C. § 1396s. Through the program, CDC uses allocated funds to purchase vaccines at a discount and then distributes them to providers at the direction of state and local awardees.[5] These resources supported the COVID-19 vaccine program, and in 2023, CDC issued guidance recognizing that COVID-19 vaccination was increasingly integrated into the administration of other routine vaccinations.[6]

Consistent with Congress's mandates in the COVID-19-related appropriations, HHS and CDC used the appropriated funds to offer additional grant programs and cooperative agreements to states and localities, including to Plaintiff Local Governments. For example, the Community Health Workers (CHW) for COVID Response and Resilience, authorized under the CARES Act, Pub. L. No. 116-136, and under the Public Health Service Act, 42 U.S.C. § 301(a), was launched to put more trained community

---

5TXD. The CARES Act awarded $631 million through the ELC program. CDC Archive, *Financial Resources* (last updated Feb. 24, 2021), https://archive.cdc.gov/#/details?q=https://www.cdc.gov/coronavirus/2019-ncov/php/financial-resources.html&start=0&rows=10&url=https://www.cdc.gov/coronavirus/2019-ncov/php/financial-resources.html, *archived at* https://perma.cc/6TVY-XZDZ.

[5] CDC, *About the Vaccines for Children (VFC) Program* (June 26, 2024), https://www.cdc.gov/vaccines-for-children/about/index.html, *archived at* https://perma.cc/52YQ-V8MX.

[6] CDC et al., *2025 Recommended Immunizations for Birth Through 6 Years Old* (Apr. 2025), https://www.cdc.gov/vaccines/imz-schedules/downloads/parent-ver-sch-0-6yrs.pdf, *archived at* https://perma.cc/DL99-8R7W.

health workers in communities with populations at high risk for COVID-19 exposure.[7]

Another program was the National Initiative to Address COVID-19 Health Disparities

Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority

Populations and Rural Communities, a non-research grant focused on reducing health

disparities related to COVID-19 and funded through the CRRSAA, and Section 317(k)(2)

of the Public Health Service Act, 42 U.S.C. § 247b(k)(2), as amended.

Plaintiff Local Governments, as well as other state and local governments

employing AFSCME members, applied for and received grants and cooperative

agreements through these funding programs:

1.      HHS and CDC awarded Harris County the Embrace HOPE (Healing,

Opportunity, Prosperity, Equity) grant and the Community Health Workers for COVID

Response and Resilient Communities ("CHW") grant.[8] Kiger Decl., ¶ 4; Lal Decl., ¶ 4.

Two other grants, the Immunization ("IMMU") and Infectious Disease Control Unit

("IDCU") grants, were awarded through the Texas Department of State Health Services

("Texas DSHS"), which acted as a pass-through entity for the funds. Kiger Decl., ¶¶ 13,

19. Harris County administered the funding it received from these grant awards through its

agency, Harris County Public Health ("HCPH"). The Embrace HOPE, IMMU, and IDCU

grants stem from the National Initiative to Address COVID-19 Health Disparities Among

---

[7] Nat'l Ctr. for Chronic Disease Prevention & Health Promotion, CDC, *Community Health Workers for COVID Response and Resilient Communities*, https://www.cdc.gov/covid-community-health-workers/pdfs/CCR-fact-sheet-H.pdf, *archived at* https://perma.cc/KF6Y-AZEK (last visited Apr. 28, 2025).

[8] The Embrace HOPE Grant is funded by money that Congress appropriated through CRRSAA. Kiger Decl., ¶ 6. The Community Health Workers program is authorized under the CARES Act, Pub. L. No. 116-136, and under the Public Health Service Act, 42 U.S.C. § 301(a).

Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities ("Health Disparities Program"). HHS, *HHS Grants Terminated* (Apr. 25, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf, *archived at* https://perma.cc/8YYL-69JW.

2. Columbus received funding from CDC through the Ohio Department of Health, which acted as a pass-through entity for the grants. Johnson Decl., ¶ 8; Tong Decl., ¶ 5. Columbus's grants stem from the Health Disparities Program, which funded the Ohio Health Improvement Zones grant awarded to Columbus's CelebrateOne Initiative, and the ELC program, which funded Columbus Public Health's Enhanced Operations grant.[9] Johnson Decl., ¶¶ 8, 9; Tong Decl., ¶¶ 5, 6. In total, Columbus received more than $6 million in CDC funding through these programs. Johnson Decl., ¶ 9; Tong Decl., ¶ 6.

3. Nashville received funding directly from CDC through the CHW grant. Thompson Decl., ¶ 8. Nashville also was awarded two grants through the State of Tennessee, which acted as a pass-through entity in distributing federal funds.[10] Thompson Decl., ¶ 4. These grants were the ELC grant and the VFC grant. *Id.* ¶ 4. In total, Nashville received more than $40 million in federal funding through these programs. *Id.* ¶¶ 5–8.

4. Kansas City received funds directly from the CDC through the Health Disparities Program. Jones Decl., ¶ 21. Kansas City received three additional federal grants via the State of Missouri, which acted as a pass-through entity for the funds. *Id.* ¶¶ 5, 11,

---

[9] The Ohio Health Improvement Zones Grant is funded by money appropriated through CRRSAA. The Enhanced Operating Grant is funded by money appropriated through the Paycheck Protection Act, Pub. L. No.116-139 (2020).

[10] The Community Health Workers program is authorized under the CARES Act, Pub. L. No. 116-136, and under the Public Health Service Act, 42 U.S.C. § 301(a).

17. These grants were the ELC grant, the CHW grant, and the COVID-19 Adult Vaccination Supplemental Grant. *Id.* ¶¶ 5, 11, 17. In total, Kansas City received over $8 million in CDC funding through these programs. *Id.* ¶¶ 5–21.

5.      AFSCME's members include public health employees in various states and localities around the country that—in addition to Plaintiff Local Governments, some of whom employ AFSCME members—also received federal funding from these programs. For example, the State of Alaska received a number of HHS COVID-era grants. CDC provided Alaska approximately $40 million in grants to fund the immunization and vaccination of children through the VFC program. CDC further provided several ELC grants to Alaska, totaling approximately $96 million to improve epidemiology laboratories in the state that work to control the spread of infectious diseases. Alaska also applied for and received an award under the Health Disparities grant. HHS, *HHS Grants Terminated* (Apr. 25, 2025), https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf, *archived at* https://perma.cc/8YYL-69JW. The Alaska State Department of Health used these grants to administer programs for improving public health access and increasing laboratory capacity for monitoring disease rates, and to hire employees to create and distribute public health programming related to vaccination. Hewitt Decl., ¶¶ 4–5; Heddings Decl., ¶¶ 4–5. Separately, Jackson County, Ohio, received Enhanced Operations funds from CDC, through the Ohio Department of Health. Jackson County Health Department received the CHW grant on August 31, 2021, totaling $4.4 million. Peters-Wiseman Decl., ¶ 5. Over the past four years, this funding was used to hire community health workers who engaged in public health outreach, vaccination, and pairing individuals with healthcare providers. *Id.* ¶ 6. Although the funding was initially allocated during the

height of the COVID-19 pandemic, its purpose was to bolster community resilience generally for public health emergencies such as measles, not limited to COVID-19. *Id.* ¶ 9. The State of Washington also received CDC funding from COVID-19-era grants to prepare for future public health crises. Spiegel Decl., ¶¶ 4, 10. These are just some of the many state and local employers who received these funds and whose public health employees AFSCME represents as their legal collective bargaining representative. O'Brien Decl., ¶¶ 5, 6.

Both Plaintiffs and Defendants understood from the start that the activities funded through these HHS and CDC programs would not be limited to work during the COVID-19 pandemic. Maddox Decl., ¶¶ 12–13; Johnson Decl., ¶ 8. Notably, the project title listed in the various HHS/CDC notices of award for the CHW grant to Harris County is "Before Always Has an After: Navigating Beyond the Pandemic," underscoring the fact that the funds were never intended to be restricted to a narrow window based on the HHS/CDC's opinion about COVID-19's status as a "pandemic." Lal Decl., ¶ 9. Columbus Public Health understood its funds to be related to broader public health emergency preparedness for future disease outbreaks, including the current measles outbreak. Johnson Decl., ¶ 8. Similarly, Kansas City was using some of its federal funds to develop laboratory capacity to test for a variety of infectious diseases such an influenza, measles, and sexually transmitted diseases, in addition to testing for COVID-19. Jones Decl., ¶¶ 7–8.

**III.**     **Congress and CDC Continue Funding Programs with Plaintiff Local Governments, and Other State and Local Employers of AFSCME Members, After the COVID-19 Public Health Emergency Ends**

On May 11, 2023, the HHS Secretary's final extension of the "public health emergency" declaration under 42 U.S.C. § 247d expired.[11] But the work states and local governments were doing as a result of COVID-19 did not end.

Later Congressional action reaffirmed what was already clear: the funding provided by the COVID-19-related appropriations was to remain available regardless of COVID-19's continuing status as a "pandemic," or as a declared "public health emergency." In early June 2023, shortly after the expiration of the "public health emergency" declaration, Congress canceled $27 billion in related appropriations through the Fiscal Responsibility Act of 2023, 37 Stat. at 23. In that Act, Congress reviewed various COVID-related laws and rescinded those funds that it determined were no longer necessary. *Id.* at 23–30. But Congress chose not to rescind the funding for the grants at issue in this case.

Through its own actions, HHS/CDC has acknowledged that the funding for these grants remains available even after the COVID-19 "public health emergency" declaration expired in May 2023. For example, in February 2024, CDC extended Plaintiff Harris County's Embrace HOPE grant's end date to May 2026. Kiger Decl., ¶ 7. With respect to the CHW Grant, CDC granted an additional $3.7 million in funding in July 2023, and in July 2024 it extended the grant period to August 2025. Lal Decl., ¶ 7.

**IV.     Defendants Unlawfully Terminate Their Grants and Cooperative Agreements with Plaintiff Local Governments and Other State and Local Employers of AFSCME Members.**

Defendants settled upon their Mass Termination Decision nearly two years after the public health emergency expired. Contravening Congress's decision to extend funding

---

[11]  NAFSA: Ass'n of Int'l Educators, *COVID-19 Executive Declarations and Determinations* (Apr. 18, 2023), https://www.nafsa.org/regulatory-information/covid-19-executive-declarations-and-determinations, *archived at* https://perma.cc/Y85A-PLXS.

for pandemic preparedness, Defendants announced that they would "no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Brandy Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, NBC News (Mar. 25, 2025), https://www.nbcnews.com/health/health-news/cdc-pulling-back-11b-covid-funding-sent-health-departments-us-rcna198006, *archived at* https://perma.cc/35SS-V2WE. Between March 24 and March 25, 2025, Defendants implemented their Mass Termination Decision by cancelling $11 billion for public health programs funded by the COVID-19-related appropriations, effective March 24, 2025. Defendants gave no prior notice or advance warning to Plaintiffs of these actions.

The terminations were nationwide in scope. Defendants did not engage in any individualized consideration of the affected grants. Instead, Defendants apparently deemed the CDC grant programs to be "COVID-related" and designated them for immediate elimination based on one criterion: their funding derived from COVID-era appropriations acts passed by Congress. Thus, Defendants relied upon the same conclusory, boilerplate explanation in Plaintiff Local Governments' termination notices (styled "Amended Notices of Awards"), which each state: "The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out." Maddox Decl., Exs. A, B; Jones Decl., ¶ 25, Ex. D; Thompson Decl., ¶ 9, Ex. B. Defendants did not provide any assessment unique to any of the Plaintiffs, explain why the funding was no longer necessary, or otherwise indicate why the agency had suddenly changed its longstanding position that the end of the pandemic did not limit the availability

of this public health funding. Defendants instead only asserted that "the end of the [COVID-19] pandemic" constituted "cause" for the terminations. Maddox Decl., ¶ 5; Jones Decl., ¶ 25, Ex. D; Thompson Decl., ¶ 9, Ex. B.

Passthrough grantees received even less information regarding the Mass Termination Decision: state health departments wrote to Plaintiff Local Governments indicating that all program activities should be paused immediately because grant funding had been terminated as of March 24, 2025. Maddox Decl., ¶ 6; Johnson Decl., ¶ 12, Ex. A; Tong Decl., ¶ 9, Ex. A; Jones Decl., ¶¶ 9, 15, 19; Thompson Decl., ¶ 7, Ex. A. These notices did not provide a reason for termination of the grants.

**V.      Defendants' Termination of Funds is Causing Plaintiffs Substantial, Irreparable Harm.**

Plaintiffs relied on the federal funding to provide critical aspects of their public health programs—programs that are used to detect and ameliorate all sorts of infectious disease, and not just COVID-19. With the terminated funds abruptly cut off, Plaintiff Local Governments will not be able to find alternate funding to sustain many of their public health programs and services. This includes programs designed to detect and prevent the spread of measles and Mpox. Kiger Decl., ¶¶ 12, 27; Lal Decl., ¶ 13. The result of Defendants' illegal actions will be that Plaintiffs' constituents will lose access to critical health care programs and services, and Plaintiffs will not be able to respond to these deadly health crises.

Most immediately, Defendants' Mass Termination will result in the termination of thousands of state and local public health employees around the country. O'Brien Decl., ¶ 7; Spiegel Decl., ¶ 11; Johnson Decl., ¶ 17 ("Due to the CDC's premature cancellation of our Enhanced Operation grant, Columbus Public Health has had to terminate eleven full

time staff members . . . charged with infectious disease tracing, investigations, and community response coordination."); Maddox Decl., ¶¶ 9–10, 15 (Harris County) ("[u]nless the grants are restored, this will result in the termination of grant-funded positions"; "HCPH will have to reduce staffing levels"; "the terminated grants support the employment of . . . 66 full-time employee positions and 37 temporary employee positions"); Sharp Decl., ¶ 12 ("[W]e had to let the staff person managing [our COVID and flu testing program] go."). Many employees of Plaintiff Local Governments, including AFSCME members, have already lost their jobs, as have AFSCME members working in public health for other state and local governments, leaving them without financial support and health insurance. O'Brien Decl., ¶ 7. Other employees will be transferred to jobs that they did not apply for, are not adequate positions for the employees' qualifications, or are located in areas further from the employees' homes. Heddings Decl., ¶¶ 12–14. Many of these public health workers are highly trained individuals—community health care workers, epidemiologists, and research scientists—who have devoted their careers to public health work, and are already, or soon may be, without any income or benefits to show for their dedication. Spiegel Decl., ¶ 6; Hewitt Decl., ¶ 9; Henry Decl., ¶ 13. The mass layoffs that will result from the Mass Termination will severely cripple local public health departments. Peters-Wiseman Decl., ¶ 9; Spiegel Decl., ¶ 13.

Plaintiffs also will have to discontinue critical health care work for their constituents. This work included preventing the spread of disease through detection projects such as wastewater monitoring. Kiger Decl., ¶¶ 8–12, 15, 18, 24. That work served as an important impediment to the spread of COVID-19 and other diseases. Kiger Decl., ¶¶ 12, 23; Sharp Decl., ¶¶ 17–18. For example, without the funding from the Embrace

HOPE Grant, Harris County will no longer be able to detect emerging diseases and outbreaks and develop timely public health interventions to safeguard the health and well-being of Harris County residents. Kiger Decl., ¶¶ 11–12 ("The loss of funding caused by the termination of the Embrace HOPE Grant will drastically decrease the County's disease surveillance capacity, which will undercut its ability to rapidly detect emerging diseases and outbreaks and develop timely public health interventions to safeguard the health and well-being of Harris County residents."); *see also* Johnson Decl., ¶ 19 ("The [staff] terminations associated with the CDC grant terminations have weakened our disease surveillance and outbreak response efforts . . . which destabilizes our community's health and safety."). This is especially concerning given the recent deadly outbreak of measles in Texas and other states. Maddox Decl., ¶ 11 ("Texas currently has the largest measles outbreak ever seen in the state," and that "[w]ithout resources to provide the MMR vaccine, such as outreach and education staff as well as vaccination staff, HCPH will be unable to protect the community from this disease."); Kiger Decl., ¶ 12 (noting that "[t]he Embrace HOPE Grant has enabled Harris County to conduct epidemiological and surveillance activities for over 80 notifiable disease conditions, including measles," that "[t]he current measles outbreak in Texas makes these activities particularly important," and that termination of the grant "will severely undermine these activities"); Johnson Decl., ¶ 17 (noting that due to the Mass Termination Decision, Columbus Public Health had to terminate staff working on prevention and mitigation of the measles outbreak in Ohio).

Through the COVID-era funding, Plaintiff Local Governments also engaged community members to schedule clinic and vaccine appointments and provide disease guidance. Kiger Decl., ¶ 15; Lal Decl., ¶ 13; Sharp Decl., ¶ 17. This important preventative

care and intervention work ended abruptly as a result of the Mass Termination. Without the funding, Plaintiffs will not have staff and resources to vaccinate children and other vulnerable populations. Kiger Decl., ¶ 18 (termination of IMMU Grant "will significantly reduce the county's vaccination outreach activities, which relate to all types of vaccines, not only COVID vaccines. This will decrease vaccine access for many vulnerable populations in Harris County, including children, elderly community members, individuals with compromised immune systems, and individuals with chronic conditions."); *see also* Sharp Decl., ¶ 20 ("[O]ur strike team is no longer able to provide vaccines and outreach to children outside of the public school system. . . . [And an] effort [to purchase a mobile medical unit] is now cancelled because of the VFC funding termination.").

Both in the near term and in the long run, the Mass Termination will have devastating effects on public health infrastructure. Local public health departments now lack funding and workforce to continue modernizing their health information systems. Johnson Decl., ¶ 22; Kiger Decl., ¶¶ 11–12. Nor can certain Plaintiff Local Governments continue their work of updating their antiquated laboratories. Jones Decl., ¶¶ 7–9. Plaintiff Local Governments have invested significant time and resources into building these projects, with the idea that the last few steps would be completed with the remaining federal funds—funds to which they no longer have access. Jones Decl., ¶¶ 8–10. At a time when our country needs more efficient health care systems to prevent, treat, and detect disease, Plaintiffs must stop doing that important work. Kiger Decl., ¶ 11; Jones Decl., ¶ 10.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In addition to their authority to issue injunctions under Federal Rule of Civil Procedure 65, courts hearing APA cases "may 'issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings' when doing so is 'necessary to prevent irreparable injury.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-00239, 2025 WL 597959, at *11 (D.D.C. Feb. 25, 2025) (quoting 5 U.S.C. § 705) (alteration omitted). Thus, "[b]oth provisions [Rule 65 and § 705] provide a mechanism for issuing injunctive relief and operate under the same four-factor test." *Id.*

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on the Merits

Even though Congress has appropriated funds for Plaintiffs to use to provide public health care services both during and beyond the COVID-19 pandemic, Defendants have terminated the funds on the pretextual ground that the pandemic is over. By terminating the funds in such an arbitrary and capricious manner, Defendants have violated their obligations under the Constitution, the APA, and the appropriation statutes.

#### A.  Plaintiffs are likely to succeed on their constitutional claims

Plaintiffs are likely to succeed on the merits of their claims that the Defendants' actions contravene the principle of separation of powers as well as the Spending Clause, and are ultra vires.

The Executive Branch may not usurp the power of the Legislative Branch. Inherent in this principle of separation of powers is the understanding that the Executive cannot withhold Congressionally appropriated funds in order to effectuate its own policy goals. *In*

19

*re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Indeed, the Constitution exclusively grants the power of the purse to Congress, and that spending power is directly linked to Congress's power to legislate. *City & Cnty. of S.F.*, 897 F.3d at 1231–32; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); *id.* § 8, cl. 1 (Spending Clause). As the D.C. Circuit has explained, the Executive Branch does not have "unilateral authority" to refuse to spend the "full amount appropriated by Congress for a particular project or program." *In re Aiken*, 725 F.3d at 261 n.1. *See also Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025).

The Executive's actions here directly contravene Congress's appropriations for Plaintiffs' public health programming, and the statutory mandate to spend must prevail. *See Train v. City of New York*, 420 U.S. 35, 41, 47–49 (1975) (invalidating a Presidential directive to "withhold[]" funding because it could not be "squared with the statute"). When the Executive disregards mandatory appropriations, its actions "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

Moreover, the Executive Branch can decline to spend duly appropriated funds only through the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 681 et seq. That Act, however, requires that the President "propose the rescission of funds [to Congress], and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). Because Defendants have rescinded

funds Congress has appropriated, without following the correct rescission procedures, Plaintiffs are likely to succeed on their separation-of-powers claim.

Plaintiffs are also likely to succeed on their claim that Defendants' decision to unilaterally terminate the funding on a retroactive and unfounded condition violates the Spending Clause of the Constitution. Just as Congress may not place conditions on grants to state and local governments unless those conditions are expressly and unambiguously stated in advance, *Pennhurst State Sch. & Hosp. v. Haldermann*, 451 U.S. 1, 17 (1981), so too, HHS and CDC may not impose such conditions on grant recipients. Thus, neither Congress, nor federal agencies, can "surpris[e]" grant recipients "with post acceptance or 'retroactive' conditions." *Id.* at 25. Any conditions imposed must be clear and defined at the outset, *id.* at 17, and such conditions must also relate to the federal interest in the particular program. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).

Defendants' Mass Termination Decision, and their implementation of it, violates the Spending Clause because it retroactively conditions the receipt of federal funds in a manner unrelated to the federal interest in the affected programs. Congress never expressly or otherwise conditioned the funding appropriations at issue to the duration of the COVID-19 pandemic. *See supra* at 6–7. Rather, after the formal termination of the COVID-19 public health emergency, Congress and Defendants HHS and CDC reaffirmed that the funding should continue. *See supra* at 12–13. Defendants' decision to change the terms of the funding retroactively—in a way that was not related to Congress's interests in the affected programs—failed to provide the clear notice that is required under the Spending Clause.

21

For similar reasons, Plaintiffs are likely to succeed on their ultra vires claim against Defendants Kennedy and Monarez. The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). Defendants Kennedy and Monarez lacked constitutional and statutory authority to issue or implement the Mass Termination Decision. As explained above, their actions violate the Constitution's separation of powers, exceed the limits of the Spending Clause, and have no basis in any federal statute. *See supra* at 19–21.

### B. Plaintiffs are likely to succeed on their APA claims

The APA permits judicial review of "final agency action," 5 U.S.C. § 704, and provides that a court "shall" "hold unlawful and set aside agency action" that is, among other things, "contrary to constitutional right, power, privilege, or immunity" "in excess of statutory …authority," or "arbitrary [and] capricious," *id.* § 706(2)(A)–(C). The Mass Termination Decision should be set aside under the APA because it is a final agency action that is contrary to Defendants' constitutional power, is in excess of statutory authority, and is arbitrary and capricious.

### 1. Defendants' decision to terminate the funding at issue is final agency action.

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C. § 704. Defendants' action to terminate all funding is a final agency action subject to the APA. Final agency actions "mark the consummation of the agency's decision-making process" and are those "by which rights or obligations have been determined, or

from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citation omitted). Here, the actions "mark[] the consummation" of Defendants' decision-making process because they announce Defendants' final decision on the matter, and the actions have the legal consequence to Plaintiffs of the immediate loss of funding and other irreparable harm. *See, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (holding that pause on funding constituted final agency action).

### 2. Defendants' termination decision is unconstitutional.

The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C). As discussed above, *supra* at 19–22, Defendants' Mass Termination Decision, which unilaterally eliminated COVID-19-related federal funding in one fell swoop, violated the separation of powers principle as well as the Spending Clause of the Constitution, and was ultra vires. Because the Executive Branch lacks the constitutional authority to amend or repeal congressional appropriations in this manner, *see supra* at 19–21, its unconstitutional action also violates the APA.

### 3. Defendants lack statutory authority to withhold the appropriated funds.

Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

HHS has not pointed to any statutory authority allowing the agency to terminate $11 billion in critical public health funding simply because the COVID-19 pandemic is over. That is because Congress specifically appropriated the funds for Plaintiffs' use during and beyond the COVID-19 pandemic. Congress expressly identified funds and programs

in the COVID-19 appropriations laws that would no longer be available after the end of the public health emergency, and, after the public health emergency ended, it reviewed all of the COVID-19 appropriations laws. Through that process, Congress rescinded $27 billions of funds that it determined were no longer necessary, but, significantly, it left in place all of the programs and funding at issue here. *See supra* at 12–13. Where Congress sought to tie programs and funding in these laws to the end of the pandemic, it did so expressly. *See, e.g.*, ARPA, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); 135 Stat. at 210–11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 306 ("until the date on which the national emergency . . . expires"). One would expect Congress to speak clearly if it intended to delegate to the Defendants the authority to terminate billions of dollars of public health funding based on a finding that the public health emergency is over. As this history makes clear, however, Congress instead reserved that decision for itself, rescinding some funds but preserving the funding at issue here to respond to ongoing threats to the public health. *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022) (considering history of congressional action on a subject in discerning the scope of delegated authority).

Defendants' Mass Termination Decision has no basis in statute, and Plaintiffs therefore are likely to succeed on their claim that Defendants' actions are therefore unlawful per 5 U.S.C. § 706(2).

### 4.  Defendants' actions are arbitrary and capricious

Plaintiffs are also likely to succeed on their claim that the Mass Termination Decision was arbitrary and capricious. Under the APA, a court must "hold unlawful and

set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants' decision is arbitrary and capricious because it violates HHS's own regulations. An agency is "bound by its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citation omitted). When the agency does not act in accordance with those regulations, it acts arbitrarily and capriciously. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.). Defendants cited no authority in their termination notices, but presumably they mean to rely on the HHS regulation in 45 C.F.R. § 75.372(a)(2), which permits termination of a federal grant "for cause." Maddox Decl., Exs. A, B; Jones Decl., ¶ 25, Ex. D; Thompson Decl., ¶ 9, Ex. B. But Defendants have not demonstrated any of the requisite preconditions for a "for cause" termination.

When HHS has examined what "for cause" means in the past, it has explained that it generally involves a failure to comply with the terms and conditions of the grant instrument. *R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642, 1998 WL 42538, at *1 (H.H.S. Jan. 15, 1998) ("When a grantee has materially failed to comply with the terms and conditions of the grant, [the Public Health Service] may . . . terminate the grant for cause."); *Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308, 1982 WL 189587, at *2 (H.H.S. June 8, 1982) ("'For cause' means a grantee has materially failed to comply with the terms of the grant."); *see* 45 C.F.R. §§ 75.371-75.375 ("Remedies for *Noncompliance*" (emphasis added)). This is consistent with the standard application of "for cause" terminations in statute and regulation. *See, e.g.*, 42 U.S.C. § 300x-55(a); 10 C.F.R § 600.25 (allowing "for cause" award termination on the basis of noncompliance or

debarment). Defendants can point to no failure by Plaintiffs to comply with the terms of their grants, and the end of the public health emergency two years ago certainly is not "cause" now. Nor does that regulation permit Defendants' mass termination of all federal grants that relate to COVID-19; rather, it indicates that Defendants were required to assess the funding on a recipient-by-recipient basis.

Defendants' action is also arbitrary and capricious because Defendants relied on factors Congress never intended them to consider, and they failed to provide a rational explanation for their Mass Termination Decision. Under arbitrary and capricious review, courts must hold as unlawful agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Agency action is reasonable and reasonably explained where the agency has provided "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). An agency action is arbitrary and capricious, on the other hand, if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The minimal explanation that Defendants offered improperly assumed that all appropriations in the laws at issue were only intended for use during the pandemic— something Congress never intended to affect the duration of *these* appropriations. Congress instead directed many of the appropriations, including the ones at issue here, beyond the

pandemic to future emergencies, for example, to expand and sustain a public health workforce, for genome sequencing and surveillance, and for data modernization and forecasting. ARPA, 135 Stat. at 41–42; *see also supra* at 4–6. And, Congress continued to operate these programs even after the public health emergency concluded. As described above, *supra* at 6–7, when Congress wanted to limit funding in the COVID-19-related laws to the duration of the pandemic, it did so expressly. *See, e.g.*, ARPA, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); 135 Stat. at 212 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 306 ("until the date on which the national emergency . . . expires"). After the end of the pandemic, Congress also specifically rescinded $27 billion for certain COVID-19 appropriations it found no longer necessary. Fiscal Responsibility of Act of 2023, Pub. L. No. 118-5 (2023). But, importantly, it did not rescind the appropriations at issue. Defendants did not provide any explanation, reasonable or otherwise, for these inconsistencies. There was thus no rational connection between the facts and Defendants' decision.

Defendants also failed to explain the reason for their sudden change in position, two years after the conclusion of the public health emergency. Indeed, Defendants have renewed multiple deadlines for Plaintiff Local Governments' grants, with deadlines set for significantly after the end of the emergency. *See, e.g.*, Kiger Decl., ¶ 7 (Harris County's Embrace HOPE Grant extended through May 31, 2026); Lal Decl., ¶ 7 (Harris County's CHW Grant extended through August 30, 2025). Defendants cannot depart from their previous policy without explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

515 (2009) ("An agency may not, for example, depart from a prior policy sub silentio . . . ."); *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[s]udden and unexplained change" may be arbitrary and capricious).

For similar reasons, Defendants acted arbitrarily and capriciously when they failed to account for the "legitimate reliance on prior interpretation" of the COVID-19-related appropriations. *Smiley*, 517 U.S. at 742. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted); *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions."). Defendants never considered the substantial reliance interests of Plaintiffs.

For example, Harris County relied on its understanding that Defendants would fulfill their commitments under the grants by hiring employees, developing relationships with community organizations and residents who depend on grant-enabled services, and entering into contracts with vendors. Maddox Decl., ¶ 14. Columbus's CelebrateOne initiative had already executed subcontracts for services to mitigate infant mortality through June 30, 2025, based on the performance period of its federal grant. Tong Decl., ¶ 9. Nashville had to stop reimbursing community health partners for several community health worker positions that performed critical resource navigation and health screening work. Sharp Decl., ¶¶ 24–26. The Kansas City Health Department had spent significant resources certifying the City to run a lab for infectious diseases and training staff on testing procedures. Jones Decl., ¶¶ 7–10. The Department planned to use its ELC grant to purchase

lab equipment and was midway through its procurement process to purchase the equipment when CDC abruptly terminated the grant, halting the City's ability to acquire the equipment. Jones Decl., ¶¶ 8–10. *See supra* at 18.

Defendants also violated the fundamental administrative law requirement that an agency must "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "This principle goes to the heart of reasoned decisionmaking." *Id.* Here, Defendants made no effort to consider alternatives, including whether to review the grants and agreements at issue to understand whether they had continued utility beyond the COVID-19 pandemic.

At bottom, Defendants have failed to engage in reasoned decisionmaking, and Plaintiffs are likely to succeed on their APA claims.[12]

## II.    This Court Has Jurisdiction Over All of Plaintiffs' Claims

### A.    The Court has jurisdiction over the constitutional and ultra vires claims (Counts I-III)

We anticipate that Defendants will contend that this case falls outside the APA's waiver of sovereign immunity for suits seeking relief "other than money damages." 5 U.S.C. § 702. As explained in more detail below, Plaintiffs seek only equitable relief, not money damages, and this case falls squarely within Section 702's waiver of immunity. In

---

[12] Defendants' actions are not of the type that are committed to agency discretion by law. There are statutory or regulatory standards that cabin Defendants' discretion here and that provide "meaningful standard[s] by which to judge [their] action." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Defendants claim to have applied a "for cause" standard based in statute and regulation. Evaluating "for cause" terminations "involve[s] the type of legal analysis that courts routinely perform," not unreviewable agency discretion. *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83 (Jackson, J.).

any event, Plaintiffs' claims center around their argument that Defendants violated the Spending Clause and separation of powers principle, and have acted ultra vires, by disregarding the congressional judgment that funding should remain available for state and local governments for pandemic preparedness. This Court may hear these constitutional and ultra vires claims even if the APA's waiver of immunity were unavailable. *See Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012); *see also Sedita v. United States*, No. 24-cv-00900 (TNM), 2025 WL 387962, at *5 & n.4 (D.D.C. Feb. 4, 2025) (the *Larson* exception "continues to operate despite the APA," so "even if the APA waiver is inapplicable, the Federal Officers are stripped of official immunity").

### B. This Court has jurisdiction over the APA claims because this case does not seek to enforce any contract between the parties

The Administrative Procedure Act waives the federal government's sovereign immunity from actions seeking relief "other than money damages." 5 U.S.C. § 702. Plaintiffs do not seek money damages here, but instead bring an action in equity to compel Defendants to comply with a statutory mandate. *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). Moreover, Plaintiffs do not seek to enforce any provision of individual grant agreements for past due sums. Congress has appropriated the funding at issue, and Plaintiffs instead seek to enforce their prospective rights under those appropriations. Such an action is available in equity, and belongs in federal district court. *Id.* at 905; *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326–27 (2020) (federal district court jurisdiction appropriate where plaintiffs seek "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations").

Where, as here, Plaintiffs seek prospective relief and challenge the statutory and regulatory basis for Defendants' decision to override Congress's judgment to devote

funding to pandemic preparedness, federal district courts have jurisdiction. *Bowen*, 487 U.S. at 905, 911.

We expect that Defendants will assert that Plaintiffs' claims should be brought under the Tucker Act, which waives sovereign immunity for claims brought against the United States founded "upon any express or implied contract." 28 U.S.C. § 1491(a)(1). For such claims, the United States Court of Federal Claims has exclusive jurisdiction when the amount sought is greater than $10,000. 28 U.S.C. § 1346(a)(2). Importantly, however, the fact that claims involve a contract is not enough to make them "contract claims"; instead, the inquiry turns on "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The Tucker Act applies if the issue in a case is "at its essence" a contract claim. *Id.* at 967.

Here, Plaintiffs' claims are not contractual claims. Plaintiffs' claims do not arise from the individual grants that were awarded to the Plaintiff Local Governments or other employers of AFSCME members. Plaintiffs instead challenge Defendants' categorical decision to terminate all grants that had been funded under congressional appropriations for pandemic preparedness. That challenge does not turn on individualized assessments of particular grant terms and conditions, or any other agreements between Defendants and Plaintiffs. Instead, Defendants improperly terminated the funding wholesale—for the unsupported reason that the COVID-19 pandemic had concluded. *See supra* at 13–14. Plaintiffs' claims arise from the Defendants' violations of the Constitution, Congress's statutory appropriations, and the procedural protections of the APA. Where, as here, it is

31

not possible "to conceive of this dispute as entirely contained within the terms of the contract," because there is a constitutional question as to the lawfulness of the agency action, that claim is not a "contract action." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009) (discussing contractor's First Amendment claim against Broadcasting Board of Governors (citation and internal quotation marks omitted)). For these reasons, this case is unlike the challenge to the Department of Education's termination of grants in *U.S. Department of Education v. California*, where the Supreme Court held—after a request for an immediate administrative stay—that the Government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA. 145 S. Ct. 966 (2025). There, the plaintiffs did not allege that the termination of their grants violated any statute. *See California v. U.S. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). Instead, the plaintiffs in that case contended that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government had invoked. Mem. Supp. Mot. for TRO, *California*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7.

"It was true before *California*, and it remains true now, that whether a claim is at its essence contractual for the Tucker Act depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Widakuswara v. Lake*, No. 25-CV-1015-RCL, 2025 WL 1166400, at *9 (D.D.C. Apr. 22, 2025) (cleaned up). As another judge in this Court recently held, grant termination cases involving challenges to the government's "attempts to dismantle the entirety of a congressionally created program" to recover "expenses that [the government] should have

paid all along" belong in federal district court.[13] *Climate United Fund*, 2025 WL 1131412, at *11 (quoting *Bowen*, 487 U.S. at 894). Because Plaintiffs' claims are "ultimately based, not on breach of contract, but on an alleged . . . violation" of federal law, this Court has jurisdiction over the claims. *Megapulse*, 672 F.2d at 969. The fact that the judicial remedy for Plaintiffs' harm may lead to the payment of money does not transform this case into a contractual case that must be heard in the Court of Federal Claims. *Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528, 534 (D.C. Cir. 1988); *see also Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025).

In any event, the grants to which Plaintiffs' claims relate are not contracts. As this Court has held, "[f]or the Court of Federal Claims to have jurisdiction, a contract must contain the four required elements of offer, acceptance, consideration, and proper government authority." *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (citation and internal quotation marks omitted). The consideration must benefit the government in a "direct, tangible" way. *Id.* at 133. Grants and cooperative agreements like the public health ones at issue in this case do not confer direct and tangible benefits on the government—any benefit the agreements might have, such as less demand on federal public health benefits, for example, is attenuated. *See id.* at 134 ("[I]f benefits as amorphous as the advancement of U.S. foreign policy interests could constitute consideration, then every cooperative agreement would transform into a contract."). "And since the Claims Court lacks jurisdiction, the Tucker Act does not deprive

---

[13] The United States itself recently informed the Supreme Court in another case that proper "APA suits do not 'claim a breach of contract' . . . such claims instead rest on statutory or constitutional theories independent of the contract terms." Appl. to Vacate the Order Issued by the U.S. Dist. Ct. for the Dist. of Mass. & Req. for an Immediate Admin. Stay, *U.S. Dep't of Educ. v. California*, 2025 WL 945313, at *14 (U.S. Mar. 26, 2025).

this Court of jurisdiction." *Id.*; *see also Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) ("categorically reject[ing] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims.").

## III.    Plaintiffs Face Irreparable Harm

Plaintiffs can establish irreparable harm by demonstrating that Defendants' actions "unquestionably make it more difficult for the [Plaintiffs] to accomplish their primary mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). In the grant context, irreparable harm can be established where the immediate termination of grants would affect the existence of programs and the livelihoods of individuals within those programs. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 25-cv-00239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (finding irreparable harm to plaintiffs where programs "may simply disappear" and others would have been forced to shutter programs just to make payroll as a result of funding freeze) (citation and internal quotation marks omitted); *see also Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-00702-JRR, --- F. Supp. 3d ---, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (finding irreparable harm where plaintiffs will be forced to terminate staff, who "rely on such funding for their livelihoods").

That is certainly the case here, where the loss of funding "will have devastating effects" on Plaintiffs' projects and programs and "imminent harm is unavoidable." *Climate United Fund*, 2025 WL 1131412, at *12, *17. Plaintiffs have had to resort to ending entire portions of their public health programming, and the Plaintiff Local Governments and other employers of AFSCME members are either preparing to lay off personnel or have done so

already. Hewitt Decl., ¶¶ 7–8; Spiegel Decl., ¶ 11 (discussing the potential loss of 265 state employees in one state alone); Henry Decl., ¶¶ 9, 13 (discussing employees' loss of jobs and "the pay and benefits they rely on"); Peters-Wiseman Decl., ¶ 8; O'Brien Decl., ¶ 6 (discussing inability of AFSCME health workers in Alaska and Ohio to "perform critical functions to support the health and safety of their communities"). In Harris County, Defendants' Mass Termination Decision will result in the termination of grant-funded positions and will reduce staffing levels and existing service contracts significantly. Maddox Decl., ¶¶ 9–10. The termination of the CHW Grant severely impairs the county's community outreach efforts due to loss of staffing. Lal Decl., ¶¶ 12–13. The termination of the Embrace HOPE and IDCU Grants will significantly reduce the county's disease surveillance capacity, require its wastewater surveillance program to cease entirely, and undermine its rapid detection of emerging disease outbreaks. Kiger Decl., ¶¶ 11–12, 24, 27. And Kansas City is similarly unable to finish executing on its plan to test for infectious diseases at the city level. Jones Decl., ¶ 10.

Health care workers represented by AFSCME, for example in Alaska and Columbus, Ohio, were required to stop all work on creating updated medical recordkeeping systems, and many of these workers have been fired. O'Brien Decl., ¶¶ 6-8; Peters-Wiseman Decl., ¶ 8; Heddings Decl., ¶¶ 5, 17; Henry Decl., ¶ 15; Hewitt Decl., ¶ 9. And "without their jobs in public health, they will face lost wages, lost health insurance benefits, and significant financial and emotional harm." O'Brien Decl., ¶ 7. In turn, their union, AFSCME, "must and will dedicate resources (which would otherwise have been used to improve wages and benefits for AFSCME members, both in those jurisdictions and elsewhere) to support them to the extent possible[.]" *Id.* The effect of the Mass Termination

Decision will have "ripple effects" throughout the affected communities, resulting in further job losses for AFSCME members if funding is not reinstated. *Id.* ¶ 8.

In Columbus, Columbus Public Health was forced to lay off eleven full-time staff members: nine disease intervention specialists and two office assistants. Johnson Decl., ¶ 17 (indicating that Columbus has already had to terminate 11 employees due to the loss of its Enhanced Operations grant). These employees were charged with infectious disease tracing, investigations, and community response coordination. *Id.* ¶ 17. They had previously been integral in preventing a measles outbreak in Columbus and, at the time of the CDC grant terminations, were preparing to investigate and mitigate the current measles outbreak in Ohio. *Id.* ¶ 17. Without these staff members, Columbus Public Health is now operating at only twenty-five percent capacity for its disease tracing and investigation work. *Id.* ¶ 19. The loss of funding in Columbus also impairs its ability to strengthen its programming to avoid future disease: The termination of its Enhanced Operations grant means that Columbus cannot modernize its electronic health record system. *Id.* ¶ 22.

As a result of the termination, Plaintiff Local Governments also will lose the ability to provide critical health care to serve their constituents, as have other state and local governments employing AFSCME members. Heddings Decl., ¶ 8. Devastatingly, for example, the termination of its Ohio Health Improvement Zones grant means Columbus cannot continue to combat high rates of infant mortality in Columbus's most underserved community. Tong Decl., ¶ 11.

Because the appropriations were designed, in part, to prevent the spread of ongoing and emerging infections, without the funding, Plaintiffs' constituents are at imminent increased risk of being exposed to infectious diseases that are currently circulating. *See*

*supra* at 16–17. The grant terminations limit Harris County's ability to prepare for public health emergencies, including the ongoing dangers of measles, H5N1, COVID variants, tuberculosis, Mpox, and RSV. Maddox Decl., ¶ 10. Due to its large population and status as an international and domestic travel hub, it is essential that Harris County be able to implement timely public health interventions that stop the spread of contagious diseases like measles. Kiger Decl., ¶¶ 12, 27. By limiting Harris County's ability to prevent, detect, and respond to outbreaks within its own borders, Defendants' Mass Termination Decision is also undermining public health in neighboring counties, throughout the state of Texas, and across the United States. Maddox Decl., ¶ 19. Columbus Public Health lost staff dedicated to investigating and preventing the spread of disease, including the current measles outbreak in Ohio. Johnson Decl., ¶ 17. Kansas City lost its ability to complete a lab for testing for infectious diseases, which would have increased its ability to detect and mitigate the spread of infectious diseases, including influenza and sexually transmitted diseases. Jones Decl., ¶¶ 7–10. And Nashville has had to cancel plans to purchase a mobile medical unit for its staff members that travel into neighborhoods to deliver vaccine services to prevent infectious disease. Sharp Decl., ¶ 21. With the loss of funding Jackson County, Ohio had to terminate all of its health crisis preparedness work that its terminated community health workers were performing; it is preparing for the worst in terms of infectious outbreak. Peters-Wiseman Decl., ¶ 9. These threats to public health establish irreparable harm. *See Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012).

Plaintiff Local Governments also face irreparable reputational harm and loss of goodwill among employees, vendors, and community members who rely on the threatened

services. Maddox Decl., ¶¶ 14, 18. Plaintiff Local Governments' reputation as reliable partners, employers, and providers is critical to their operations, and Defendants' immediate termination of grants, undermines that reputation. *Id.* ¶¶ 14, 18. This harm is exacerbated by two features of the Mass Termination Decision and its implementation. First, Defendants chose to impose an abbreviated 30-day closeout period for the terminated grants, rather than the ordinary 90-day grant closeout period. *Id.* ¶ 18. This action significantly shortens the window of time that vendors have to seek reimbursement for work that they performed *before* the grants were terminated, making it more likely that work will not be compensated, requiring vendors to scramble their resources to meet the unnecessarily compressed timeline, and undermining Plaintiffs' reputations as stable and reliable business partners. *Id.* ¶ 18. Second, the "for cause" reason given for the terminations will exacerbate reputational harm by adversely affecting grantees' ability to obtain other grant funding in the future. *Id.* ¶ 17. Grantees such as Nashville, for example, are required to certify to the State of Tennessee that they have "not within a three (3) year period preceding . . . had one or more public transactions (federal, state, or local) terminated for cause or default." Thompson Decl., ¶ 15. A failure to so certify may make Nashville less competitive for future grant awards. *See Climate United Fund*, 2025 WL 1131412, at *19 (finding irreparable harm to plaintiffs' whose EPA funding was terminated in damage to their business reputation). For Plaintiff AFSCME, its members are losing bargaining strength by the day, as more members of the union are laid off. Peters-Wiseman Decl., ¶ 10 ("our strength in numbers is of utmost importance when we negotiate wages, benefits, and other terms and conditions of employment for the public health workers").

Defendants' Mass Termination Decision is also causing Plaintiffs irreparable harm by creating severe budget uncertainty and forcing them to redirect their limited resources to respond to the resulting chaos. In Harris County, for example, the grant terminations have created immense budget uncertainty and administrative burdens on HCPH and its staff. Maddox Decl., ¶ 15–16. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (recognizing immediate, irreparable harm due to order that created "budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions" and explaining that this "uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents" and that counties' need to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services . . . will cause the Counties irreparable harm").

## IV.    The Balance of Equities and Public Interest Favor Relief

The balance of equities and public interest prongs merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the D.C. Circuit has held, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Plaintiffs also have a substantial interest in minimizing health risks and preventing infection. *See State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021) ("public interest in slowing the spread of COVID-19").

As described above, *supra* at 35–37, Plaintiffs do not have the financial means of keeping their programs running, and they will immediately have to terminate programs that benefit the public—programs that have a critical value in preventing the spread diseases

such as measles and Mpox. Johnson Decl., ¶¶ 17-19; Kiger Decl., ¶12; Maddox Decl., ¶¶ 10–11, 19. Given the real and immediate harm that the public faces as a result of Defendants' actions, the equities and public interest strongly favor preliminary relief. This is even more true given that Plaintiffs have demonstrated their likelihood of success on the merits. The "extremely high likelihood of success on the merits" shows that preliminary relief "would serve the public interest." *Newby*, 838 F.3d at 12.

Defendants, on the other hand, face no harm from an injury that merely ends an unlawful practice. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Moreover, HHS regulations specifically provide that "[a]ny funds paid to the non–Federal entity in excess of the amount to which the non–Federal entity is finally determined to be entitled under the terms of the Federal award constitute a debt to the Federal Government." 45 C.F.R. § 75.391(a); *see also* HHS, *HHS Grants Policy Statement* (Apr. 16, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf, *archived at* https://perma.cc/82TZ-SJED. To recoup that debt, HHS can make "an administrative offset against other requests for reimbursements." 45 C.F.R. § 75.391(a)(1). Outside of the funding at issue, HHS provides billions of dollars in aid to Plaintiffs every year from which they could offset in the event they ultimately prevail. As such, it is unclear how Defendants could claim irreparable harm here.

## V.        The Court Should Not Require a Bond

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" to require bonds, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d

492, 520 (D.D.C. 2020). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

In enjoining government interference with congressional appropriations, courts in this district and across the country have declined to require plaintiffs to post bond. *See, e.g.*, Order Granting Mot. for TRO, *RFE/RL, Inc. v. Lake*, No. 25-cv-00799 (D.D.C. Mar. 25, 2025), ECF No. 14; *Nat'l Council of Nonprofits v. OMB*, 2025 WL, at *19 (D.D.C. Feb. 25, 2025); *Colorado v. HHS*, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in East Palo Alto v. HHS*, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025). As one such court recently held, "[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097-MSM-PAS, 2025 WL 1116157, at *24 (D.R.I. Apr. 15, 2025).

## VI.        Requested Relief

Plaintiffs respectfully request that the Court enter a preliminary injunction that:

(1) Enjoins Defendants from implementing or enforcing the Mass Termination Decision;

(2) Enjoins Defendants from reinstating the Mass Termination Decision for the same or similar reasons;

(3) Requires Defendants to resume the implementation of the grants of Plaintiff Local Governments and of state and local employers of AFSCME members that were affected by the Mass Termination Decision;

(4) Requires Defendants to provide written notice of the order within 24 hours to all Defendants and agencies, and their employees, contractors, and grantees; and

(5) Requires Defendants to provide a status report within 24 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

## CONCLUSION

For these reasons, Plaintiffs respectfully request a preliminary injunction.

Dated: April 30, 2025

Respectfully submitted,

**CHRISTIAN D. MENEFEE**
Harris County Attorney

/s/ Jonathan G.C. Fombonne
**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**TIFFANY BINGHAM**
Managing Counsel
Texas State Bar No. 24012287
D.D.C. Bar ID: TX0087
tiffany.bingham@harriscountytx.gov

**EDWARD D. SWIDRISKI III***
Senior Assistant County Attorney
Texas State Bar No. 24083929
Edward.Swidriski@harriscountytx.gov
Office of The Harris County Attorney
1019 Congress Plaza, 15th Floor

Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Counsel for Harris County, Texas*

AISHA RICH*
KATHERINE COURTNEY
ALEXANDRA KLIGER*
Public Rights Project
490 43rd Street, Unit #115
Oakland, California 94609
(510) 214-6960 (phone)
aisha@publicrightsproject.org
katiec@publicrightsproject.org
sasha@publicrightsproject.org

*Counsel for Columbus, Ohio, Nashville, Tennessee, and Kansas City, Missouri*

JOEL McELVAIN
POOJA BOISTURE*
SKYE L. PERRYMAN
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jmcelvain@democracyforward.org
pboisture@democracyforward.org
sperryman@democracyforward.org

*Counsel for Columbus, Ohio, Nashville, Tennessee, Kansas City, Missouri, and AFSCME*

*Admitted pro hac vice*

43