**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**HARRIS COUNTY, TEXAS**, *et al.*,

                Plaintiffs,

    v.

**ROBERT F. KENNEDY, JR.,** *in his official capacity as Secretary of Health and Human Services, et al.,*

                Defendants.

No. 25-cv-01275 (CRC)

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.     COVID-19 Appropriations Statutes.......................................................... 3

II.    HHS awarded more to STLTs than Congress specified, and HHS ultimately terminated the remaining grants at the end of the COVID-19 public health emergency ................................................................................................ 4

III.   The Grants Awarded to Local Government Plaintiffs ........................... 6

IV.   Plaintiffs' Claims ................................................................................... 9

LEGAL STANDARD......................................................................................... 10

ARGUMENT ..................................................................................................... 10

I.     Plaintiffs Are Not Likely of Success on the Merits ............................ 10

    A.   This Court lacks Subject Matter Jurisdiction because the Court of Federal Claims has Exclusive Jurisdiction over Contract Claims .................................... 11

        (a)   *Department of Education* requires denial of Plaintiffs' Motion for lack of jurisdiction...................................................... 12

        (b)   The D.C. Circuit's *Megapulse*-test also confirms that Plaintiffs' claims are disguised contract claims over which this Court lacks jurisdiction. ......................................................... 15

        (c)   Plaintiffs' counter-arguments on jurisdiction are unavailing........ 20

        (d)   Plaintiffs' status as subrecipient (for some grants) does not alter the analysis............................................................................. 23

    B.   Even if the Court has jurisdiction, Plaintiffs' attempt to challenge an alleged "Mass Termination Decision" is unreviewable........................................ 25

    C.   In any event, Plaintiffs' claims fail on the merits. ............................... 27

      1.   Plaintiffs' APA Claims are without merit .............................. 27

        (a)   Plaintiffs cannot show that Defendants lacked statutory authority. ................................................................................. 27

        (b)   Defendants' actions were not arbitrary and capricious................. 28

i

          2.     Plaintiffs' Constitutional law claims fail ................................................... 32

II.    Plaintiffs Will Not Face Irreparable Harm in The Absence of an Injunction ................... 33

III.   The Remaining Factors Favor Defendants ....................................................... 34

IV.   Any Relief Should Be Limited ................................................................. 35

      A.    AFSCME Does Not Have Standing ....................................................... 35

           1.     Associational Standing ............................................................. 36

           2.     Organizational standing ........................................................... 37

      B.    The Court should not enter a nationwide injunction turning on "state and local employes of AFSCME members" that were allegedly "affected" by the termination of grants. ................................................................. 39

V.    Any Injunction Should be Stayed, and Plaintiffs Should be Required to Post a Reasonable Bond if an Injunction is Entered. ................................................. 39

    CONCLUSION ............................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Alphapointe v. Dep't of Veterans Affairs*,
 475 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................... 12

*Am. Radio Relay League, Inc. v. FCC*,
 524 F.3d 227 (D.C. Cir. 2008) ....................................................................... 31

*American Near East Refugee Aid v. United States Agency for International Development*,
 703 F. Supp. 3d 126 (D.D.C. 2023) ............................................................... 23

*Bennett v. Spear*,
 520 U.S. 154 (1997) ........................................................................................ 26

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
 419 U.S. 281 (1974) ........................................................................................ 30

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*,
 344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................... 33

*California v. U.S. Dep't of Educ.*,
 Civ. A. No. 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025),
 *granting stay*, 145 S. Ct. 966 (2025) ............................................................ 12

*Chamber of Com. v. EPA*,
 642 F.3d 192 (D.C. Cir. 2011) ....................................................................... 36

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 33

*Climate United Fund v. Citibank, N.A.*,
 ---F. Supp. 3d---, 2025 WL 1131412 (D.D.C. Apr. 16, 2025),
 *appeal filed*, No. 25-5123 (D.C. Cir. Apr. 17, 2025) .................................. 20

*Cobell v. Norton*,
 391 F.3d 251 (D.C. Cir. 2004) ....................................................................... 10

*Columbus Reg'l Hosp. v. United States*,
 990 F.3d 1330 (Fed. Cir. 2021) ..................................................................... 22

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
 38 F.4th 1099 (D.C. Cir. 2022) ............................................................ *passim*

*Department of Education v. California*,
 604 U.S.---, 145 S. Ct. 966 (2025) ...................................................... *passim*

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ............................................................................... 35

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................... 30

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................................... 30

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................................................................... 38

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ............................................................................... 38

*Franklin-Mason v. Mabus*,
   742 F. 3d 1051 (D.C. Cir. 2014) ........................................................................... 11

*Furlong v. Shalala*,
   156 F.3d 384 (2d Cir. 1998) .................................................................................. 21

*Gateway City Church v. Newsom*,
   141 S. Ct. 1460 (2021) .......................................................................................... 14

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U. S. 204 (2002) ............................................................................................. 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ......................................................................................... 36, 37

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ................................................................................ 12

*Jin v. Ministry of State Sec.*,
   557 F. Supp. 2d 131 (D.D.C. 2008) ...................................................................... 38

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
   56 F.3d 279 (D.C. Cir. 1985) ............................................................... 16, 18, 22, 24

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .............................................................................................. 27

*Mallory v Norfolk S. Ry. Co.*,
   600 U.S. 122 (2023) .............................................................................................. 14

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ......................................................................... *passim*

*Nat'l Kidney Patients Ass'n v. Sullivan*,
   958 F.2d 1127 (D.C. Cir. 1992) ............................................................... 40

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ................................................................. 39

*Navab-Safavi v. Broad. Bd. of Governors*,
   650 F. Supp. 2d 40 (D.D.C. 2009), *aff'd sub nom.*
   *Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011) ...................... 21

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................................. 27

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................... 38

*Perry Capital, LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ...................................................... 11, 16, 24

*Pollack v. Hogan*,
   703 F.3d 117 (D.C. Cir. 2012) ................................................................. 18

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
   400 U.S. 62 (1970) ................................................................................. 26

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) ................................................................................. 14

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................... 33, 34

*Sedita v. United States*,
   ---F. Supp. 3d---, 2025 WL 387962 (D.D.C. Feb. 4, 2025) ....................... 18

*Seed v. EPA*,
   100 F.4th 257 (D.C. Cir. 2024) ............................................................... 25

*Shaffer v. Veneman*,
   325 F.3d 370 (D.C. Cir. 2003) ................................................................. 11

*Solutions in Hometown Connections v. Noem*,
   No. 8:25-cv-00885-LKG, 2025 WL 1103253 (D. Md. Apr. 14, 2025) .......... 15

*South Bay United Pentecostal Church v. Newsom*,
   141 S. Ct. 716 (2021) ............................................................................. 15

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ........................................................... 19, 24

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
   997 F.3d 1247 (D.C. Cir. 2021) ................................................................. 31

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................... 36

*Tandom v. Newsom*,
   593 U.S. 61 (2021) ................................................................................. 14

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ................................................................. 12

*Twin Metals Minn. LLC v. United States*,
   Case No. 22-cv-2506 (CRC), 2023 WL 5748624 (D.D.C. Sept. 6, 2023),
   *appeal filed*, No. 23-5254 (D.C. Cir. Nov. 9, 2023) ..................... 16, 17, 22

*Twin Rivers Paper Co. v. SEC*,
   934 F.3d 607 (D.C. Cir. 2019) ................................................................. 36

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025), *dismissed*,
   2025 WL 1350103 (D.C. Cir. May 2, 2025) .............................................. 18

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020),
   *appeal dismissed*, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021) ................ 31

*Widakuswara v. Lake*,
   ---F. Supp. 3d---, 2025 WL 1166400 (D.D.C. Apr. 22, 2025),
   *appeal filed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025) ............................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................... 10

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................... 33, 34

*Wright v. Foreign Serv. Grievance Bd.*,
   503 F. Supp. 2d 163 (D.D.C. 2007), *aff'd*, 2008 WL 4068606 (D.C. Cir. July 30, 2008) ....... 25

**STATUTES**

5 U.S.C. § 702 .......................................................................................... 11, 24

5 U.S.C. § 704 .............................................................................................. 26

5 U.S.C. § 706 .............................................................................................. 27

28 U.S.C. § 1491 ....................................................................................... 11, 13

42 U.S.C. § 247d ............................................................................................................ 5

42 U.S.C. § 300x-55 ..................................................................................................... 30

The Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020,
    Pub. L. No. 116-123, 134 Stat. 146 ...................................................................... 3, 4

The Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) .......................................................... 3, 4

The Paycheck Protection Program and Health Care Enhancement Act,
    Pub. L. No. 116-139, 134 Stat. 620 (2020) .......................................................... 3, 5

The Coronavirus Response and Relief Supplemental Appropriations Act, (2021),
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) ........................................................ 3, 5

The American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, 135 Stat. 4 ............................................................................. 3, 5

**RULES**

Fed. R. Civ. P 65 ...................................................................................................... 3, 40

**REGULATIONS**

10 C.F.R. § 600.25 ....................................................................................................... 30

45 C.F.R. § 74.61 ......................................................................................................... 30

45 C.F.R. § 74.115 ....................................................................................................... 30

45 C.F.R. §§ 75.371-375 .............................................................................................. 30

45 C.F.R. § 75.372 ....................................................................................................... 29

Economic Relief Related to the COVID-19 Pandemic,
    Exec. Order No. 14,002, 86 Fed. Reg. 7229 (Jan. 22, 2021) .................................. 29

**OTHER AUTHORITIES**

White House OMB Statement of Administration Policy, H.R. 1319 – American Rescue
    Plan Act of 2021 (Feb. 26, 2021) ............................................................................ 29

# INTRODUCTION

Plaintiffs, four local governments and a nationwide labor union, move for a preliminary injunction to order the federal government to payout, potentially, billions of dollars in COVID-19 era grants, which the government recently terminated. But this Court does not have jurisdiction over this lawsuit. Under the Supreme Court's recent decision, *Department of Education v. California*, 604 U.S.---, 145 S. Ct. 966 (2025) (per curiam), Plaintiffs' grant-related claims—styled under the Administrative Procedure Act (APA)—are, in essence, contract-based claims, that are subject to the exclusive jurisdiction of the Court of Federal Claim, under the Tucker Act. This case, which Plaintiffs bring against Defendants Department of Health and Human Service (HHS) and the Centers for Disease Control and Prevention (CDC) (and the agency heads), is indistinguishable in all material respects from *Department of Education,* which is binding precedent here. From the outset, the Court therefore should deny the Motion because Plaintiffs cannot make the requisite "clear showing" of likelihood of success on the merits, when they have brought their case in the wrong court.

Even if the Court had jurisdiction, Plaintiffs' claims are not reviewable under the APA. Plaintiffs' APA claims challenge what they call a "Mass Termination Decision," but Plaintiffs lack standing to challenge any such decision, as opposed to the individual grant terminations that Plaintiffs claim are actually harming them and whose reinstatement might redress Plaintiffs' alleged injury. Any such "Mass Termination Decision" also would not qualify as "final agency action" under the APA and any effort to challenge such a decision would constitute an unreviewable "programmatic challenge."

And even if the Court reached the merits, the APA and constitutional claims fail. Defendants provided a rational explanation for terminating the grants, explaining in part, "Now

1

that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out." In doing so, HHS properly utilized the termination clauses in the grants, which incorporated HHS regulations authorizing "for cause" termination. Moreover, Defendants have not acted contrary to law. The underlying COVID-19 supplemental appropriations statutes directed HHS to allocate money for "grants" or "cooperative agreements" to "state, tribal, local, and territorial entities" ("STLTs"). These lump-sum appropriations statutes generally specified a minimum amount to be allocated to STLTs. HHS not only abided by this instruction, but awarded *more* to the STLTs than the amounts specified by Congress, by the dates specified in the relevant appropriations statutes. HHS thus has not violated any statute or the Constitution.

The remaining preliminary injunction factors also strongly favor the federal government. Plaintiffs do not show irreparable harm, because they are just seeking money from the federal government, which they can pursue in the Court of Federal Claims. In contrast, as the Supreme Court observed in *Department of Education*, the federal government, as a practical matter, has no hope of recovering the terminated funds once they are disbursed, even if the government ultimately prevails on the merits. The proposed injunction also would be a profound intrusion into the prerogatives of the Executive Branch.

In the event the Court disagrees and issues an injunction, any relief should extend only to the grants received (directly or indirectly) by the four named local government plaintiffs, which are specifically identified in Plaintiffs' moving papers. Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") lacks standing, and the moving papers and record are devoid of any specifics to support the extraordinarily broad relief

2

AFSCME seeks.  The Court also should require a bond under Federal Rules of Civil Procedure

65(c).

## BACKGROUND

### I.    COVID-19 Appropriations Statutes

Plaintiffs challenge the termination of grants awarded, either directly or indirectly

through state agencies, under the following five COVID-19 appropriations bills.[1]  In each,

Congress appropriated money to HHS (directly or through CDC). Excerpts of relevant portions

are included in the Exhibits:

- The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 ("ARPA") (*See* **Ex. A**)
- The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES") (*See* **Ex. B**)
- The Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, Pub. L. No. 116-123, 134 Stat. 146 ("CPRSA") (*See* **Ex. C**)
- The Coronavirus Response and Relief Supplemental Appropriations Act, (2021) Pub. L. No. 116-260, 134 Stat. 1182 (2020) ("CRRSAA") (*See* **Ex. D**)
- The Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020) ("PPP"). (*See* **Ex. E**)

These appropriations statutes generally direct, with varied wording, a minimum amount

of funding to be provided by HHS to STLTs.  Some of these bills also specify the date by which

the funding must be made available and/or expended.  For example, The CARES Act provided

$4.3 billion to the CDC:

 to remain available until September 30, 2024, to prevent, prepare for, and respond to
coronavirus, domestically or internationally: *Provided*, That not less than
$1,500,000,000 of the amount provided under this heading in this Act shall be for
grants to or cooperative agreements with States, localities, territories, tribes, tribal
organizations, urban Indian health organizations, or health service providers to tribes
. . . .

---

[1] As explained further below, the Complaint and Motion do not clearly specify which
appropriation statutes underly claims by AFSCME.

*See* 134 Stat. at 554, **Ex. B**.

## II.    HHS awarded more to STLTs than Congress specified, and HHS ultimately terminated the remaining grants at the end of the COVID-19 public health emergency

For each appropriation statute, HHS awarded at least the full amount of money Congress instructed should go to STLTs, by the date set by Congress.  In most cases, HHS awarded more to STLTs than the amounts specified by Congress.

For example, although Congress appropriated $4.3 billion in coronavirus funding to the HHS through the CARES Act, Congress only directed that only $1.5 billion of those funds should go to STLTs, to remain available until September 30, 2024. HHS, in its discretion, awarded over $2.1 billion to STLTs by September 30, 2024.

Based on HHS's tracking each of its appropriated funding streams and the expenditure of those funds to each grant recipient, the following chart summarizes: 1) the total amount appropriated to CDC through these appropriations bills; 2) the date by which it had to be obligated by CDC; 3) the amount designated by the bill for STLTs; 4) the amount provided by the CDC to STLTs.  Source: Legier Decl.

| Appropriations Bill | Total Amount Appropriated to CDC | Amount Appropriated for CDC to Provide to STLTs | Amount Provided by CDC to STLTs |
|---|---|---|---|
| CPRSA<br><br>(134 Stat. at 147) | $2,200,000,000, available until September 30, 2022 | **$950,000,000** | **$1,113,063,558** |
| CARES<br><br>(134 Stat. at 554) | $4,300,000,000, available until September 30, 2024 | **$1,500,000,000** | **$2,108,793,598** |

| PPP (134 Stat. at 623-624) | $25,000,000,000 to HHS, available until expended | **$10,250,000,000** through HHS | **$10,532,321,503** |
|---|---|---|---|
| CRRSAA (134 Stat. at 1911) | $8,750,000,000, available until September 30, 2024 | **$4,290,000,000** | **$5,322,551,251** |
| ARPA (135 Stat. at 38-39) | $1,000,000,000 for vaccine-related uses; available until expended | **$0** | **$18,964,597,077** |

Pursuant to these Supplement COVID-19 appropriations, Harris County, Texas; Columbus, Ohio; Nashville and Davidson County, Tennessee; and Kansas City, Missouri (the "Local Government Plaintiffs") were awarded the grants at issue in this case (as discussed further below)—either directly by HHS, or indirectly, as a subgrantee (through an award by HHS to the relevant state agency).

On May 11, 2023, the HHS Secretary's final extension of the "public health emergency" declaration under 42 U.S.C. § 247d expired. On March 24, 2025, HHS terminated the remaining grants that were funded by these COVID-19 Supplemental Appropriations. The Termination Notices state:

> The purpose of this amendment is to terminate this award which is funded by COVID-19 supplemental appropriations. The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of this award is effective as of the date set out in your Notice of Award.
>
> No additional activities can be conducted and no additional costs may be incurred. Unobligated award balances will be de-obligated by CDC.

*See* Decl. of Brandon Maddox ("Maddox Decl."), Exs. A and B, ECF No. 14-3.  The

terminations allowed for drawdown funds for work performed by the termination date, under a

30-day closeout period.

### III.    The Grants Awarded to Local Government Plaintiffs

The Complaint and Motion specifically discuss four direct grants (from HHS to the Local

Government Plaintiffs), but do not attach copies of any of the actual grants.  The four direct

grants, and related documents for each, including the associated Notice of Funding Opportunity

("NOFO"), are as follows:

**A.  Award to Harris County Public Health.  Award#: 6 NH75OT000026-01 (the "Embrace HOPE Grant"), pursuant to statutory authority under 42 U.S.C. § 247(b). Awarded May 27, 2021, for $27,627,507, for the period June 1, 2021 to May 31, 2023.**

> *See* **Exhibit F**, including (i) original award, (ii) NOFO #CDC-RFA-OT21-2103, entitled *National initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities*; (iii) extension on February 22, 2024, and (iv) Termination on March 24, 2024.

**B.  Award to Harris County Public Health. Award#: NU58DP006986-01-00 August 23, 2021 (Community Health Workers for Public Health Response and Resilient Communities Grant) (the "CHW Grant"). Pursuant to statutory authority in 42 U.S.C. § 301(a), Award for $2,999,755, for the period Aug. 31, 2021 to Aug. 30, 2022.**

> *See* **Exhibit G**, including (i) original award, (ii) NOFO #DP21-2109 entitled *Community Health Workers for COVID Response and Resilient Communities (CCR)*; (iii) continuation on July 13, 2022, (iv) continuation on June 1, 2023, (v) extension on July 15, 2024, and (vi) Termination on March 24, 2024.

**C.  Tennessee COVID-19 Health Disparities Initiative, Award # 6 NU58DP006999-03-10, August 23, 2021, Pursuant to statutory authority in 42 U.S.C. § 301(a). Award for $1,000,000, for the period Aug. 31, 2021 to Aug. 30, 2024.**

> *See* **Exhibit H**, including (i) original award, (ii) NOFO #DP21-2109 entitled *Community Health Workers for COVID Response and Resilient Communities (CCR)* ; (iii) continuation on July 13, 2022, (iv) continuation on June 1, 2023, (v) extension on July 15, 2024, and (vi) Termination on March 24, 2024.

**D. Kansas City, MO, Award #** 6NH75OT000012-01-05,, **May 27, 2021, Pursuant to statutory authority in 42 U.S.C. § 247B(K)(2); Award for $3,674,514, for the period June 1, 2021 to May 31, 2023.**

> *See* **Exhibit I**, including (i) original award, (ii) NOFO #CDC-RFA-OT21-2103, entitled *National initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities* ; (iii) extension on February 28, 2023, (iii) extension on Feb. 21, 2024; and (iv) Termination on March 24, 2024.

Each award—both originally, and when renewed / continued / extended—incorporates

"Terms and Conditions." For example, the Notice of Award for the Harris County Embrace

HOPE Grant, awarded May 27, 2021 (at the top of the list above) provides:

---

**AWARD INFORMATION**

**Incorporation**: In addition to the federal laws, regulations, policies, and CDC General Terms and Conditions for Non-research awards at https://www.cdc.gov/grants/federalregulationspolicies/index.html, the Centers for Disease Control and Prevention (CDC) hereby incorporates Notice of Funding Opportunity (NOFO) number CDC-RFA-OT21-2103, entitled National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities, and application dated May 3, 2021, as may be amended, which are hereby made a part of this Non-research award, hereinafter referred to as the Notice of Award (NoA).

---

*See* Ex. F. As incorporated into the Award Information above, the "General Terms and

Conditions for Non-Research awards," provides the following, in relevant part, regarding

termination:

> **Termination (45 C.F.R. Part 75.372) applies to this award and states, in part, the following:**
> (a) *This award may be terminated in whole or in part:*
> (1) By the HHS awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award;
> (2) By the HHS awarding agency or pass-through entity for cause;
> ****

*See* Ex. J (p. 8) Further, as also incorporated in the Award Information above, the underlying

NOFO (#CDC-RFA-OT21-2103) states the following, in relevant part, regarding termination:

**6. Termination**

CDC may impose other enforcement actions in accordance with 45 CFR 75.371- Remedies for Noncompliance, as appropriate.

The Federal award may be terminated in whole or in part as follows:

(1) By the HHS awarding agency or pass-through entity, if the non-Federal entity fails to comply with the terms and conditions of the award;

(2) By the HHS awarding agency or pass-through entity for cause;

*See* Ex. A at 42 of 50, NOFO (#CDC-RFA-OT21-2103)

Similarly, the No-Cost Extension for this same grant, dated February 22, 2024, provides:

**ADDITIONAL TERMS AND CONDITIONS OF AWARD**

The General Terms and Conditions for non-research grants and cooperative agreements have been updated, effective January 23, 2024, to reflect current regulations and requirements for federal financial assistance.

The updated "General Terms and Conditions" (as referenced in the above "Additional Terms and Conditions of Award") includes the same information on termination, as referenced with the original "General Terms and Conditions." (*supra*).  See Ex. K, p. 9.

The above information is basically the same across the remaining three direct grants, listed above. *See* Exs. G-I.

Finally, the four Local Government Plaintiffs also allege termination of specific subgrants, as listed in the footnote below.[2]   But again, Plaintiffs do not provide the papers for

---

[2] **Harris County, TX**
- Award#: HHS001019500034 (Immunization COVID-19 Grant Program); and
- Award#: HHS000812700023) (the Infectious Disease Control Unit Grant);
*See* Compl. ¶¶ 37-58, ECF No. 1; *see also* Maddox Decl. and Exs. A, B, C (ECF No. 14-3
**Columbus, Ohio**
- "Enhanced Operations grant," *see* Compl. ¶¶ 59-61; *see also* Decl. of Edward Johnson and Ex. A (ECF No. 14-6);
- Enhanced Operations federal funding in the form of an Ohio Health Improvement Zones grant (Project #02520021OI0123), *see* Compl. ¶ 62; Decl. of Danielle Tong ("Tong Decl."), (ECF No. 14-7).
**Kansas City, Missouri**

these grants.  Defendants have been unable to locate the documents, but presently have no reason to believe that the relevant provisions—including termination—are different from those above.

## IV.    Plaintiffs' Claims

Plaintiffs filed their complaint—asserting APA, constitutional and ultra vires claims— and then moved for a preliminary injunction.  The remedy they seek is enforcement of the government's obligations under the terminated grant agreements—including the obligation to pay money.  Specifically, the Complaint asks the Court to: "(C) Enjoin Defendants to **reinstate the eliminated grant programs and to spend the funding** appropriated by the following laws for the purposes specified by Congress: [(1) CARES, (2) CRRSA, (3) ARPA, (4) CPRSA, and (5) PPP]."  Compl. (Prayer for Relief) at 53 (emphasis added).  The Complaint also seeks specific performance of the grants: "(D) Enjoin Defendants to **reinstate Plaintiffs' grants for the awarded project periods and to continue to administer the grants** to the same extent and in the same manner as prior to the unlawful terminations, in accordance with the governing statutes and regulations;" *Id*.   Among other things, the Complaint also asks the Court to: (A) Declare unlawful and vacate Defendants' decision to terminate the grant programs, and (B) Declare unlawful and vacate Defendants' terminations of Plaintiffs' grants."  *See Id*.

---

- Epidemiology & Laboratory Capacity Enhancing Detection Expansion ("ELC-ED") Grant
- The ELC Expansion for Community Health Workers ("CHW") Grant
- COVID-19 Adult Vaccination Supplemental ("AVS") Grant.

*See* Compl. ¶¶ 67-71; Decl. of Marvia Jones ("Jones  Decl.") and Ex. D (ECF No. 14-8).
**Nashville, Tenn**
- ELC-EDx, or Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases (ELC) - Building and Strengthening Epidemiology, Laboratory and Health Information Systems Capacity; and
- CDC-RFA-IP19-1901 Immunization and Vaccines for Children

*See* Compl. ¶¶ 63-66; *see also* Decl. of Bradley Thompson ("Thompson Decl.") and Ex. B (ECF No. 14-9).

The Preliminary Injunction also seeks specific performance:  "Order Defendants to

"**resume the implementation of the grants of** Plaintiff Local Governments and of state and

local employers of AFSCME members that were affected" by the grant termination decisions."

*See* Pl. Br. Proposed Order at 14-17, ECF No. 14-17.  The Preliminary Injunction Motoin also

seeks to: "Enjoin Defendants from implementing, enforcing, or effectuating" the grant

terminations; and "Enjoin Defendants from reinstating" the grant terminations for the same or

similar reasons.  (*Id*.) (also proposing to require notice and status report requirements).

As noted above, with respect to Plaintiff Local Governments, the Complaint and Motion

center around five appropriations statutes (CARES, CRRSA, ARPA, CPRSA, and PPP) and the

four direct awards listed above, as well as nine indirect awards.  *See* Exs. F-I; n.2, *supra*.   With

respect to AFSCME, the Complaint and Motion are not tethered to any specific COVID

appropriations statutes, to any specific state or local government, or to any specific grants.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary" remedy that "should be granted only when

the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v.

Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail, a moving party must demonstrate that

(1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in

the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    **Plaintiffs Are Not Likely of Success on the Merits**

### A. This Court lacks Subject Matter Jurisdiction because the Court of Federal Claims has Exclusive Jurisdiction over Contract Claims

"To bring a claim against the United States, a plaintiff must identify an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014). As explained below, Plaintiffs are unable to make this requisite "clear showing" to establish this Court's jurisdiction, in light of *Department of Education,* and therefore, Plaintiffs are not likely to succeed on the merits.

The only waiver of sovereign immunity Plaintiffs have identified for their claims is the APA. Regardless of how a claim is styled, a district court lacks jurisdiction over an APA claim if it "is in 'its essence' contractual." *Perry Capital, LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). This is because of the interplay between two statutes. Section 702 of the APA "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105-06 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). The Tucker Act waives sovereign immunity by providing that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." *See* 28 U.S.C. § 1491(a)(1). Thus, the D.C. Circuit has "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Capital*, 864 F.3d at 618-19 (citation omitted)). The Tucker Act "create[s] a presumption of exclusive jurisdiction in the Court of Federal Claims[.]" *Franklin-Mason* 742 F.3d at 1055. *See Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the

government, at least *vis a vis* the APA." (quoting *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)).[3]

### (a) *Department of Education* requires denial of Plaintiffs' Motion for lack of jurisdiction

In *Department of Education*, the Supreme Court recently held, in indistinguishable circumstances, that a district court likely lacks subject matter jurisdiction to "enjoin[] the Government from terminating various education-related grants," because the Tucker Act likely confers exclusive jurisdiction on the Court of Federal Claims, based on the contractual nature of the educational grants. *See* 145 S. Ct. at 968. In other words, the Supreme Court held that the APA's waiver of sovereign immunity likely did not extend to actions that challenge an agency's termination of grants.

Specifically, eight plaintiff states had sued the Department of Education, and the district court entered a TRO and ordered defendants to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded [ ] grants for recipients in Plaintiff States." *See California v. U.S. Dep't of Educ.*, Civ. A. No. 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025), *granting stay*, 145 S. Ct. 966 (2025). Ultimately, on appeal of this order, the Supreme Court explained that the government is "likely to succeed in

---

[3] This jurisdictional barrier ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 475 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract"). *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

showing the District Court lacked jurisdiction to order the payment of money under the APA."

145 S. Ct. at 968.  The Supreme Court reasoned:

> [A]s we have recognized, the APA's limited waiver of immunity **does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here.** *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002). **Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States."** 28 U.S.C. § 1491(a)(1).

*Id*. (emphasis added).

The circumstances here are indistinguishable from *Department of Education*.  Like the state plaintiffs suing the Department of Education, Plaintiffs here sue HHS seeking relief from the termination of government grants under which they received federal funding, and they challenge the grant-termination decision under the APA.  The COVID-19 appropriations statutes at issue here are lump-sum, like the appropriations statutes at issue in *Department of Education*—neither specify line-item amounts for any particular recipient.  *See* Exs. A-E.  And Plaintiffs here, like the plaintiff states in *Department of Education*, do not point to any specific statutory violation, or claim that any statute or regulation entitles them, in particular, to these grants; instead, the basis for their claim is in essence contractual.

The relief sought here and in *Department of Education* is also the same.  In *Department of Education*, the Supreme Court observed that the TRO "[1] enjoin[ed] the Government from terminating … [the] grants," "[2] requires the Government to pay out past-due grant obligations and [3] to continue paying obligations as they accrue."  *See* 145 S. Ct. at 968.  Plaintiffs here seek that same relief—specifically: (1) to "vacate Defendants' termination of Plaintiffs' grants" (2) to order "Defendants to reinstate Plaintiffs' grants for the awarded project periods and to continue to administer the grants to same extent and in the same manner as prior to the [] terminations …. ," and (3) to order Defendants "to reinstate the eliminated granted programs and

13

to spend the funding appropriated…." *See* Compl., Prayer for Relief (B), (C), (D), respectively.

*See also*, Pl. Br. Proposed Order (requesting that the Court enjoin Defendants from

"implementing, enforcing, or effectuating" the grant terminations and from "reinstating" the

grant terminations "for the same or similar reasons," and that the Court order Defendants to

"resume the implementation of the grants . . . .").  The same result therefore should follow:  like

the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the

APA" to compel Defendants "to pay money" pursuant to grants. *Dep't of Educ.*, 145 S. Ct. at

968.

 *Department of Education* is binding precedent on the issue of whether there is a

likelihood of success on the merits as to this Court's jurisdiction to hear this case.  Five justices

of the Supreme Court considered the issue, reached a conclusion, and provided their reasoning. It

is a ruling of our highest court, and thus binding on all lower courts.  And when Supreme Court

precedent "has direct application in a case," a district court "should follow the case which

directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decision."

*Mallory v Norfolk S. Ry. Co*., 600 U.S. 122, 124 (2023) (cleaned up). "This is true even if the

lower court thinks the precedent is in tension with some other line of decisions." *Id*. (citation

omitted). Indeed, the Supreme Court has explained the precedential effect of its per *curiam*

decisions and found lower court decisions erroneous for failing to follow that precedent. *See,*

*e.g., Tandom v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (citing *Roman Catholic Diocese of*

*Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam) (slip opinion)); *see also Gateway City*

*Church v. Newsom*, 141 S. Ct. 1460 (2021) (mem.) (holding that the Ninth Circuit's "failure to

grant relief was erroneous," because the right to injunctive relief was "clearly dictated" by the

Supreme Court's prior summary order on an application for injunctive relief in *South Bay United Pentecostal Church v. Newsom,* 141 S. Ct. 716 (2021) (mem.)).

Accordingly, this Court should follow *Department of Education*, and deny Plaintiffs' motion for preliminary injunction for lack of jurisdiction—as other courts have done. *See e.g., Solutions in Hometown Connections v. Noem*, No. 8:25-cv-00885-LKG, 2025 WL 1103253, at *8-10 (D. Md. Apr. 14, 2025) (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants in light of the *Department of Education* order and concluding that the plaintiffs' claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Electronic Order, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041 (D. Mass Apr. 14, 2025), ECF No. 42 (dissolving a TRO after acknowledging that the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also* Order, *Am. Ass'n of Colls. For Tchr. Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* order).

### (b) The D.C. Circuit's *Megapulse*-test also confirms that Plaintiffs' claims are disguised contract claims over which this Court lacks jurisdiction.

D.C. Circuit precedent also compels the conclusion that Plaintiffs' claims amount to contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction. The determination of whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on [1] the source of the rights upon which the plaintiff bases its claims, and [2] upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968)

(hereinafter "*Megapulse*-test").  "The [*Megapulse*] test seeks to ascertain whether claims brought

in federal court are, in fact, 'disguised' contract claims." *Twin Metals Minn. LLC v. United*

*States*, Case No. 22-cv-2506 (CRC), 2023 WL 5748624, at *5 (D.D.C. Sept. 6, 2023) (Cooper,

J.) (quoting *Megapulse*, 672 F.2d at 969), *appeal filed*, No. 23-5254 (D.C. Cir. Nov. 9, 2023).

 "In assessing the first prong of the *Megapulse* test, the D.C. Circuit considers whether the

plaintiff's 'rights and the government's purported authority arise from statute, whether the

plaintiff's rights exist prior to and apart from rights created under the contract, and whether the

plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to

which the government is a party.'" *Id.* (quoting *Crowley,* 38 F.4th at 1107).  And with respect to

the *Megapulse*-test's second prong on "type of relief sought," the court "look[s] to the

complaint's substance, not merely its form." *Perry Capital*, 864 F.3d at 619; *Kidwell v. Dep't of*

*Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1985).  This Court has explained:

> [A] claim is founded on a contract if the claim seeks the 'explicitly contractual
> remedy' of specific performance or the 'prototypical contract remedy' of damages.
> *Perry,* 864 F.3d at 619 (citation omitted). The classification of a claim depends not
> only on how it is pled, but on what relief would be "appropriate." *Megapulse,* 672
> F.2d at 968.  Under this prong, claims do not fall within the Tucker Act if the
> complaint requests "non-monetary relief that has 'considerable value' independent of
> any future potential for monetary relief.'" *Kidwell*[, 56 F.3d at 284.]

*Twin Metals*, 2023 WL 5748624, at *5.

 Applying the *Megapulse* test *in Twin Metals,* this Court concluded that it lacked

jurisdiction over plaintiffs' "objection to [a] lease cancellation"—"a disguised contract claim"—

because under the first prong, "the only sources of Twin Metals' asserted rights are [in] the

underlying leases," and under the second prong, "[t]he relief Twin Metals seeks is also properly

understood as contractual relief," notwithstanding that "Twin Metals does not request monetary

damages."  *See id.* at *4, *7.  The Court looked to "[t]he real harms alleged in the complaint":

that (i) Twin Metals spent money on a mining project in "reasonable reliance" of a renewal, and

(ii) Twin Metals cannot recoup its financial investment. *See id.* at *7. The Court concluded,

"[t]he Tucker Act, not the APA, allows plaintiffs to recover for these kinds of harms, in the form

of expectancy, reliance, and other monetary damages." *See id.*

Here, under the first prong, the only statutes on which Plaintiffs rely are lump-sum

appropriations bills, which do not specify amounts dedicated to any of the plaintiffs or other

particular recipients—but rather, authorize HHS, through "grants" or "cooperative agreements"

to provide money to STLTs. *See* Exs. A-E. Plaintiffs do not identify any specific violation of

these appropriations statutes. Instead, the source of the rights upon which Plaintiffs seek

continued grant funding are in the terms of the grants (i.e., contracts) that HHS awarded to them.

As for the second prong, Plaintiffs' complaint seeks specific performance in the form of

an order to pay money to the Award recipients. *See, e.g.,* Compl., Prayer for Relief (C) (ordering

HHS/CDC "to reinstate the eliminated grant programs and to spend the funding appropriated . .

."); *Id.*, Prayer for Relief (D) (ordering HHS/CDC "to reinstate Plaintiffs' grants for the awarded

project periods and to continue to administer the grants to the same extent and in the same

manner as prior to the unlawful terminations . . ."). Similarly, Plaintiffs' Motion seeks specific

performance: "Order[]" Defendants to "resume the implementation of the grants of Plaintiff

Local Governments and of state and local employers of AFSCME members that were affected"

by the grant terminations. *See* Pl. Br. Proposed Order at 2. And Plaintiffs likewise allege

"harms, in the form of expectancy, reliance, and other monetary damages." *See Twin Metals,*

2023 WL 5748624, at *7. *See* Pl.'s Mot. for a Prelim. Inj. at 28, ECF No. 14 ("Pl. Br.") (citing

Maddox Decl.); Maddox Decl. ¶14 ("[Harris County Public Health (HCPH)] relied and acted

upon its *expectation* and understanding that HHS/CDC would fulfill its commitment to provide

the grant funding it awarded to Harris County. HCPH's *reliance* on this funding included hiring employees . . ." (emphasis added)); Tong Decl. ¶ 11 ("CelebrateOne *relied* and acted upon its *expectation* and understanding that these funds would be available throughout the agreed performance period." (emphasis added)); *see also*, Pl. Br. at 18 ("Plaintiff Local Governments have invested significant time and resources into building these projects, with the idea that the last few steps would be completed with the remaining federal funds—funds to which they no longer have access." (citing Jones Decl. ¶¶ 8–10)).  Plaintiffs also do not seek "any non-monetary relief that has 'considerable value' independent of any future potential for monetary relief." *Kidwell*, 56 F.3d at 284 (citation omitted).

> As another judge of this Court put it:

> Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements. In even plainer English: The Conference wants the Government to keep paying up. Thus the Conference "seeks the classic contractual remedy of specific performance." . . . But this Court cannot order the Government to pay money due on a contract. *Id.* Such a request for an order that the government "must perform" on its contract is one that "must be resolved by the Claims Court."

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,  ---F. Supp. 3d---, 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025) (citations omitted), *dismissed*, 2025 WL 1350103 (D.C. Cir. May 2, 2025).

Plaintiffs argue that "[t]his Court may hear [their] constitutional [Spending Clause and separation of powers] and ultra vires claims even if the APA's waiver of immunity were unavailable." Pl. Br. at 30. [4]  This misses the point in *Department of Education*.

---

[4] Plaintiffs' authorities are simply inapplicable here.  *See* Pl. Br at 30 (alleging federal officers violated plaintiff's second amendment rights in connection with his attempt to purchase a gun (citing *Sedita v. United States*, ---F. Supp. 3d---, 2025 WL 387962 (D.D.C. Feb. 4, 2025))); *Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) (alleging federal officers rejected her job application in violation of her constitutional right to travel).

The Court focused on the *remedy* sought by plaintiffs and the *basis* of plaintiffs' claims. A suit belongs in the Court of Federal Claims when the source of plaintiffs' asserted right is a contract and what plaintiffs seek amounts to contractual remedies, regardless of whether Plaintiffs frame their claims as contract claims, APA claims, constitutional claims, or something else. *See Department of Education*, 145 S. Ct. at 968 (jurisdiction lies in the Claims Court when the suit is "based on 'any express or implied contract with the United States'" and the remedy seeks "to enforce a contractual obligation to pay money" (citations omitted)). The source of Plaintiffs' asserted rights are their grant agreements with the federal government—they would have no claim at all if not for those grant agreements. Indeed, in their Proposed Order, Plaintiffs explicitly identify the remedy they seek as enforcement of the government's obligations under the grants—including the obligation to pay money. *See* Pl. Br. Proposed Order at 2 (seeking an Order that "Defendants shall resume the implementation of the grants . . ."); Compl., Prayer for Relief (C) (seeking an order that "Defendants to reinstate the eliminated grant programs and to spend the funding appropriated"). In other words, the thrust of all these allegations is that Plaintiffs "seek an injunction requiring the government to pay monies" under terminated grants. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). "The right to these payments is created in the first instance by the contract" or grant agreement, not by any statutory or constitutional provision, and any such provision "confers no such right in the absence of the contract [or grant agreement] itself." *Id.*

Here, the heart of Plaintiffs' challenge is to get "the Government to keep paying up" on the terminated grants. They do not allege the statutes themselves are unconstitutional or that the government has violated Plaintiffs' individual constitutional rights. Plaintiffs therefore cannot avoid the Tucker Act by framing their challenge to the grant terminations as constitutional

claims.  Indeed, the D.C. Circuit "prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act." *Crowley*, 38 F.4th at 1107 (cleaned up); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982) (a plaintiff "should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarge waivers of sovereign immunity, as under the APA.").

### (c)  Plaintiffs' counter-arguments on jurisdiction are unavailing.

First, Plaintiffs' sole response to *Department of Education* is that "the plaintiffs [there] did not allege that the termination of their grants violated any statute" (but rather the terms and conditions of the grants).  *See* Pl. Br. at 32. But the same is true here.  Nowhere do Plaintiffs point to a specific statute and identify a specific violation by Defendants.[5]

Second, Plaintiffs argue that they satisfy the *Megapulse*-test because, under the first prong, the "source of [their] rights" is not "the individual grants that were awarded." *Id.* at 31 (citation omitted).  Rather, they argue that they challenge the "categorical decision to terminate *all grants* that had been funded under congressional appropriations for pandemic preparedness." *Id.* (emphasis added).  But Plaintiffs have no standing to challenge any such "categorical" decision, because only the actual termination of Plaintiffs' individual grants injured them.  Put

---

[5] Plaintiffs' cited cases concerning *Department of Education* are presently on appeal.  *See Widakuswara v. Lake*, ---F. Supp. 3d---, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) (cited at Pl. Br. at 32), *appeal filed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025).  We note that the appropriations statutes in *Widakuswara* contained line-item appropriations.  Because *Department of Education* is controlling precedent, Defendants do not believe it is necessary to await the *en banc* decision in *Widakuswara* before denying Plaintiffs' Motion.  *See also, Climate United Fund v. Citibank, N.A.*, ---F. Supp. 3d---,2025 WL 1131412 (D.D.C. Apr. 16, 2025) (cited at Pl. Br. at 33), *appeal filed*, No. 25-5123 (D.C. Cir. Apr. 17, 2025).

differently, reversing any such "categorical decision" would not redress Plaintiffs' injury because the individual terminations would remain.

Plaintiffs also argue that their "claims arise from Defendants' violations of the Constitution, Congress's statutory appropriations, and the procedural protections of the APA." *Id.* But the only legal "source . . . upon which" Plaintiffs could even plausibly "base[]" that asserted right, *see Crowley*, 38 F.4th at 1108, are the grants themselves. Plaintiffs have no colorable claim to funding whatsoever absent those contracts. *See Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) ("[T]he APA itself does not 'confer a substantive right to be free from arbitrary agency action,' . . . nor does it create any other substantive right that might be violated." (quoting *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998))), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). Thus, there is no merit to Plaintiffs' argument that their "challenge does not turn on individualized assessments of particular grant terms and conditions, or any other agreements." Pl. Br. at 31. The Court could not resolve Plaintiffs' claims without looking at the terms and conditions of the terminated grants.

Plaintiffs' argument (if any) under *Megapulse's* second prong, "the type of relief sought," is unclear. *See id.* at 31-32 (quoting *Megapulse*, 672 F.2d at 968). Elsewhere in their brief, Plaintiffs assert they bring this "action in equity to compel Defendants to comply with a statutory mandate." *Id.* at 30. This makes no sense because they cite to no specific statutory violation. Plaintiffs also claim that they "do not seek to enforce any provision of individual grant agreements for past due sums," *id.*, but their papers belie this assertion. *See* Compl., Prayer for Relief (D). In any event, as this Court observed, "[t]he 'plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction . . . because plaintiffs can bypass

Tucker Act jurisdiction by converting complaints which 'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Twin Metals*, 2023 WL 5748624, at *7 (quoting *Kidwell*, 56 F.3d at 284).  At base, Plaintiffs fail to show that their claims are not contract claims "disguised" as "APA claim[s]" under *Megapulse*.

Third, plaintiffs argue that "[i]n any event, the grants ... are not contracts"—because they lack the element of consideration.  Pl. Br. at 33.  But the Federal Circuit "treat[s] federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *See Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). To determine whether the standard conditions for a contract are met, the Federal Circuit "appl[ies] the traditional four-part test for the existence of a government contract: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Id*. at 1339.  The presence of these elements is clear, where, as reflected in the Notices of Award, there is an exchange of funding by CDC, in return for agreements by the recipient to comply with and support various federal government requirements.

For example, the Notice of Award at **Exhibit F** (Award#: 6 NH75OT000026-01 to Harris County Public Health, described *supra*), obligates the recipient to support the federal government's COVID-19 strategy:

> [R]ecipient agrees, as applicable to the award, to: ….assist the United States Government in the implementation and enforcement of federal orders related to quarantine and isolation… Recipient … will comply … with respect to the reporting to the HHS Secretary of results of tests intended to detect SRS-CoV-2 or to diagnose a possible case of COVID-19…..[T]he recipient is expected to provide to CDC copes of and/or access to COVID-19 data collected with these funds….This award is contingent upon agreement by the recipient to comply with existing and future guidance from the HHS Secretary regarding control of the spread of COVID-19.

22

Last, and relatedly, Plaintiffs misrely on this Court's decision in *American Near East Refugee Aid v. United States Agency for International Development*, 703 F. Supp. 3d 126 (D.D.C. 2023) ("*Anera*"). That case involved an agreement between a humanitarian organization (Anera) and USAID, which "funded Anera to build water and sanitation infrastructure in the West Bank and Gaza." *Id.* at 129. This Court concluded in part that where "[t]he agreement's stated purpose was to 'increase Palestinian access to water, sanitation and other small and medium scale community infrastructure,'" *id.* at 133 (citation omitted), "USAID and Anera's Cooperative Agreement did not confer direct, tangible benefits on the agency [(USAID)]," so it therefore does not constitute "consideration" for Tucker Act jurisdiction purposes. *Id.* In contrast, as shown by Plaintiffs' own papers, the grants at issue here provide tangible and direct benefits to the federal government. *See* Maddox Decl. ¶ 19 ("Limiting Harris County's ability to prevent, detect, and respond to outbreaks threatens public health in neighboring counties, throughout the state of Texas, and nationwide."); *see also* Pl. Br. at 18; Maddox Decl. ¶¶ 9, 19 (re Measles outbreak). Moreover, Plaintiffs overlook this Court's reasoning that nothing in the *Anera* agreement "granted USAID or other U.S. agencies access to or use of the new infrastructure," although funded by the US agency. Here, by contrast, as explained above, the grants contractually obligate the award recipient to support the federal government's COVID-19 efforts and policies.

### (d) Plaintiffs' status as subrecipient (for some grants) does not alter the analysis

Plaintiffs cannot escape the conclusion that their APA claims are "at [their] essence" contractual, *see Crowley*, 38 F.4th at 1106, by pointing to their status as subrecipients (i.e., sub-grantees) for some challenged grant terminations. Where a plaintiff has been awarded a subaward, although the plaintiff is not a party to the grant between the federal government and

the recipient (i.e., the state, as pass-through), the plaintiff's asserted right to funding is undoubtedly grounded in *a* contract—specifically, its subaward with the state, which is derived in turn from the primary award.  Consequently, Plaintiffs' claims can still be fairly characterized as the sort of claims "sound[ing] in contract" over which the Court lacks jurisdiction under the APA. *Perry Capital*, 864 F.3d at 619.

Additionally, a conclusion that claims sounding in contract would necessarily fall within the APA's waiver of sovereign immunity so long as they are brought by a subrecipient who is not in direct privity with the government would have perverse consequences. The Tucker Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, and to that end, the statute "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims," *Crowley*, 38 F.4th at 1106 (citation omitted); *see also Spectrum*, 764 F.2d at 895 (observing that "Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts"). The D.C. Circuit has consistently respected this jurisdictional boundary by reading the Tucker Act to "'impliedly forbid[]' contract claims against the Government from being brought in district court" under the APA's waiver of sovereign immunity. *Perry Capital*, 864 F.3d at 618-19 (quoting 5 U.S.C. § 702). Yet concluding here that Plaintiffs' APA claims fall within that waiver merely because Plaintiffs are not in direct privity with the federal government for some of the challenged grants would create an easily exploitable jurisdictional loophole, whereby claims for monetary relief that are grounded in a contract between the government and a prime contractor—claims that ordinarily should be brought in and resolved by the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106; *Spectrum*, 764 F.2d at 895—could instead be reviewed by district courts under the

APA so long as a *subrecipient* who benefits indirectly from the prime award is the one bringing suit.

The Court's endorsement of such a novel jurisdictional strategy here would threaten to undermine the jurisdictional scheme that Congress devised under the Tucker Act. *Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 180-81 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity . . . to obtain a district-court judgment that a government contract is void would 'create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.'" (quoting *Megapulse*, 672 F.2d at 967)), *aff'd*, 2008 WL 4068606 (D.C. Cir. July 30, 2008). Such an outcome would also upend the settled expectations and agreed-upon obligations reached by the federal government in its grants by subjecting any consequential exercise of a contractual right to APA lawsuits brought by subrecipients in district court, whereas an identical contract-based claim brought by a prime recipient could only be brought in the Court of Federal Claims. The APA's waiver of sovereign immunity should not be read to permit such an absurd result. *See Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) ("Courts, in turn, must strictly construe a waiver of sovereign immunity in terms of its scope, in favor of the sovereign." (cleaned up)).

**B. Even if the Court has jurisdiction, Plaintiffs' attempt to challenge an alleged "Mass Termination Decision" is unreviewable.**

Plaintiffs' three APA claims, Compl. Count IV, V, and VI, challenge what Plaintiffs call "Defendants' Mass Termination Decision." Plaintiffs define this purported decision as "Defendants' decision to terminate the[] 'COVID-related' CDC grant programs *en masse*." Compl. ¶ 5. Although Plaintiffs refer to a "Mass Termination Decision," the papers attached to their preliminary injunction motion include notices of termination for each direct grant at issue that explain that the grant is being terminated and the agency' reasoning. Plaintiffs' apparent

attempt to challenge an alleged "Mass Termination Decision," as opposed to the agency's decision to terminate each grant as evidenced by the individual notices of termination, fails for several reasons.

First, Plaintiffs lack standing to challenge any alleged "Mass Termination Decision." Any injury to Harris County (for example) stems from the notice of termination for each of its particular grants, not any alleged "Mass Termination Decision". For similar reasons, vacatur of any alleged "Mass Termination Decision" would not provide redress to Plaintiffs. Rather, redress would require *reinstatement* of each individual terminated grant.

Second, any alleged "Mass Termination Decision" would not qualify as final agency action, Pl. Br. at 22, because no legal consequences would flow from it. Finality is a prerequisite to judicial review of agency action. *See* 5 U.S.C. § 704. To be final, agency action must satisfy two independent requirements. *See Bennett v. Spear*, 520 U.S. 154, 177 (1997). First, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or interlocutory nature." *Id.* at 178 (citation omitted). Second, the action must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Here, any alleged "Mass Termination Decision" would not qualify as final agency action, at minimum, because it would not determine Plaintiffs' rights and obligations. Rather, "legal consequences . . . flow" only from the termination of each grant as manifested in the termination notice for each individual grant. *Bennett*, 520 U.S. at 178 (citation omitted).

Finally, any alleged "Mass Termination Decision" would be an unreviewable "programmatic" decision under *Lujan*. "[U]nder the terms of the APA, [Plaintiffs] must direct

[their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). In *Lujan*, the Supreme Court dispelled any notion that a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review [and] adversely affects [a plaintiff].

497 U.S. at 892-93. Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 66. Here, to the extent Plaintiffs seek to "vacate and set aside the [alleged] wholesale elimination of CDC's COVID-19-related grants," Compl. ¶ 14,[6] such a claim is precluded under the APA.

**C. In any event, Plaintiffs' claims fail on the merits.**

Even if the Court reaches the merits, Plaintiffs fail to show that Defendants lacked statutory authority to terminate the grants at issue or that the terminations were arbitrary and capricious, unconstitutional, or ultra vires.

**1. Plaintiffs' APA claims are without merit.**

**(a) Plaintiffs cannot show that Defendants lacked statutory authority.**

Plaintiffs argue that Defendants exceeded statutory authority, in violation of 5 U.S.C. § 706(2)(C), by terminating funding where "Congress specifically appropriated the funds for

---

[6] *See also* Compl. ¶ 157 ("Defendants' Mass Termination Decision, and its implementation . . . eliminates, wholesale, federal grant programs because they are funded through COVID-related appropriations laws"); *id.* ¶ 3 (alleging that President Trump "made dismantling the federal government's approach to COVID-19 a priority").

Plaintiffs' use during and beyond the COVID-19 pandemic." Pl. Br. at 23. But as made clear in the Background Section, the five appropriations statutes at issue in this case do no such thing. The underlying Covid-19 supplemental appropriations statutes directed HHS to allocate money for "grants" or "cooperative agreements" to "state, tribal, local, and territorial entities," not Plaintiffs specifically or any particular entity. These lump-sum appropriations statutes generally specified a minimum amount to be allocated to STLTs. HHS not only abided by this instruction, but awarded *more* to the STLTs than the amounts specified by Congress, by the dates specified in the relevant appropriations statutes. By obligating the appropriated funds through grants, HHS satisfied any duty it had under the appropriations statutes.

Plaintiffs do not contend that HHS violated any statutory requirement. Instead, they seek to find in congressional silence a restriction on what HHS may do once it has obligated the funds consistent with the appropriations statutes. *See id.* at 24 ("One would expect Congress to speak clearly if it intended to delegate to the Defendants the authority to terminate billions of dollars of public health funding based on a finding that the public health emergency is over."). But once HHS obligated the funds through grants and cooperative agreements, it fully satisfied any statutory requirements and the parties' further dealings were governed by the terms and conditions of the grants. If Congress had intended to impose additional restrictions on HHS's actions, it would have said so. There was no statutory violation.

### (b) Defendants' actions were not arbitrary and capricious

Nor is there any merit to Plaintiffs' four arguments that Defendants' actions were arbitrary and capricious.

First, Plaintiffs argue that HHS violated its own regulations by terminating the grants "for cause" without finding that Plaintiffs "fail[ed] to comply with the terms and conditions of the

grant instrument." *Id.* at 25.  As an initial matter, HHS's regulations are only relevant to the extent the terms and conditions of the grants at issue parrot the regulations or incorporated them. In any event, Plaintiffs' argument is meritless.  Both the "Termination" section of the grants' terms and conditions as well as the regulations demonstrate that the agency may terminate grants "for cause," as distinct from any violation of the grant terms and conditions. Both provisions list "for cause" as a separate basis for termination from "fails to comply with the terms and conditions of the award" as a basis for termination.  *See* 45 C.F.R. § 75.372(a)(1)-(2); *see* Background – Part III, *supra* (quoting terms and conditions).  Thus, these provisions make clear that "for cause" is distinct from non-compliance, and that the agency is permitted to terminate grants for reasons other than non-compliance.

The agency exercised its authority to terminate the grants for cause after determining that the purpose for which the grants were awarded was superseded by the end of the public health emergency.  The Termination Notices reflect this determination by stating that the pandemic was over.  The agency made these termination decisions years after Congress had appropriated the underlying funding to address the public health and economic crises caused by the global COVID-19 pandemic, *see* Economic Relief Related to the COVID-19 Pandemic, Exec. Order No. 14,002, 86 Fed. Reg. 7229 (Jan. 22, 2021); White House OMB Statement of Administration Policy, H.R. 1319 – American Rescue Plan Act of 2021 (Feb. 26, 2021), and HHS had expeditiously provided funding to the states and local governments through many different types of grants specifically for the purpose of addressing the COVID-19 pandemic.  The grant terminations thus comported with the express terms and conditions incorporated therein.

Relatedly, Plaintiffs allege that Defendants failed to provide a rational explanation for terminating the grants, but Plaintiffs mistake the standard. *See* Pl. Br. at 26.  "Under the

'arbitrary and capricious' standard the scope of review is a narrow one." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 285 (1974). Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned." *Id*. at 286. Put differently, the agency need only articulate "a 'rational connection between the facts found and the choice made,'" *id*. at 285 (citation omitted), acting within a wide "zone of reasonableness*." FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation provided in the Termination Decisions, *see* supra, amply clear this bar. Rather than addressing the agency's explanation, Plaintiffs cite to various authorities that have no bearing on the grants at issue.[7]

Second, Plaintiffs argue that "Defendants cannot depart from their previous policy without explanation." Pl. Br. at 27 (citing *FCC v. Fox Television Stations, Inc*. 556 U.S. 502, 512 (2009)). At the outset, Plaintiffs are mistaken to assume that the "policies" they fault here—in contrast to the more formal policies at issue in *Fox Television*—are subject to this doctrine at all. In any event, the argument fails because HHS *did* explain its decision *vis a vis* the ending of the pandemic. Plaintiffs argue that "Defendants have renewed multiple deadlines for Plaintiff Local Governments' grants," *id.*, but the HHS Grants Policy Statement explains—in connection with

---

[7] *See* Pl. Br. at 25 (citing to a 1982 administrative decision concerning 45 C.F.R. § 74.115, and a 1988 administrative decision concerning 45 C.F.R. § 74.61, without attempting to reconcile the language used with the terms and conditions at issue here). Nor do Plaintiffs explain how a passing citation to 45 C.F.R. §§ 75.371-375 (Remedies for Noncompliance) (cited at Pl. Br. at 25) demonstrates arbitrary and capricious action. Plaintiffs likewise fail to explain any connection to 42 U.S.C. § 300x-55(a) (which concerns "Block Grants Regarding Mental Health and Substance Abuse"), where none of the grants at issue here involve that program. Similarly, Plaintiffs fail to explain how a Department of Energy regulation, 10 C.F.R. § 600.25 (cited at Pl. Br. at 25), has any bearing on HHS/CDC grants.

continuations and extensions—"Funding is based on adequate performance, availability of

funding, <u>and the best interests of the federal government</u>." *See* Ex. L (emphasis added).[8]

Third, and relatedly, Plaintiffs argue that "Defendants acted arbitrarily and capriciously

when they failed to account for legitimate reliance on prior interoperation of the COVID-19-

related appropriations." Pl. Br. at 28 (citation omitted). But the APA requires the weighing of

only those interests that are "legitimate" and "serious." *See, e.g., Whitman-Walker Clinic, Inc. v.*

*U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 49 (D.D.C. 2020) (citations omitted),

*appeal dismissed*, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021). And again, at the time of the

grant terminations, HHS already had awarded more to STLTs than the amounts specified by

Congress, by the dates specified in the relevant statutes. So it is hard to see how Plaintiffs can

reasonably claim that they had "legitimate" and "serious" reliance interests beyond those

amounts. Moreover, with respect to Plaintiffs' work and expenditure of funds prior to the

termination of the grants, HHS allowed Plaintiffs to draw down from funds for any work that

they already had done prior to the termination date. (See Terminations Notices).

Last, Plaintiffs argue that, under *Spirit Airlines, Inc. v. U.S. Department of*

*Transportation*, "[a]n agency is required to consider responsible alternatives to its chosen policy

and to give a reasoned explanation for its rejection of such alternatives." 997 F.3d 1247, 1255

(D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir.

2008)). But this presupposes a formal "policy" here akin to that in *Spirit,* and improperly

suggests that this doctrine would apply whenever an agency changes its mind about anything.

---

[8] The version of the HHS Grants Policy Statement attached at Exhibit L, with effective date April 16, 2025, is in all relevant respects, for purposes of this case, the same as the preceding version of the Grants Policy Statement.

The Termination Notices make clear that HHS viewed the grants as unnecessary—with the end of the pandemic, "their limited purposes has run out."  *See* Exs. F, G, H, I.

### 2.  Plaintiffs' Constitutional law claims fail

Finally, Plaintiffs cannot show that "Defendants' actions contravene the principle of separation of powers [or] the Spending Clause, [or] are ultra vires." Pl. Br. at 19.

First, Plaintiffs argue that Defendants have violated the separation of powers because "[t]he Executive's actions here directly contravene Congress's appropriations for Plaintiffs' public health programming." *Id*. at 20.  This argument is meritless, because again, the statutes in question authorize HHS to allocate amounts to STLTs generally (not Plaintiffs specifically) through grants, and HHS not only abided by this instruction, but it awarded more to STLTs than the amounts specified by Congress by the dates specified in the relevant statutes.[9]

Second, plaintiffs allege that Defendants violated the Spending Clause by "retroactively" imposing "conditions" on the grants to limit them to the duration of the COVID-19 pandemic. *See id.* at 21.  Again, Plaintiffs overlook that HHS complied with all requirements imposed by Congress by allocating the specified funding to STLTs through grants.  And HHS relied on the terms and conditions of those grants in terminating the funding.  The "for cause" termination provision on which HHS relied was not imposed retroactively—it was written into the grants at the time they were awarded.

---

[9] In passing, at page 20, Plaintiffs argue that under the Congressional Budget & Impoundment Control Act of 1974, to rescind funds Congress has appropriated, the Executive must follow rescission procedures (*i.e*., proposing the rescission to Congress).  But plaintiffs fail to show that there is any "recission" here in the first place triggering any obligations.

Finally, plaintiffs predicate their ultra vires claims against Defendants Kennedy and Monarez upon their allegation of a violation of the separation of powers and the Spending Clause. As already explained above, those claims are meritless.

## II.    Plaintiffs Will Not Face Irreparable Harm in The Absence of an Injunction

A showing that the movant will likely suffer an irreparable injury "is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted). In this Circuit, it is a "high standard" to meet. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "[T]he injury 'must be both certain and great; it must be actual and not theoretical.'" *Id*. (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And "the injury must be beyond remediation." *Id*. "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Id*. at 297–98 (quoting *Wis. Gas*, 758 F.2d at 674). "Bare allegations of what is likely to occur" and "conclusory assertions of potential loss" will not suffice. *Wis. Gas*, 758 F.2d at 674; *Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). If the moving party fails to substantiate its claim of irreparable harm, it is not entitled to injunctive relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiffs make sweeping assertions of harm but fail to address the fundamental problem that the relief they seek is *monetary damages*—the classic example of harm that can be

remedied.  At base, they want the federal government to pay money, via reinstatement of their terminated grants.   It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas*, 758 F.2d at 674.

Further, a number of the alleged harms are simply speculative—far from "certain and great." *See id.  See also* Maddox Decl. ¶ 15 ("A prolonged loss of funding would force the termination of grant-funded positions . . ."); *id.* ¶ 17 ("termination of these grants 'for cause' *may* also have adverse consequences . .  ..in the future . . ." (emphasis added)); Pl. Br. at 38 ("making it more likely that work will not be compensated"); *id.* ("A failure to so certify *may* make Nashville less competitive for future grant awards" (emphasis added)).  Moreover, loss of employment generally does not constitute irreparable injury.  *Sampson v. Murray*, 415 U.S. 61 (1974).

## III.    The Remaining Factors Favor Defendants

The balance of equities and public interest strongly favor the federal government, because the harm to the federal government from an injunction would be irreparable.  If the Court does not issue a preliminary injunction and Plaintiffs ultimately prevail in the case, they can seek money damages. But the opposite is not true—if the grantees are given access to the remaining grant funds now, and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Accordingly, HHS will bear all the risk if the Court enters a preliminary injunction. The Supreme Court recognized precisely that dynamic in *Department of Education* when it stayed the TRO granted by the district court in that case:

> *[The states] have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee "promised to return withdrawn funds should its grant termination be reinstated," and the District Court declined to impose bond. . . . By contrast, the Government compellingly argues that*

34

> [the states] would not suffer irreparable harm while the TRO is stayed. [The states] have represented in this litigation that they have the financial wherewithal to keep their programs running. So, if [the states] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum. And if [the states] instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making.

145 S. Ct. at 968-69 (citation omitted and emphasis added).

Moreover, the relevant harm to the federal government is not merely the forced expenditure of (unrecoverable) money during the pendency of this litigation. The harm is also the forced expenditure of money in support of causes that are inconsistent with Executive Branch policy objectives. Put another way, it is not just a loss of money, but also a loss of control that has been vested by statute in the Secretary, who in turn answers to the President and thus the public at large. Forcing the government to financially support causes at odds with its own policies, and Congress's express purpose for the funds, inflicts a distinct and irremediable harm on the public that goes beyond the expenditure of appropriated funds.

## IV.    Any Relief Should Be Limited

To the extent the Court grants any injunction, it should be limited to the four Local Government Plaintiffs, and the (terminated) grants awarded to those plaintiffs (directly or indirectly) that are specifically identified in Plaintiffs' Motion. AFSCME's presence in this suit does not provide a basis for expanding any injunction, as explained below.

### A.  AFSCME Does Not Have Standing

"A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed" on the merits and, as such, is not entitled to pretrial injunctive relief. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017). Although Plaintiffs do not address standing in their Motion, they assert in their complaint AFSCME has both associational and organizational standing. *See* Compl. ¶ 22.

### 1. Associational Standing.

An organization has standing to bring suit on behalf of its members when (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). AFSCME fails at the first step (as well as at the third, as explained below), because the organization fails to identify any individual member with standing in his or her own right.  "It is not enough to aver that unidentified members have been injured." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quoting *Chamber of Com. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011)). Rather, the "organization must provide 'individual affidavits' from 'members who have suffered the requisite harm.'" *Id*. (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

Only two of AFSCME's six declarants, Ms. Hedi Heddings and Ms. Eva Hewitt, are members who allege injury in their own right.[10]  These declarations, however, reveal that the alleged basis of the injury is insufficient to establish standing.

First, Ms. Heddings' declaration shows that, notwithstanding grant termination, she still is employed with the Alaska State Department of Health.  She states that in August 2024, her title was "Public Health Informaticist II" (Division of Public Health, Section of Public Health Nursing) and that "the majority of funding for [her] position, including funding for the creation of [a] new electronic health record, came from Immunization Grant Funding" from HHS. Decl. of Heidi Heddings ¶¶ 3, 5, ECF No. 14-11.  Following the termination of that funding, she states

---

[10]  The other two AFSCME members, Megan Peters-Wiseman, and John Henry, Jr., do not assert a loss of employment or other cognizable injury.

that she was informed of an opportunity in a different role in the Division of Behavioral Health, and she states, "I indicated I was interested, and met with that Division.  I was transferred to the Division of Behavioral Health, and I now  work as a Public Health Informaticist II in that division."  *Id.* ¶¶ 10-11.  Although Ms. Heddings references stress, issues with a longer commute, and loss of the satisfaction she felt from her earlier work, *id.* ¶¶ 14-18, these are not sufficient to establish injury in fact.

Second, Ms. Hewitt states in her declaration that she was "hired as a nonpermanent staff" at the Alaska State Department of Health, and her position was funded by Covid-related funding. Decl. of Eva Rose Hewitt ¶¶ 3, 5, ECF No. 14-12. She continues, "I understood that my role was nonpermanent and dependent on grant timelines.  The grant I was working under ended on June 30, 2025 and paperwork had been filed requesting an extension for two more years, lasting through June 2027." *Id.* ¶ 5. She states that, due to the termination of the grant, she lost her employment in April 2025. *Id.* ¶ 7.  Loss of a nonpermanent position that likely would have ended on June 30, 2025 in any event is not sufficient to show injury in fact.  Moreover, any suggestion that the grant funding Ms. Hewitt's position would have been extended is pure speculation.

Because AFSCME has not identified any individual member with standing in his or her own right, it lacks associational standing.  And AFSCME also lacks associational standing because "the claim asserted [and] the relief requested require[] the participation of individual members in the lawsuit."  *See Hunt*, 432 U.S. at 343.  Specifically, the claims asserted and relief requested require identification of the specific grants at issue with respect to AFSCME members.

### 2.  Organizational standing

Alternatively, an organization may show standing to sue in its own right by satisfying the traditional criteria applicable to individuals—*i.e.,* a cognizable injury in fact, causation, and redressability. To satisfy the injury-in-fact requirement, an organizational plaintiff must show "more than a frustration of its purpose," since the mere hindrance to a nonprofit's mission "is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). Instead, for an organization to have standing, it must have "suffered a concrete and demonstrable injury to [its] activities." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). It is not enough, however, if the organization merely "diverts its resources in response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike." *Id*. An organization cannot "spend its way into standing" in that way. *Id*. at 394.

Here, Plaintiffs' Motion again says nothing about what, exactly, their theory of organizational standing is. That alone is reason enough to reject the claim, given their burden on this point. *See Jin v. Ministry of State Sec*., 557 F. Supp. 2d 131, 144 n.9 (D.D.C. 2008) (the "court has no duty to comb through the record without direction from the parties"). And Plaintiffs' declarations are insufficient to show standing. *See* Decl. of Amy M. Spiegel ¶ 14, ECF No. 14-13 (speculating that the loss of members from layoff results in a "diminished public workforce to service our communities," and the "loss of dues revenue," and reduced strength "at the bargaining table"); Decl. of John Henry Jr. ¶14, ECF No. 14-16 (similar); Decl. of Shaun C. O'Brien ¶ 7, ECF No. 14-14 ("as a labor organization," AFSCME "will dedicate resources" to support laid-off workers).  "The mere fact that an organization redirects some of its resources to

litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (citation omitted).

AFSCME lacks standing. Thus, its presence in this case does not provide a basis for expanding any injunction beyond the four Local Government Plaintiffs.

> **B.    The Court should not enter a nationwide injunction turning on "state and local employes of AFSCME members" that were allegedly "affected" by the termination of grants.**

Finally, apart from the standing defect, the Motion lacks the necessary specifics for any injunction to be based on AFSCME. Plaintiffs state that AFSCME "members include public health employees in *various states and localities around the country* that . . . received federal funding from these programs." Pl. Br. at 11. And Plaintiffs seek an order to "resume the implementation of the grants of … state and local employers of AFSCME members that were affected" by the grant terminations. *See* Pl. Br. Proposed Order at 2. But the Complaint and Motion fail to provide any specifics needed to craft appropriately tailored relief. The moving papers, for example, do not identify what grants would be covered.

The Court therefore should limit any remedy as set forth above.

**V.    Any Injunction Should be Stayed, and Plaintiffs Should be Required to Post a Reasonable Bond if an Injunction is Entered.**

To the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

Last, the Court should reject Plaintiffs' argument that they should not be required to post a bond. Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The "precise purpose" of such a bond is to ensure that a defendant can be fairly compensated for injury stemming from a wrongfully granted injunction. *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

The starting point for determining the amount of the bond should be the award balance amount for each direct grant of the Local Government Plaintiffs, discussed in the Motion, at the time the grant was terminated, which is as follows:

| Recipient | Award Number | Closeout Submitted | Award Balance 3/24/25 | Award Balance 5/13/25 |
|---|---|---|---|---|
| Harris County, TX | 21NH75OT000026C5 | Yes | $4,435,194 | $4,005,605.21 |
| Harris County, TX | 21NU58DP006986C3 | Yes | $1,034,010 | $561,354.55 |
| Kansas City, MO | 21NH75OT000012C5 | Yes | $633,353.00 | $516,227.25 |
| Nashville and Davidson, TN | 21NU58DP006999C3 | No | $1,447,100.00 | $1,130,788.28 |

*See* Legier Decl., ¶ 15. Thus, as an initial matter, the bond among should include at least $5,469,204 for Harris County; $633,353 for Kansas City, and $ 1,447,100 for Nashville and Davidson County.

The bond also should include the award balance for the indirect grants of the four Local Government Plaintiffs. Defendants presently do not have that information available, but to the extent the Court issues injunctive relief, Defendants respectfully request that the Court order Local Government Plaintiffs to provide this information before the issuance of any injunctive

relief so the Court can determine the proper bond amount.  Finally, to the extent the Court awards any injunctive relief with respect to AFSCME, the Court should require AFSCME to provide information necessary for the Court to determine the proper bond amount with respect to any grants impacted by that relief.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: May 14, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       MICHELLE BENNETT
                                       Assistant Director, Federal Programs Branch

                                       */s/ Steven M. Chasin*
                                       STEVEN M. CHASIN
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, DC 20005

                                       *Counsel for Defendants*