# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HARRIS COUNTY, TEXAS**, *et al.*,

                *Plaintiffs*,

v.

**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services, *et al.*,

                *Defendants*.

Case No. 1:25-cv-01275-CRC

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
## <u>FOR A PRELIMINARY INJUNCTION</u>

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I.   This Court has subject matter jurisdiction over Plaintiffs and Plaintiffs'
     claims..........................................................................................................2

     A.   The Court has jurisdiction over Plaintiffs' constitutional claims,
          which do not require any waiver of sovereign immunity..........................2

     B.   The Court also has jurisdiction over Plaintiffs' APA claims, which
          do not turn on any contract and do not seek money damages. ...................3

          1.   The source of Plaintiffs' claims is the Constitution, the
               congressional appropriations, agency regulation, and the APA...........4

          2.   Plaintiffs do not seek any contractual remedy......................................5

          3.   *Department of Education v. California* does not render this
               Court an improper forum....................................................................6

     C.   The CFC does not have jurisdiction over Plaintiffs' claims and thus
          cannot divest this Court of jurisdiction. ....................................................7

     D.   Plaintiffs have standing. ...........................................................................9

II.  Plaintiffs are likely to succeed on the merits of their claims..........................11

     A.   Plaintiffs are likely to succeed on the merits of their constitutional
          and equitable *ultra vires* claims...............................................................12

     B.   Plaintiffs are likely to succeed on their APA claims. ...............................13

          1.   Defendants' Mass Termination is reviewable action. .........................13

          2.   Defendants' actions violate the APA because they are
               unconstitutional. ................................................................................14

          3.   Defendants violated the APA because they lacked statutory
               authority for their actions. .................................................................14

          4.   Defendants' actions violate the APA because they are arbitrary
               and capricious. ...................................................................................15

III. Plaintiffs will be irreparably harmed absent a preliminary injunction. ...........19

IV.  The remaining preliminary injunction factors favor relief. .............................21

i

V.  The requested scope of relief is warranted. .......................................................22

VI. The Court should neither require a bond nor stay its decision pending
    appeal...........................................................................................................25

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*ABA v. U.S. DOJ*,
No. 25-CV-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025) ...passim

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) ........................................................................ 10

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ....................................................................................... 15

*Allen v. Milligan*,
599 U.S. 1 (2023) .............................................................................................. 6

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) ......................................................................... 19

*Am. Fed'n of Labor & Congress of Indus. Orgs. v. DOL*,
No. CV 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025)............. 14

*Am. Library Ass'n v. Sonderling*,
No. CV 25-1050 (RJL), 2025 WL 1262054 (D.D.C. May 1, 2025)............. 11

*Am. Near E. Refugee Aid v. U. S. Agency for Int'l Dev.*,
703 F. Supp. 3d 126 (D.D.C. 2023) ................................................................ 5

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ......................................................................................... 8

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .................................................................................. 3, 5, 8

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................................ 2

*Climate United Fund v. Citibank, N.A.*,
No. 25-CV-698 (TSC), 2025 WL 1131412, (D.D.C. Apr. 16, 2025),
*appeal docketed*, No. 25-5122 (D.C. Cir. Apr. 16, 2025)................... 6, 16, 21

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ....................................................................................... 13

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ....................................................................... 4

iii

*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025) ................................................................................... 6, 7

*Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025) .................... 7

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ...................................................................... 11

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ....................................................................................... 17

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ....................................................................................... 11

*FEC v. Cruz,*
    596 U.S. 289 (2022) ....................................................................................... 14

*Florida v. HHS,*
    19 F.4th (11th Cir. 2021) ............................................................................... 23

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ......................................................................................... 5

*Green v. U.S. Dep't of Justice,*
    54 F.4th 738 (D.C. Cir. 2022) .......................................................................... 9

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ....................................................................................... 11

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 12

*Kollodge v. State,*
    757 P.2d 1028 (Alaska 1988) .......................................................................... 11

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) .................................................................................... 2, 13

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
    No. CV 25-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ...................... 10

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed. Cir. 1995) .......................................................................... 7

*Local 2677, Fed'n of Gov't Emps. v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973) ........................................................................ 3

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................... 9

iv

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................. 14

*Lummi Tribe of the Lummi Reservation v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) ............................................................... 6

*Maine v. USDA*,
  No. 1:25-cv-131-JAW, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .............. 6

*Massachusetts v. NIH*, 25-CV-10338,
  2025 WL 702163 (D. Mass. Mar. 5, 2025) ........................................ 18, 22, 24

*Md. Dep't of Human. Res. v. HHS*,
  763 F.2d 1441 (D.C. Cir. 1985) ............................................................... 5

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ................................................................................. 8

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ........................................................... 3, 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ................................................................................... 18

*Nat. Res. Def. Council, Inc. v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971) ............................................................. 25

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................... 25

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
  No. 25-CV-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ............... 23

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ............................................................... 16

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ............................................................. 25

*Nat'l Weather Serv. Emps. Org., Branch 1-18 v. Brown*,
  18 F.3d 986 (2d Cir. 1994) ..................................................................... 10

*Nat'l Wildlife Fed'n v. Hodel*,
  839 F.2d 694 (D.C. Cir. 1988) ................................................................. 9

*New York v. Trump*,
  No. 25-cv-39, 2025 WL 1098966 (D.R.I. Apr. 14, 2025),
  *appeal docketed*, No. 25-1413 (1st Cir. Apr. 28, 2025) ........................... 6

*Ohio v. EPA*,
   603 U.S. 279 (2024) ....................................................................................... 15

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................... 25

*Pollack v. Hogan*,
   703 F.3d 117 (D.C. Cir. 2012). ........................................................................ 2

*Quarles v. United States*,
   587 U.S. 645 (2019) ....................................................................................... 12

*Rhode Island v. Trump*,
   No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868
   (D.R.I. May 6, 2025) ......................................................................................... 6

*Sampson v. Murray*,
   415 U.S. 61 (1974) ......................................................................................... 19

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*,
   841 F. Supp. 2d 349 (D.D.C. 2012) ............................................................... 20

*Spirit Airlines, Inc. v. Dep't of Transp.*,
   997 F.3d 1247 (D.C. Cir. 2021) ..................................................................... 18

*Stephens v. United States*,
   165 Fed. Cl. 341 (2023) .................................................................................... 7

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ....................................................................................... 10

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) .......................................................................... 8

*Tourus Recs., Inc. v. DEA*,
   259 F.3d 731 (D.C. Cir. 2001) ....................................................................... 17

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992), *overruled in part on other grounds*,
   *Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) .................................................................... 3, 4

*Twin Metals Minn. LLC v. United States*,
   No. 22-CV-2506 (CRC), 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ......... 4, 5

*U.S. Enrichment Corp. v. United States*,
   117 Fed. Cl. 548 (2014) .................................................................................... 8

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ...................................................................................11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) .....................................................................................9

*Webster v. Doe*,
    486 U.S. 592 (1988) .....................................................................................8

*Woonasquatucket River Watershed Council v. USDA*,
    No. 25-cv-97-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025),
    *appeal docketed*, No. 25-1428 (1st Cir. May 18, 2025).....................6, 22, 24

**STATUTES**

5 U.S.C. § 704 ........................................................................................13

5 U.S.C. § 706(2) .............................................................................14, 25

28 U.S.C. § 1491(a)(1) ............................................................................3

31 U.S.C. § 1552(a) ...............................................................................12

31 U.S.C. § 1553(a) ...............................................................................12

ARPA, Pub. L. No. 117-2, 135 Stat. 4 (2021).........................................23

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020)..........................12

CRRSAA, 2021, Pub. L. No. 116-260, 134 Stat. 1184 (2021) ................23

Fiscal Responsibility Act, Pub. L. No. 118-5, 137 Stat. 10 (2023) ..........15

**REGULATIONS**

45 C.F.R. § 75.372(a) .............................................................................16

45 C.F.R. § 75.372(b) .............................................................................20

45 C.F.R. § 75.391 ................................................................................21

45 C.F.R. §§ 75.371-375 .......................................................................16

**OTHER AUTHORITIES**

HHS Grants Terminated, https://perma.cc/8YYL-69JW ..........................23

Opening Br. of Def.-Appellant,
    *112 Genesee St., LLC v. United States*,
    No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15 ..................................... 6

Paul G. Dembling & Malcolm S. Mason,
    ESSENTIALS OF GRANT LAW PRACTICE § 4.12 (1991) .................................. 24

## INTRODUCTION

In the wake of the COVID-19 pandemic, Congress appropriated billions of dollars to the public health departments of Plaintiffs and other localities to stave off the harm from that pandemic, and to develop the capacity to prevent future-such pandemics. Defendants unilaterally terminated the funding, citing an unsupported basis that "the grants and cooperative agreements are no longer necessary." *See* Compl., ECF No. 1 at ¶ 85. This flagrant violation of statutory commands will cause the Plaintiffs irreparable harm, including the termination of critical members of their public health force, and the abrupt end to their vital efforts at keeping their residents safe. As such, Plaintiffs seek to enjoin the Defendants' unconstitutional and statutory violations.

Defendants incorrectly argue that sovereign immunity and the Tucker Act shield them from this Court's jurisdiction over Plaintiffs' claims for injunctive and declaratory relief. But the individual Defendants are not protected by sovereign immunity because their actions directly contravene the congressional commands and are thus ultra vires. Additionally, this is not a contract dispute about the termination of individual grant agreements that belongs in the Court of Federal Claims ("CFC"), but is instead a challenge to Defendants' discrete action to terminate all COVID-19-related funding. Plaintiffs do not seek money damages, but rather the equitable, prospective reinstatement of the same grants with the same statutory strings attached. Plaintiffs have standing to raise these claims. Their harm is not only discrete, particularized, and imminent, but also likely to be redressed by the injunction they seek. AFSCME also has standing because both the organization and its members were directly affected by the funding termination.

Plaintiffs are likely to succeed on the merits of their claims against Defendants. Once obligated, Defendants had no authority to unilaterally terminate the funding, and their decision to do so anyway cannot be reconciled with the Constitution, the appropriating statutes, or Congress's

decision to keep the funding in place even after the public health emergency ended. And, because Defendants' termination decision and the implementation of that decision are unconstitutional and unlawful, they also violate the Administrative Procedure Act ("APA").

Without the Court's intervention, Plaintiffs will face irreparable harm. The termination threatens not only to cripple their public health workforce, but also to gut vaccination campaigns, to impede efforts to track and respond to threats of infectious disease, and to stymie the modernization of public health infrastructure. For these reasons, the balance of equities and the public interest decidedly weigh in favor of granting injunctive relief. Given the significant harms that Plaintiffs face, nationwide injunctive relief is warranted.

## ARGUMENT

I. **This Court has subject matter jurisdiction over Plaintiffs and Plaintiffs' claims.**

    A. **The Court has jurisdiction over Plaintiffs' constitutional claims, which do not require any waiver of sovereign immunity.**

This Court has jurisdiction over each of Plaintiffs' three constitutional claims. *See* Compl. at ¶¶ 133–153. Those claims, brought against only individual officials, do not hinge on any sovereign immunity waiver. *Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012). When an "'officer is not doing the business which the sovereign has empowered him to do,'" "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)).

This so-called *Larson-Dugan* exception applies here because the Mass Termination Decision "conflict[s] with the terms of [Defendants'] valid statutory authority," namely the various congressional appropriations at issue here. *Larson*, 337 U.S. at 695. Those appropriations specifically designated significant funds to localities for pandemic surveillance, increased

2

distribution of vaccines, expansion of public health workforce, and the development of other disease preparedness and response activities. *See* Pls.' Mem. in Support of Prelim. Inj. ("Pls.' Br."), ECF No. 14-1, at 3–6. Defendants' Mass Termination Decision, which unilaterally terminated those funds, was made without any authority from Congress and contradicts Congress's own actions in extending the funding after the public health emergency of COVID-19 ended. Such unconstitutional action is not protected by sovereign immunity. *Local 2677, Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 68 (D.D.C. 1973); *ABA v. U.S. DOJ*, No. 25-CV-1263 (CRC), 2025 WL 1388891, at *4 (D.D.C. May 14, 2025).

**B.     The Court also has jurisdiction over Plaintiffs' APA claims, which do not turn on any contract and do not seek money damages.**

Defendants argue that the Tucker Act, 28 U.S.C. § 1491(a)(1), forbids relief in the District Court and requires Plaintiffs to bring their claims in the CFC.[1] Defs.' Opp. to Pls.' Prelim. Inj. Mot. ("Defs.' Br."), ECF No. 21 at 11–25. The CFC, however, does not have jurisdiction over Plaintiffs' claims, which have no basis in the grant agreements Defendants seek to fold into this dispute. Plaintiffs instead seek the enforcement of congressional appropriations through injunctive and declaratory relief—something the CFC cannot grant. "This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969–70 (D.C. Cir. 1982). To draw this distinction, this Court must examine (1) the source of the right upon which the plaintiffs

---

[1] It is unclear whether the CFC's jurisdiction over contract claims against the government is exclusive, because as the Supreme Court has pointed out, no "language in the Tucker Act" makes the Court of Federal Claims' jurisdiction over contract claims "exclusive." *See Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988). As the D.C. Circuit has itself recognized, there is a "strong case" that, in fact, "the Tucker Act should not be read to 'impliedly forbid'" district courts from considering "contract actions for specific relief." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 612 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Plaintiffs reserve the right to seek reconsideration of this precedent in an appropriate forum.

base their claims; and (2) the type of relief sought. *Id.* at 968. Both factors weigh in favor of this Court's jurisdiction.

<strong>1.    The source of Plaintiffs' claims is the Constitution, the congressional appropriations, agency regulation, and the APA.</strong>

At their core, Plaintiffs' claims challenge Defendants' violation of Congress's appropriations via the Mass Termination Decision and Defendants' unlawful procedures in implementing the Mass Termination Decision. *See* Pls.' Br. at 23–29. Plaintiffs' rights spring not from the grants themselves, but from the Constitution, the specific statutory appropriations that Defendants violated, agency regulation, and the APA. *Transohio,* 967 F.2d at 609. That the appropriations do not "specify amounts dedicated to any . . . particular recipients," Defs.' Br. at 17, does not make this a contracts case. Plaintiffs challenge Defendants' unilateral and wholesale termination of congressionally authorized funding, and they specifically do not challenge any individual grant termination. *Contra Twin Metals Minn. LLC v. United States*, No. 22-CV-2506 (CRC), 2023 WL 5748624, at *6 (D.D.C. Sept. 6, 2023) (concerning the cancellation of an individual entity's leases with Department of Interior). Nor could they, as Defendants did not make individualized decisions to terminate the grants at issue for violation of their terms. Where, as here, "determining whether the [defendants] infringed [plaintiffs'] rights as alleged in the complaint requires primarily an examination of the statutes the [defendants] ha[ve] purportedly violated, not of [plaintiff's] contract with [defendants]," the district court has jurisdiction over the case. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108–09 (D.C. Cir. 2022).

In *Colorado v. HHS*, a district court in Rhode Island preliminarily enjoined the same Mass Termination Decision, holding that it had jurisdiction because the case "concerns the process the Government undertook when terminating the funding based on the end of the pandemic," something that it could determine by reviewing "the governing federal statute and regulations."

4

Mem. and Order on Prelim. Inj. at 19, No. 1:25-cv-00121-MSM-LDA (D.R.I. May 16, 2025) ("*Colorado* PI Order"), ECF No. 22, Ex. A (citation omitted). The state plaintiffs there had "assert[ed] constitutional claims alongside [their] APA claims," which made the source of their rights "even clearer." *Id.* at 18. So too here. Plaintiffs contend that the Mass Termination Decision was unlawful under the Constitution, appropriations statutes, agency regulations, and the APA, not under the terms of any particular grant instrument.

### 2.    Plaintiffs do not seek any contractual remedy.

Plaintiffs seek prospective, equitable relief, not money damages under a contract.[2] The relief that Plaintiff seek may result in payments "going forward" to grant recipients after the Mass Termination Decision is rescinded, but this would not be compensation for losses suffered due to breach, and so these funds would not be "money damages." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); *Md. Dep't of Human. Res. v. HHS,* 763 F.2d 1441, 1446 (D.C. Cir. 1985).

"Though [plaintiff's] challenge might somehow result in it receiving authorization to draw on [grant] funds . . . at core it seeks to enforce [a] statutory [and regulatory] mandate." *Am. Near E. Refugee Aid v. U. S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 135 (D.D.C. 2023) (cleaned up); *see also Colorado* PI Order at 20–21. This is not a case where Plaintiffs are seeking damages for past harm, or for expectancy or reliance. *Compare Twin Metals*, 2023 WL 5748624, at *7–8 (damages for harms relating to money already spent and inability to recoup on investment) *with* Pls.' Br. at 41–42 (declaratory and injunctive relief to enforce congressional appropriations).

In any event, any order that results in Defendants paying Plaintiffs, or the employers of AFSCME members, under the relevant appropriations would not be a "free and clear transfer of

---

[2] Money damages "refers to a sum of money used as compensatory relief" that "substitutes for that which ought to have been done." *Bowen*, 487 U.S. at 895, 910 (cleaned up).

money," but instead a "strings-attached disbursement" that qualifies as equitable relief, not money damages. *Lummi Tribe of the Lummi Reservation v. United States*, 870 F.3d 1313, 1318–19 (Fed. Cir. 2017). Plaintiffs do not seek unrestricted sums of money, but instead, declaratory and injunctive relief that would likely lead to the reinstatement of grant funding subject to the same restrictions to which the grantees will remain bound, including limitations on the use of funding for specified activities. As the government recently argued before the Federal Circuit, the CFC lacks jurisdiction over such claims for relief, because that "would allow [plaintiffs] to avoid the strings-attached nature of the [grant program]." *See* Opening Br. of Def.-Appellant at 30–34, *112 Genesee St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15.

> **3.** ***Department of Education v. California* does not render this Court an improper forum.**

Defendants rely heavily on the Supreme Court's recent decision in *Department of Education v. California,* 145 S. Ct. 966 (2025) (per curiam), to challenge this Court's jurisdiction. But *California* does not divest this Court of jurisdiction.[3] As an emergency stay decision, it has limited precedential value.[4] *See Colorado* PI Order at 22 ("The Supreme Court's brief treatment of *Bowen* and *Great-W. Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here."). Indeed, just one month before that stay decision, the Supreme Court denied the government's stay application in a different grant

---

[3] Numerous other district courts that have faced the question of how to treat *California* in the grant termination context have held that the case does not divest them of jurisdiction. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412, at *11 (D.D.C. Apr. 16, 2025), *appeal docketed*, No. 25-5122 (D.C. Cir. Apr. 16, 2025); *New York v. Trump*, No. 25-cv-39, 2025 WL 1098966, at *1–2 (D.R.I. Apr. 14, 2025), *appeal docketed*, No. 25-1413 (1st Cir. Apr. 28, 2025); *Maine v. USDA*, No. 1:25-cv-131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025); *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025); *Woonasquatucket River Watershed Council v. USDA*, No. 25-cv-97-MSM-PAS, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 18, 2025).

[4] The Supreme Court can stay the issuance of an injunction only to affirm the issuance of an injunction later on. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023).

termination case, *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025), rejecting the position that "sovereign immunity deprived the District Court of jurisdiction to enter its enforcement order." *Id.* at 755 (Alito, J., dissenting). Given the limited precedential value of both stay decisions, this Court remains bound by *Bowen* (which *California* cites and does not overrule, *see* 145 S. Ct. at 968). And *Bowen* dictates a finding of jurisdiction here. *See* Pls.' Br. at 30–34.

Moreover, the plaintiffs in *California* did not raise any constitutional claims, relying instead on the APA alone to challenge the termination of their education grants. *ABA*, 2025 WL 1388891, at *6. That distinction persuaded this Court to conclude that *California* did not affect its determination that it had jurisdiction over the ABA's request for injunctive relief from the termination of grants on constitutional grounds. *Id.* The same result should hold here.

### C.    The CFC does not have jurisdiction over Plaintiffs' claims and thus cannot divest this Court of jurisdiction.

Plaintiffs' claims are not contract claims covered by the Tucker Act, and thus the Plaintiffs could not have brought their claims in the CFC. The Tucker Act gives the CFC jurisdiction over contract claims and confers a corresponding waiver of sovereign immunity in that court, "when the constitutional provision, statute, or regulation in question expressly creates a substantive right enforceable against the federal government for money damages." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)). That waiver of sovereign immunity does not apply here.

First, Plaintiffs allege constitutional violation of their rights under the separation of powers doctrine and the Spending Clause, neither of which mandate money damages against the government. *LeBlanc*, 50 F.3d at 1028; *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023) (Article I is not a money-mandating provision of the Constitution). Moreover, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity,

and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). If Congress wanted to remove a district court's long-established ability to enjoin unconstitutional action through the Tucker Act, it would have had to do so clearly. *Webster v. Doe*, 486 U.S. 592, 603 (1988). A "heightened showing" is required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* The Tucker Act lacks the requisite clear intent to foreclose judicial review of Plaintiffs' constitutional claims. *See also Bowen*, 487 U.S. at 908.

Second, the CFC cannot provide the prospective relief that Plaintiffs seek. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) ("[T]he Court of Federal Claims 'does not have the general equitable powers of a district court to grant prospective relief.'" (quoting *Bowen*, 487 U.S. at 905)); *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). In other words, Plaintiffs have nowhere else to go. Because the CFC does not have jurisdiction to decide Plaintiffs' claims, this Court does not lose jurisdiction over them. *Tootle,* 446 F.3d at 176 ("We categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the [CFC].").

Third, Plaintiff AFSCME is not subject to Tucker Act jurisdiction for an independent reason: AFSCME and its members are not grantees here at all, but rather third parties harmed as a result of Defendants' unlawful withholding. They thus indisputably seek relief that is unavailable in the CFC, and so the Tucker Act cannot be read to deprive them of any redress for their claims. *See id.*; *see also U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014) (recognizing that "[s]ubcontractors and other third parties are generally not permitted to raise [contract] claims directly against the government").

D.      **Plaintiffs have standing.**

Plaintiff Local Governments are likely to succeed in establishing a substantial likelihood of standing. *Green v. U.S. Dep't of Justice,* 54 F.4th 738, 744 (D.C. Cir. 2022). Though all Plaintiffs have standing, Plaintiffs only need establish that one Plaintiff has standing with respect to each Defendant in order for each claim to proceed. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). Defendants dispute Plaintiffs' standing to challenge the Mass Termination Decision, asserting that their injury does not stem from that decision but, instead, from individual grants. Defs.' Br. at 20–21. Binding precedent says otherwise.

To establish Article III standing, a party must show that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, the Mass Termination Decision caused Plaintiff Local Governments to suffer concrete, particularized, and actual and imminent harm, including layoffs of staff and termination of vital public health care programming. *See infra* pp. 19–21; *see also* Pls.' Br. at 34–40. These injuries are traceable to the Mass Termination Decision, without which Plaintiff Local Governments would still have funding to maintain their public health programs. Thus, an injunction against that decision would likely provide redress to Plaintiffs. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988) ("a party seeking judicial relief need not show to a certainty that a favorable decision will redress [its] injury").

AFSCME also has both associational and organizational standing. For associational standing, it must show that "(1) at least one of its members would have standing to sue in [the member's] own right; (2) the interest [it] seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit."

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 592 (D.C. Cir. 2022). Defendants dispute the first and third prongs of this test.

As to the first prong, an organization need only set forth "specific facts . . . that one or more of [its] members would be directly affected." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (cleaned up). To do so, the organization may produce declarations from the affected member, *or* it may submit "declarations from leaders of organizations describing their organizations' membership in sufficient detail to support a finding of standing." *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946, 2025 WL 1187730, at *24 (D.D.C. Apr. 24, 2025) (collecting cases).

Plaintiffs have provided specific facts demonstrating that AFSCME's members are directly affected by the Mass Termination Decision. As a result of this decision, Heidi Heddings was transferred to a different job that is harder and more taxing, with a longer commute that has caused her to incur greater expenses. Heddings Decl., ¶¶ 12, 14. Eva Rose Hewitt lost her jobs two months early, and lost the opportunity to renew her employment, as a result of her employer's loss of funding. Hewitt Decl., ¶ 8. These are all injuries in fact. *See Nat'l Weather Serv. Emps. Org., Branch 1-18 v. Brown*, 18 F.3d 986, 989 (2d Cir. 1994) (union had standing on behalf of members who "would be forced to relocate or undergo long commutes").[5]

As to the third prong for associational standing, individual AFSCME members do not need to be joined. Defendants assert that each member must join this suit because it "require[s]

---

[5] Defendants also ignore the declarations of John Henry Jr. and Megan Peters-Wiseman, both of which specify that AFSCME members have been terminated because of the funding cuts. Peters-Wiseman Decl., ¶ 8; Henry Decl., ¶¶ 9, 10, 14. Defendants overread *Summers* to require individuals to submit declarations attesting to their own personal harm. But *Summers* requires no such thing: it rejected the notion that an organization could establish standing by "self-descri[bing] the activities of its members" and relying on "a statistical probability" (rather than a certainty) "that some of those members are threatened with concrete injury," 555 U.S. at 498, but did not reject the type of specific evidence set forth in the Henry and Peters-Wiseman declarations. These declarations demonstrate that AFSCME members have lost their jobs as a result of Defendants' funding cuts, and thus they have "sufficient detail to support a finding of standing." *League of United Latin Am. Citizens*, No. CV 25-0946, 2025 WL 1187730, at *24.

identification of the specific grants at issue with respect to AFSCME members," Defs.' Br. at 37, but this is a non sequitur. As a matter of law, "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members," as Plaintiffs do here. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

AFSCME also has standing to sue on its own behalf through organizational standing. An organization has standing to challenge actions that "perceptibly impair[]" its ability to provide services, thereby "interfer[ing] with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). AFSCME has been required to divert significant resources away from its efforts to improve member workplace conditions to support members who have lost jobs because of the Mass Termination Decision. O'Brien Decl., ¶ 7. Unlike other advocacy organizations, AFSCME has a statutory duty to represent its members with respect to their terms and conditions of employment. *See, e.g.*, *Kollodge v. State,* 757 P.2d 1028, 1034 (Alaska 1988) ("A union has a duty to fairly represent its members"). This mandatory diversion of resources has impeded AFSCME's "core business activities" representing employees in affected bargaining units. *All. for Hippocratic Med.*, 602 U.S. at 395; *see also Equal Rights Ctr. v. Post Props., Inc*., 633 F.3d 1136, 1140 (D.C. Cir. 2011). AFSCME has also suffered lost dues and diminished bargaining power from the Mass Termination Decision. Spiegel Decl., ¶ 14; Henry Decl., ¶ 14. These are also injuries in fact. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977); *see also Am. Library Ass'n v. Sonderling*, No. CV 25-1050 (RJL), 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) (AFSCME loss of bargaining power constitutes irreparable harm).

## II.    Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs have a strong likelihood of success on the merits. Although Plaintiffs bring six claims, they "need only show a likelihood of success on one [claim] to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied." *ABA*, 2025 WL 1388891, at *4.

**A.      Plaintiffs are likely to succeed on the merits of their constitutional and equitable *ultra vires* claims.**

Defendants' primary argument that Plaintiffs are unlikely to succeed on the merits of their constitutional claims is that Congress only required HHS to *obligate* the funds, not to follow through on those obligations. Defs.' Br. at 28, 32. That argument is absurd. Defendants have not provided any authority that supports this proposition. Their reading would upend the structure of Congressional appropriations, such that the Executive Branch could, at any time after earmarking Congressionally authorized funds on paper, withdraw or revoke those allocations without violating the statute. The obvious intention of Congress was for the grant recipients to receive these funds to use for particular purposes that Congress outlined. Courts should not lightly "conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019); *see Colorado* PI Order at 46 (HHS's "decision to *allocate*, in some cases, more than it was statutorily required to does not alleviate HHS of its obligation to *expend* the appropriated funds pursuant to Congress's intent" (emphasis added)); *see also In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (the Executive "does not have unilateral authority to refuse to *spend* the funds" appropriated by Congress) (emphasis added)). If Defendants' Mass Termination Decision stands, those obligations will not be liquidated via actual spending, and the Congressional directives embodied in the appropriations acts will never be fulfilled.[6]

Defendants also contend that the Mass Termination Decision does not run afoul of the Spending Clause because the HHS "for cause" regulation was "written into the grants at the time

---

[6] Some of the appropriations statutes at issue here imposed deadlines for Defendants to obligate the appropriated funds by 2024. *See, e.g.,* CARES Act, tit. VIII, Pub. L. No. 116-136, 134 Stat. 281, 554 (2020). Having done so, Defendants have five years to liquidate—that is, complete the expenditure—of the funds they have obligated. 31 U.S.C. §§ 1552(a), 1553(a). Defendants could not now re-obligate those funds for new purposes after the 2024 deadline has passed. In other words, if the Mass Termination Decision were permitted to stand, it would be impossible for Defendants to find another means for them to comply with the terms of the appropriations statutes, even if they wished to do so.

they were awarded" and therefore cannot be an unconstitutional retroactive condition. Defs.' Br. at 32. The relevant condition, however, is not the "for cause" regulation but the condition that Defendants' Mass Termination Decision imposed, namely, the condition that the grants would be terminated because Defendants had concluded that the COVID-19 "pandemic [was] over" and the grants "no longer necessary." Compl. ¶ 85. That condition was never specified and thus is plainly retroactive, as well as impermissibly ambiguous. Pls.' Br. at 21; Compl. ¶ 147.[7]

### B.    Plaintiffs are likely to succeed on their APA claims.

#### 1.    Defendants' Mass Termination is reviewable action.

The Mass Termination Decision is a "final agency action" under 5 U.S.C. § 704, because it (1) "marks the consummation of the agency's decision-making process"; and (2) is either an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024) (cleaned up). As the Rhode Island district court just held in *Colorado*, the decision marks the culmination of HHS's decision to cut funding, and there are no other steps HHS must take in that regard. *Colorado* PI Order at 26. And, contrary to Defendants' argument, Defs.' Br. at 26, "there are clear legal consequences" from the Mass Termination Decision—grantees can no longer access previously available funds and consequently have been or will be forced to terminate employees, end infrastructure modernization efforts, and eliminate programs designed to prevent future

---

[7] Defendants raise two other points in their opposition. They contend that Plaintiffs have not shown that the Mass Termination Decision amounts to a "rescission" under the Congressional Budget and Impoundment Control Act of 1974. Defs.' Br. at 32 n.9. But Plaintiffs do not bring a claim under that statute. The fact that the Mass Termination Decision does not satisfy the Impoundment Control Act simply confirms that Congress did not authorize Defendants' action. Lastly, Defendants' suggestion that Plaintiffs' equitable *ultra vires* claim is wholly "predicated . . . upon" their constitutional claims is inaccurate. Defs.' Br. at 33. As the Supreme Court explained in *Larson*, 337 U.S. at 689, the actions of federal officers can be enjoined as *ultra vires* not only when they are unconstitutional but also when they are "beyond th[e] limitations" set by federal statute. Pls.' Br. at 22. In this case, the fact that Defendants acted without statutory authority supports both the constitutional and *ultra vires* claims.

pandemics, among other harms. *See, e.g.*, Heddings Decl., ¶¶ 12–14; Kiger Decl., ¶¶ 11–12; Johnson Decl., ¶ 19; Sharp Dec., ¶ 20; *see also Colorado* PI Order at 26.

Nor does this case involve a "programmatic" challenge. Although the Supreme Court has disavowed challenges that seek "wholesale improvement" of an entire agency program "by court decree," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), it has also recognized the availability of review for a "specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations," *id.* at 890 n.2. Plaintiffs challenge a discrete agency action—the Mass Termination Decision that uniformly terminated CDC's pandemic preparedness grants—but do not seek otherwise to interfere with CDC's lawful discretion. Such a challenge is proper. *Am. Fed'n of Labor & Congress of Indus. Orgs. v. DOL*, No. CV 25-339 (JDB), 2025 WL 1129227, at *12 (D.D.C. Apr. 16, 2025).

### 2.    Defendants' actions violate the APA because they are unconstitutional.

Because Defendants' actions violate the separation of powers principle as well as the Spending Clause of the Constitution, and were ultra vires, *see supra* pp. 12–13, they therefore also violate the APA. 5 U.S.C. § 706(2)(A)–(C). While Defendants have (unsuccessfully) argued that their actions were constitutional, they have not disputed that Plaintiffs' constitutional arguments can form the basis of an APA violation as well.

### 3.    Defendants violated the APA because they lacked statutory authority for their actions.

As discussed above, Congress did not authorize the Mass Termination Decision, and for that reason, Defendants' actions violate the APA. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up). Congress must "speak clearly" if it wishes to

14

charge an agency with a decision of "vast economic and political significance." *Ala. Ass'n of Realtors v. HHS,* 594 U.S. 758, 764 (2021) (cleaned up).

Moreover, Congress has made clear that HHS *did not* have the authority to terminate these grants once obligated. Congress specifically appropriated the funds for grantees' use during and beyond the COVID-19 pandemic. Congress expressly identified funds and programs in the COVID-19 appropriations laws that would no longer be available after the end of the public health emergency, and, after the public health emergency ended, it reviewed all of the COVID-19 appropriations laws, leaving in place all of the programs and funding at issue here. *See* Pls.' Br. at 13; Fiscal Responsibility Act, Pub. L. No. 118-5, 137 Stat. 10 (2023) Div. B., § 2(3). Defendants do not address Congress's overt decision to keep the funds in place. As the *Colorado* Court correctly determined, "Congress's express decision to eliminate some COVID-era public health funding, but leave alone the funding at issue here, signals its intent to continue that funding." *Colorado* PI Order at 33. The Mass Termination Decision "usurped Congress's power to control these public health appropriations," a power that Congress clearly did not delegate to HHS. *Id.*

### 4.    Defendants' actions violate the APA because they are arbitrary and capricious.

Defendants further violated the APA by arbitrarily and capriciously terminating the grants in violation of HHS's own regulations and without reasoned explanation. In determining whether an agency's action is arbitrary and capricious, a court must be able to "ensure" that the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). Defendants have not provided any evidence of such a satisfactory explanation, or any evidence of rational decision-making leading to the Mass Termination Decision.

First, Defendants failed to follow the relevant HHS regulation for termination. 45 C.F.R. § 75.372(a). It is axiomatic that "an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up); *Climate United Fund*, 2025 WL 1131412, at *16. Defendants cited no authority in the grant termination notices, but they now assert that they followed 45 C.F.R. § 75.372(a)(2), which permits termination of a federal grant "for cause." But the "cause" that defendants purportedly relied on for termination is not what HHS long understood "cause" to mean—noncompliance with terms and conditions. *See* Pls.' Br. at 25 (citing cases and regulations); *Colorado* PI Order at 37–38. Indeed, as Plaintiffs pointed out, Pls.' Br. at 25, the "for cause" provision itself is in a section entitled "Remedies for Noncompliance." 45 C.F.R. §§ 75.371-375.

Defendants do not engage with this historic interpretation but instead point to the current HHS Grants Policy Statement[8] to imply that "cause" could include "the best interests of the federal government." Defs.' Br. at 29–30. But this citation is inapt: it applies to decisions to approve funding for a new budget period (following a specified application and reporting process), not to terminate funds. HHS Grants Policy Statement at 21.[9] In fact, the Grants Policy Statement strongly reinforces that HHS equates "for cause" with "noncompliance." In the only section addressing terminations, entitled "Suspending Award Activities or Terminations," the HHS Grants Policy Statement states that "[t]he HHS awarding agency generally will suspend [and provide opportunity for corrective action], rather than immediately terminate, a federal award. . . . The HHS awarding agency may terminate without first suspending the federal award if the problem is serious enough

---

[8] Defendants attach the HHS Grants Policy Statement as Exhibit L to the Legier Declaration, but Plaintiffs have not been able to access that Exhibit via ECF. The latest version, effective April 16, 2025, is attached hereto as Exhibit B.

[9] "Recipients must submit a continuation application or annual report to get approval and funding for each new budget period within the approved period of performance. The HHS agency will make its decision to fund the next budget period by issuing a [Notice of Award] which shows the new budget period and amount of new funding. Funding is based on adequate performance, availability of funding, and the best interests of the federal government."

or if public health or welfare concerns require immediate action." *Id.* at 58–59; *see also id.* ("consistent with 45 CFR § 75.372(a)," an awarding agency or pass-through entity may suspend, pending corrective action, or terminate all or part of your award activities pending your corrective action <u>if you fail to materially comply with the award terms and conditions</u>." (emphasis added)).[10] Defendants' new interpretation of "cause" for purposes of this litigation thus reflects a textbook case of "'post hoc rationalization advanced by an agency seeking to defend past agency action against attack.'" *Colorado* PI Order at 37 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012)).

Second, Defendants now argue they adequately explained their changed policy through their minimal statement that the pandemic was over. But a "fundamental" requirement of administrative law is that an agency "set forth [ ] reasons" for its decision. *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001). An agency may not depart from a prior policy without providing "good reasons for the new policy" and showing "that the new policy is permissible under the statute." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "It is not that further justification is demanded by the mere fact of policy change"—formal or informal, *cf.* Defs.' Br. at 30—"but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox Television Stations*, 556 U.S. at 515. That same reasoned explanation is required here, where HHS's "sudden change in position that appropriations Congress determined were needed to fund public health initiatives beyond the pandemic were no longer necessary" reflects a "drastic change of course." *Colorado* PI Opinion

---

[10] In any event, as the General Terms and Conditions acknowledge, where the HHS Grants Policy Statement conflicts with "applicable statutes/appropriations acts . . . then statutes and regulation take precedence." ECF 21-11, Defs. Ex. J. As explained herein, those statutes and regulations provided no basis for HHS's determination. *See Colorado* PI Order at 43 (HHS's claim that the end of the pandemic was "cause" for termination is "contrary to statutory and regulatory authority and inconsistent with Congress's directive that the funds remain available beyond the pandemic.").

at 40–41. Defendants have provided no real reason at all for the Mass Termination Decision, other than now claiming that it is in the "best interest of the government." Defs.' Br. at 31. To the extent Defendants now try to recast their "for cause" terminations as ones based on agency priorities (without articulating what those priorities are), this too is an impermissible post hoc rationalization. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 49–50 (1983); *Massachusetts v. NIH*, 25-CV-10338, 2025 WL 702163, at *21 (D. Mass. Mar. 5, 2025).

Third, Defendants do not address the point that they ignored serious reliance interests when terminating these grants. *See* Pls.' Br. at 28–29. Instead, they argue that Plaintiffs' reliance interests are not "legitimate" or "serious" because HHS had awarded more than the amounts specifically earmarked for state and local governments by Congress. Defs.' Br. at 31. But once Defendants did so, Plaintiff Local Governments depended on these grants in hiring employees, executing subcontracts, obtaining certifications, developing community relationships, and procuring equipment. Pls.' Br. at 28–29*; see also infra* pp. 19–21. They acted in reasonable reliance on the expectation that Defendants would observe the terms of their appropriations statutes and devote the full range of appropriated funds to pandemic preparedness. As the *Colorado* Court found, and no evidence in this record disputes, "HHS gave no consideration to the programs and services that would be impacted by these terminations when it decided the funds were no longer necessary based on the end of the pandemic," *Colorado* PI Order at 41.

Finally, Defendants are wrong to argue that they were not required to consider "reasonable alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives," *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021), because there was no "formal policy." An agency's failure to "consider significant alternatives to the course [it] ultimately cho[se]," is a telltale sign that its decision-making process cannot "be

regarded as rational." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). Defendants do not even try to argue that they considered any alternatives, such as reviewing the grants at issue to see whether each had continued utility beyond the COVID-19 pandemic.

## III.    Plaintiffs will be irreparably harmed absent a preliminary injunction.

Despite Defendant's cursory assertions to the contrary, Defs.' Br. at 33–34, Plaintiffs have submitted copious evidence of non-speculative irreparable harm caused by the Mass Termination Decision. These harms are concrete and imminent:  The decision will result in the termination of thousands of state and local public health employees across the country. *see* O'Brien Decl., ¶ 7; Spiegel Decl., ¶ 11; Johnson Decl., ¶ 17; Maddox Decl., ¶¶ 9–10, 15; Sharp Decl., ¶ 17.[11] Other employees have already been or will be transferred to inferior jobs. *See, e.g.*, Heddings Decl., ¶¶ 12–14. The Mass Termination Decision has already diminished Plaintiff Local Governments' ability to detect emerging diseases and outbreaks and develop public health interventions, or will shortly do so. *See*, *e.g.*, Kiger Decl., ¶¶ 11–12, 27; Johnson Decl., ¶ 19. And it has had or threatens to have significant impacts on efforts to vaccinate children and other vulnerable populations. *See* Kiger Decl., ¶ 18; Sharp Decl., ¶ 20. It has additionally stymied efforts to make public health infrastructure more robust. *See, e.g.*, Johnson Decl., ¶ 22; Jones Decl., ¶¶ 7–9.

On the whole, Plaintiff Local Governments relied on the federal funding at issue to support mission critical public health programming. The abrupt and illegal termination of these grant programs has damaged and will continue to damage the country's public health systems and

---

[11] Defendants cite *Sampson v. Murray*, 415 U.S. 61 (1974), for the proposition that loss of employment generally does not constitute irreparable injury. But AFSCME's members who are affected here are employees of state and local government, not federal employees who could pursue a remedy for damages or for back pay against the federal Defendants. Regardless, loss of employment is not the sole basis for Plaintiffs articulation of irreparable harm. Loss of funds have threatened *both* public health programs *and* the public health workforce, and together damage Plaintiff Local Governments' ability to protect the health of their residents. *See, e.g, ABA v. U.S. DOJ*, 2025 WL 1388891, at *8 (finding irreparable harm where layoffs or threat of layoffs will jeopardize movant's operations).

detrimentally impact public health employees across the country absent the issuance of a preliminary injunction. *See Colorado* PI Order at 49; *see also Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012). Moreover, several of Plaintiffs' grants have performance periods that end in June of 2025. *See* Jones Decl., ¶ 8; Tong Decl., ¶ 6; Kiger Decl., ¶ 14. Plaintiffs had plans to expend the obligated funds by the end of their performance periods, Jones Decl., ¶ 8; Tong Decl., ¶ 6, but absent a preliminary injunction they will have no opportunity to finish out the planned programming. Without prompt relief, there might not be an effective remedy at the end of the judicial proceedings.

Here, too, Defendants attempt to recast Plaintiffs' claim as one for money damages, arguing that "economic loss does not, in and of itself, constitute irreparable harm." Defs.' Br. at 34. But, as already discussed, *supra* pp. 5–6, Plaintiffs seek prospective injunctive relief rather than redress for past wrongs. No later remedy can undo the threat that the Mass Termination Decision presently poses to public health and public health works; the damage will have already been done. *See Colorado* PI Order at 48. These programs are needed now to avoid "worsening public health outcomes and placing . . . residents at risk." *Id.* at 54.

Nor would money damages abate the reputational harm caused by the labeling of the terminations at issue as "for cause." Because "for cause" termination requires grantee noncompliance, *see supra* pp. 16–17, it can trigger federal and state reporting requirements. *See, e.g.*, 45 C.F.R. § 75.372(b) ("the HHS awarding agency must report the termination to the OMB-designated integrity and performance system"); Maddox Decl., ¶ 17; Thompson Decl., ¶ 15 (Plaintiff Nashville must certify to Tennessee that it has not had a public transaction terminated for cause in the past three years). This reporting can make Plaintiff Local Governments less competitive for future grant awards. Thus, the Mass Termination Decision also threatens Plaintiff

Local Governments' business reputation and future grant prospects, as well as those of grantees that employ AFSCME members. *See Climate United Fund*, 2025 WL 1131412, at *19 & n.4.

## IV.    The remaining preliminary injunction factors favor relief.

The balance of equities and the public interest both strongly weigh in Plaintiffs' favor. As discussed in connection with irreparable harm, because of the Mass Termination Decision, grantees nationwide do not have the means to keep vital public health programs running and will need to terminate or significantly downsize programs that benefit the public—including programs that are vital to prevent the spread of infectious diseases.

Defendants do not bother to refute this in their brief. Instead, they argue, without any supporting evidence, that if grantees draw down funds "throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail." Defs.' Br. at 34. This is simply not the case. Defendants' own regulations allow them to make administrative offsets or to withhold payments in order to recoup any money a grantee owes the federal government. 45 C.F.R. § 75.391. But even if Defendants were to face minimal complications recouping funds, this would not outweigh the serious ongoing harm to public health that the Mass Termination Decision continues to cause. *See Colorado* PI Order at 55 ("Congress's direction that the funds remain intact and the [Plaintiffs'] reliance on the continuation of the funding overshadows" Defendants' arguments that they may struggle to recover grant funds if they prevail in litigation).

Defendants also suggest that they suffer harm in "forced expenditure of money in support of causes that are inconsistent with Executive Branch policy objectives." Defs.' Br. at 35. But Defendants do not "have unfettered power to further a President's agenda, particularly when Congress appropriated this money to [Plaintiffs] to fund their public health systems and initiatives." *Colorado* PI Order at 57. In fact, "'[g]overnment actions in contravention of the

Constitution are 'always contrary to the public interest.'" *ABA*, 2025 WL 1388891, at *8 (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020)). When weighing "an agency's unreasoned, unsubstantiated, and likely unlawful determination that funding was 'no longer necessary,' against the [Plaintiffs'] interest and reliance on the funds to safeguard their public health outcomes, the balance of the equities and public interest are undeniably in the [Plaintiffs'] favor." *Colorado* PI Order at 57. For these reasons, the remaining public interest factors strongly favor the grant of an injunction.

## V.    The requested scope of relief is warranted.

The Mass Termination Decision is nationwide in scope and is currently impairing critical public health measures on a national scale. The broad sweep of Defendants' unlawful action militates in favor of a correspondingly broad preliminary injunction. Pls.' Br. at 41–42; Proposed Order, ECF No. 14-17; *see Massachusetts*, 2025 WL 702163, at *35 ("the broad impact" of the agency's unlawful action "warrants a broad response").

"[I]n drafting equitable relief, courts must consider 'what is necessary, what is fair, and what is workable.'" *Woonasquatucket River*, 2025 WL 1116157, at *25 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). Nationwide injunctive relief is "not only appropriate, but necessary" in various cases, including when "the plaintiffs are dispersed throughout the United States," when there is a "need to protect similarly situated nonparties," or when more limited relief would not be practicable. *Woonasquatucket River*, 2025 WL 1116157, at *25 (cleaned up) (citing *Florida v. HHS*, 19 F.4th 1271, 1281–82 (11th Cir. 2021)).

In this case, nationwide relief is needed to provide complete relief to AFSCME's members, who are employed by public health departments across the United States, O'Brien Decl., ¶¶ 4, 6, including by state employers who would not gain the benefit of an injunction running in favor only

of the Local Government Plaintiffs, *id.* ¶ 3.[12] *See Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *32 (D.N.H. Apr. 24, 2025) (enjoining implementation of agency decision against national union, its members, and employers of those members).

Nationwide relief is also essential to ensure that the Local Government Plaintiffs are completely protected from irreparable harm caused by the Mass Termination Decision. A preliminary injunction limited to Local Government Plaintiffs will not provide them with complete relief because public health measures are inherently interdependent: the effectiveness of Local Government Plaintiffs' *own* efforts to protect the health of *their own* residents depends on whether *other* state and local jurisdictions take similar action to protect *their* residents. Congress recognized the interconnected nature of these efforts when it directed the use of funds to support broad, nationwide public health efforts—not small-scale measures limited to a few individual localities. *E.g.*, CRRSAA, 2021, Pub. L. No. 116-260, 134 Stat. 1184 at 1911 (2021) (directing Defendants to use funds "to ensure *broad-based* distribution, access, and vaccine coverage" (emphasis added)); ARPA, Pub. L. No. 117-2, 135 Stat. 4 at 37–41 (2021) (directing Defendants to spend funds to "strengthen vaccine confidence *in the United States*" and to "improve rates of vaccination *throughout the United States*" (emphasis added)). Not only are Local Government Plaintiffs geographically dispersed, but the public health threats they face—especially ongoing threats posed by highly contagious diseases like the measles—do not respect county lines, city limits, or state borders. *See* Maddox Decl., ¶ 19. If the Mass Termination Decision is allowed to remain in effect anywhere, then, Local Government Plaintiffs will not obtain complete relief for their injuries. *See Florida*, 19 F.4th at 1281–82.

---

[12] Defendants profess ignorance as to which of the terminated grants would be covered by an injunction in favor of AFSCME. Defs.' Br. at 39. But Defendants themselves have published a list of CDC's terminated grants, *see* HHS Grants Terminated, https://perma.cc/8YYL-69JW, so this information is readily ascertainable.

A nationwide injunction is also the only administratively feasible way to ensure that all Plaintiffs obtain full and prompt preliminary relief. Because Defendants allocated a significant portion of the public health funding though pass-through grant programs, many of the grants of Local Government Plaintiffs and other employers of AFSCME members are administered by state entities rather than by Defendants. *See* Pls.' Br. at 9–11. These state entities are responsible for allocating and distributing federal funds to various grant recipients—a process with which Defendants are not involved. *See* Paul G. Dembling & Malcolm S. Mason, ESSENTIALS OF GRANT LAW PRACTICE § 4.12 (1991); Legier Decl., ¶ 6. Defendants' lack of involvement with the administration of pass-through grants will pose no difficulties if the Court issues a nationwide preliminary injunction: the grant programs will simply resume functioning in the same manner as before the Mass Termination Decision. But a party-specific injunction would leave the pass-through grant recipients subject to inconsistent obligations, as they would likely receive only a partial restoration of their funding, and it is uncertain whether those partial funds could be readily directed only to Local Government Plaintiffs.

Nationwide relief is further necessary to ensure that similarly situated nonparties do not suffer irreparable harm as a result of Defendants' unlawful actions. Plaintiffs are likely to succeed on the merits of their challenge to Defendants' sweeping Mass Termination Decision, and there is no reason "why similarly situated nonparties should remain subject to" the Mass Termination Decision and be "forced to suffer the harms just because there was not enough time or resources for them to join th[is] suit" or file their own. *Woonasquatucket River*, 2025 WL 1116157, at *25; *accord Massachusetts*, 2025 WL 702163, at *33.

Finally, "the nature of th[is] action itself supports a nationwide injunction." *Woonasquatucket River*, 2025 WL 1116157, at *25. When a court determines that an agency has

acted unlawfully, the "ordinary result" is that the unlawful actions "are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up); *see also* 5 U.S.C. § 706(2).

**VI.    The Court should neither require a bond nor stay its decision pending appeal.**

The Court should not require a bond. This Court has the discretion to not require any bond at all. *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). It should exercise that discretion here, where Defendants are unlawfully withholding "previously committed funds," "will personally face no monetary injury from the injunction," and a bond would merely "hold Plaintiffs hostage" for the harm from the Government's unlawful actions. *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025). Plaintiffs seek a preliminary injunction to remedy the irreparable harm that they would otherwise suffer from the immediate loss of their grant funding. If Plaintiffs were required to pay back the same funding in the form of a bond, they would gain no relief at all.  In these circumstances, the imposition of a bond would be tantamount to a denial of a preliminary injunction, effectively denying Plaintiffs their "right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

Nor should the Court stay its decision pending appeal. There is no basis—and Defendants cite none—to issue a preemptive stay of the Court's order in this case. Any such order would be issued only after finding that Plaintiffs suffer irreparable harm, negating the utility of a stay.

## CONCLUSION

For these reasons and those detailed in their opening brief, Plaintiffs respectfully request a preliminary injunction.

Dated: May 19, 2025                                Respectfully submitted,

                                                   **CHRISTIAN D. MENEFEE**
                                                   Harris County Attorney

                                                   /s/ Jonathan G.C. Fombonne
                                                   **JONATHAN G.C. FOMBONNE**
                                                   Deputy County Attorney and First Assistant
                                                   Texas State Bar No. 24102702
                                                   D.D.C. Bar ID: TX0090
                                                   jonathan.fombonne@harriscountytx.gov

                                                   **TIFFANY BINGHAM**
                                                   Managing Counsel
                                                   Texas State Bar No. 24012287
                                                   D.D.C. Bar ID: TX0087
                                                   tiffany.bingham@harriscountytx.gov

                                                   **EDWARD D. SWIDRISKI III***
                                                   Senior Assistant County Attorney
                                                   Texas State Bar No. 24083929
                                                   Edward.Swidriski@harriscountytx.gov
                                                   Office of The Harris County Attorney
                                                   1019 Congress Plaza, 15th Floor
                                                   Houston, Texas 77002
                                                   Telephone: (713) 274-5101
                                                   Facsimile: (713) 755-8924

                                                   *Counsel for Harris County, Texas*

                                                   AISHA RICH*
                                                   KATHERINE COURTNEY
                                                   ALEXANDRA KLIGER*
                                                   Public Rights Project
                                                   490 43rd Street, Unit #115
                                                   Oakland, California 94609
                                                   (510) 214-6960 (phone)
                                                   aisha@publicrightsproject.org
                                                   katiec@publicrightsproject.org
                                                   sasha@publicrightsproject.org

                                                   *Counsel for Columbus, Ohio, Nashville, Tennessee,*
                                                   *and Kansas City, Missouri*

JOEL McELVAIN
POOJA BOISTURE*
SKYE L. PERRYMAN
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jmcelvain@democracyforward.org
pboisture@democracyforward.org
sperryman@democracyforward.org

*Counsel for Columbus, Ohio, Nashville, Tennessee, Kansas City, Missouri, and AFSCME*

*Admitted pro hac vice*

27