**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HARRIS COUNTY, TEXAS, *et al.*, | |
| Plaintiffs, | Case No. 1:25-cv-1275-CRC |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of United States Department of Health and Human Services, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR COMBINED MOTION TO DISMISS, MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMRARY JUDGMENT**

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 4

I.    Factual Background ............................................................................................ 4

II.   Procedural History ............................................................................................. 9

    A.    The Preliminary Injunction Motion and Order ....................................... 9

    B.    Defendants' Compliance with the PI Order ............................................ 10

    C.    Plaintiffs' Attempts to Monetize the Reinstated Awards........................ 11

    D.    Relief Sought in Plaintiffs' Summary Judgment Motion....................... 13

LEGAL STANDARDS ................................................................................................ 15

ARGUMENT ............................................................................................................... 16

I.    The Tucker Act Divests This Court of Jurisdiction .......................................... 16

    A.    This Court Lacks Jurisdiction over Each of the Three APA Claims .................... 18

        1.    Arbitrary and Capricious Claim (Count VI) ............................. 18

        2.    Contrary-to-Regulation APA Claim (Count V)......................... 19

        3.    Contrary to Statute and Constitution Claim (Count IV) ........... 20

    B.    Plaintiffs' Tucker Act Counterarguments on the APA Claims are Unavailing........................................................................................ 21

    C.    This Court Lacks Jurisdiction over Plaintiffs' Other Claims............................. 25

II.   The Local Government Plaintiffs Lack Standing to Challenge the Termination of Indirect Grants, and AFSCME Lacks Standing Altogheter. ............................................. 27

    A.    The Local Government Plaintiffs Cannot Show Standing with Respect to their Indirect Grants ........................................................................ 27

    B.    AFSCME Cannot Establish Standing ................................................... 30

III.  Plaintiffs' Claims are Moot Insofar as the Contractual Performance Periods Have Expired and No Meaningful Relief is Possible................................................ 32

IV.   Even if the Court had Jurisdiction, Plaintiffs' Claims fail ............................... 33

A.    Plaintiffs' Attempt to Challenge an Alleged "Mass Termination Decision" is Not Reviewable ................................................................................. 33

B.    Plaintiffs' APA Claims Fail on the Merits ............................................................ 35

1.    Defendants' Actions Were Not Arbitrary and Capricious ......................... 35

2.    Defendants did not Violate HHS Regulations ........................................... 37

C.    Plaintiffs' Constitutional and Ultra Vires claims also Fail ................................... 38

1.    Plaintiffs Lack a Cause of Action for their Freestanding Separation-of-Powers Claim ..................................................................... 40

2.    Plaintiffs Lack a Cause of Action for their Spending-Clause Claim ........ 40

3.    Plaintiffs Cannot Meet the Stringent Standards for their *Ultra Vires* Claim ......................................................................................................... 41

4.    Even if the *Ultra Vires* Standard is Inapplicable, Plaintiffs Cannot Establish any Constitutional or Statutory Violation ................................... 42

V.    Any Relief Should be Limited ........................................................................................ 44

CONCLUSION ........................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*ACLU of Mass. v. U.S. Conf. of Cath. Bishops*,
  705 F.3d 44 (1st Cir. 2013) ........................................................................ 32

*Am. Ass'n of Physics Teachers v. Nat'l Sci. Found.*,
  ---F. Supp. 3d---, 2025 WL 2615054 (D.D.C. Sep. 10, 2025) ......................................... *passim*

*Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*,
  2025 WL 1852762, (D.D.C. July 6, 2025).......................................................... 25

*Appalachian Voices v. EPA*,
  2025 WL 2494905 (D.D.C. Aug. 29, 2025), *appeal filed*, No. 25-5333
  (D.C. Cir. Sep. 19, 2025), *denying injunction pending appeal*,
  2025 WL 2732746 (D.D.C. Sep. 25, 2025) ............................................ 21, 23, 39, 45

*Appalachian Voices v. FERC*,
  139 F.4th 903 (D.C. Cir. 2025) .................................................................... 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................ 15

*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019).................................................................... 27

*Bd. of Educ. for the Silver Consol. Schs. v. McMahon*,
  791 F. Supp. 3d 1272 (D.N.M. 2025) .......................................................... 25, 40

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................ 15

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................ 35

*Bloch v. Powell*,
  348 F.3d 1060 (D.C. Cir. 2003).................................................................... 36

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)................................................................................ 36

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................ 34

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)...................................................................... 39

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ................................................................. 41

*Cierco v. Mnuchin*,
    857 F.3d 407 (D.C. Cir. 2017) ........................................................... 29, 31

*Columbian Rope Co. v. West*,
    142 F.3d 1313 (D.C. Cir. 1998) .......................................................... 32, 33

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ......................................................... 19, 23

*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................. 39

*Department of Education v. California*,
    604 U.S. 650 (2025) ...................................................................... *passim*

*Diamond Alternative Energy, LLC v. EPA*,
    606 U.S. 100 (2025) ......................................................................... 31, 32

*EB5 Holdings, Inc. v. Jaddou*,
    717 F. Supp. 3d 86 (D.D.C. 2024) .......................................................... 15

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................. 36

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................. 36

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025), *reh'g denied en banc*,
    2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ................................... *passim*

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ......................................................................... 28, 29

*Harris Cnty. v. Kennedy*,
    786 F. Supp. 3d 194 (D.D.C. 2025) ................................................. *passim*

*Hecate Energy LLC v. FERC*,
    126 F.4th 660 (D.C. Cir. 2025) ........................................................ 27, 29

*In re Piazza*,
    719 F.3d 1253 (11th Cir. 2013) ............................................................. 38

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ........................................................... *passim*

iv

*Int'l Eng'g Co., Div. of A-T-O, Inc. v. Richardson*,
   512 F.2d 573 (D.C. Cir. 1975) .................................................................... 18, 22, 23

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021) ............................................................................. 15

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) ............................................................................................ 27

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................ 15

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ..................................................................................... 34, 35

*McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.*,
   264 F.3d 52 (D.C. Cir. 2000) .............................................................................. 32

*McKay v. United States*,
   516 F. 3d 848 (10th Cir. 2008) ............................................................................ 18

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) .............................................................. 17, 18, 19, 22

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ................................................................................... 28, 29, 30

*National Institutes of Health v. American Public Health Association*,
   145 S. Ct. 2658 (2025) .............................................................................. 2, 17, 19

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................................ 35

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .............................................................................................. 34

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ..................................................................................... 41, 42

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ............................................................................ 16

*Shaffer v. Veneman*,
   325 F.3d 370 (D.C. Cir. 2003) ............................................................................ 16

*Smith v. Bayer Corp.*,
   564 U.S. 299 (2011) ............................................................................................ 44

v

*Sols. in Hometown Connections v. Noem*,
  2025 WL 1103253 (D. Md. Apr. 14, 2025) ............................................................................ 20

*Spectrum Five LLC v. FCC*,
  758 F.3d 254 (D.C. Cir. 2014) ............................................................................................... 30

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ............................................................................... 19, 21, 23

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
  997 F.3d 1247 (D.C. Cir. 2021) ............................................................................................. 37

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................................................ 27

*Suburban Mortg. Assocs. v. HUD*,
  480 F.3d 1116 (Fed. Cir. 2007) ............................................................................................. 24

*Sustainability Inst. v. Trump*,
  No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2205) .................................................... 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................................................................ 15

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ............................................................................................... 24

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................................ 27

*Trends, Inc. v. U.S. Dep't of Educ.*,
  787 F. Supp. 3d 81 (D. Md. 2025) ........................................................................................ 25

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*,
  832 F.2d 214 (1st Cir. 1987) .................................................................................................. 45

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................................................ 44

*U.S. Conf. of Cath. Bishops v. Dep't of State*,
  770 F. Supp. 3d 155 (D.D.C. 2025) ...................................................................................... 26

*Validata Chem. Servs. v. U.S. Dep't of Energy*,
  169 F. Supp. 3d 69 (D.D.C. 2016) ........................................................................................ 25

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020), *appeal dismissed*,
  2021 WL 5537747 (D.C. Cir. Nov. 19, 2021) ...................................................................... 36

*Widakuswara v. Lake*,
    No. 25- 5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................................... 22

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025) ...... 40

## STATUTES

28 U.S.C. § 1491 ............................................................................................. 16

42 U.S.C. § 247d ............................................................................................. 6

Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020,
    Pub. L. No. 116-123, 134 Stat. 146 ............................................................. 4, 5

Coronavirus Aid, Relief, and Economic Security Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) .................................................. 4, 5

Coronavirus Response and Relief Supplemental Appropriations Act of 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) ................................................ 4, 5

Paycheck Protection Program and Health Care Enhancement Act,
    Pub. L. No. 116-139, 134 Stat. 620 (2020) ..................................................... 4

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, 135 Stat. 4 (2021) ............................................................. 4

Fiscal Responsibility Act of 2023,
    Pub. L. No. 118-5, 137 Stat. 10 ....................................................................... 6

## RULES

Fed. R. Civ. P. 12 ............................................................................................ 15

## REGULATIONS

2 C.F.R. § 200.340 .................................................................................... 20, 38

45 C.F.R. § 75.372 ................................................................................. *passim*

Plaintiffs are four local governments, whose respective state governments applied for and received COVID-era grant awards from the federal government and then made discretionary sub-awards to these local governments (as subrecipients).   Each of these local governments alleges it was harmed when, in March 2025, the Centers for Disease Control and Prevention (CDC) terminated its award agreements with the respective state governments, which then terminated these subawards.  A subset (three of the four local government plaintiffs) also were direct recipients of some allegedly-wrongfully terminated CDC grants.  None of the relevant state governments have brought suit here, nor have any other localities, but a labor union, plaintiff American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), seeks a nationwide injunction covering all "states and localities who employ AFSCME-represented public health workers."  Pl. Br. at 2, ECF No. 46.  In an effort to avoid the Tucker Act's channeling of this case to the Court of Federal Claims ("CFC"), which has exclusive jurisdiction over contract suits against the federal government, Plaintiffs emphatically argued at the preliminary injunction stage that they are not seeking money—and any order requiring the government to 'pay up' on the terminated agreements would be merely incidental to the litigation.  Now on summary judgment, Plaintiffs complain that they have been unable to 'monetize' and "spend-down" most of the twelve grants CDC reinstated in compliance with the Court's preliminary injunction order.  They now ask the Court to re-write the grant contracts to enlarge the contractual performance-period end date specifically to maximize the payout.  The record cannot be clearer now, especially in light of new controlling case law described below, that the CFC is the only court where this essentially contractual dispute can be heard—even before considering Article III standing defects and other issues.

1

To start, the Tucker Act divests this Court of jurisdiction over the three Administrative Procedure Act (APA) claims. This Court already determined at the preliminary injunction stage that the Tucker Act likely foreclosed the arbitrary and capricious claim, and potentially foreclosed Plaintiffs' other APA claims, pursuant to *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam) ("*Department of Education*"). Since then, the Supreme Court has doubled down on *Department of Education* in another grant-termination case, *National Institutes of Health v. American Public Health Association,* 145 S. Ct. 2658 (2025) ("*NIH*"). Together, these cases require the channeling of "essentially contractual" grant-termination claims—like the three APA claims here—to the CFC.

This Court also lacks jurisdiction to hear Plaintiffs' constitutional and *ultra vires* claims. The extraordinary contractual relief that Plaintiffs now seek on these claims—an order directing CDC to re-write the contractual performance-period terms in the grants—reveals that under the *Megapulse* test, these claims are disguised contract claims that can be raised only in the CFC.

Even if the Tucker Act did not divest the Court of jurisdiction over these claims, Plaintiffs face an Article III standing problem: Neither the four Local Government Plaintiffs, with respect to their indirect grants, nor AFSCME, can satisfy the redressability requirement. In both cases, the so-called "prime" recipient of the grants at issue is a third-party, not before the Court, and exercises its own discretion over the award. Plaintiffs cannot show that CDC's reinstatement of that award likely would redress their injuries. In fact, Harris County's indirect awards are testament to this issue: in compliance with the Court's preliminary injunction order, CDC restored nearly $14 million in terminated grants to (prime-recipient) State of Texas this past July; yet to date, Texas has declined to exercise its discretion to sub-award those restored funds to Harris County—and even has broached the possibility of returning the funds to CDC. AFSCME

similarly lacks standing, because it cannot show that reinstatement of the terminated grants likely would alleviate its alleged injury, which would occur only if the prime recipient exercised its discretion to accept and expend any awarded funds to rehire terminated AFSCME members.

Plaintiffs' claims also are moot, and the Court lacks jurisdiction, to extent the contractual performance periods of the grants have expired, so that the relief requested in the complaint is meaningless. To the extent these claims proceed in this Court under the APA and/or the Constitution, rather than as essentially contractual claims in the CFC, no payout is possible on these grants, even if the Court sets aside the challenged termination decisions.

And Plaintiffs' APA claims fail even if the Court had jurisdiction. Plaintiffs predicate their APA claims on an unreviewable, alleged "Mass Termination Decision," rather than on the individual grant terminations at issue. In any event, Plaintiffs' three APA claims are meritless. The termination decisions do not violate HHS's regulations, because the grant agreements incorporated the then-existing HHS regulation allowing "for cause" termination. The termination decisions also were not arbitrary and capricious. The terminations likewise were not unconstitutional or contrary to statute so as to violate the APA.

Plaintiffs' constitutional and *ultra vires* claims also fail. Under *Global Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025) ("*Global Health*"), *reh'g denied en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025), Plaintiffs lack a cause of action to "bring a freestanding constitutional claim [because] the underlying alleged violation and claimed authority are statutory," not constitutional. Instead, the claim must satisfy the stringent review standard of an *ultra vires* claim. *Id*. The bottom line is that even if the Tucker Act does not deprive this Court of jurisdiction over these claims, the claims fail.

The Court therefore should dismiss this case, and/or grant summary judgment in favor of Defendants. To the extent the Court is inclined to grant any relief to Plaintiffs, it should decline to order CDC to re-write the performance period terms of the contracts, where as a litigation strategy matter, Plaintiffs never sought that relief in the first place, and Plaintiffs fail to provide any legal basis for their request anyhow. The Court also should not afford any relief to AFSCME, and instead should continue to respect the decisions of the underlying jurisdictions that have chosen not to join this lawsuit.

## BACKGROUND

### I.    Factual Background

During the COVID-19 pandemic, Congress enacted five appropriations statutes, which funded the grants at issue in this case. These statutes provided for the U.S. Department of Health and Human Services (HHS)/CDC to allocate/distribute funds to "state, tribal, Local, and territorial entities" ("STLTs")—and as a funding mechanism, directed or allowed CDC to disburse the funds in the form of discretionary grants and/or cooperative agreements: (1) the Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020 ("CPRSAA"), Pub. L. No. 116-123, 134 Stat. 146 (2020); (2) the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020); (3) the Coronavirus Response and Relief Supplemental Appropriations Act ("CRRSAA") of 2021, Pub. L. No. 116-260, div. M., 134 Stat. 1182 (2020); (4) the Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act" or ("PPP")), Pub. L. No. 116-139, 134 Stat. 620 (2020), and (5) the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021). Appropriations under the first three statutes have since expired (in 2022, 2024,

and 2024, respectively); while the last two made funds "available until expended[.]"[1]

Defendants summarized these appropriations statutes, and the relevant funding of awards

thereunder, in a declaration Defendants filed in this case on May 23, 2025, pursuant to Court

order.  *See* ECF No. 25-1 (hereinafter, the "May 23 Legier Declaration").

Pursuant to these appropriations statutes, as relevant here, CDC issued so-called

"primary" grant awards to two groups of "prime recipients" (or "Primes")—meaning, the entity

with which CDC has a legal relationship.  *See* May 23 Legier Decl. ¶ 6, ECF No. 25.  First, CDC

issued primary awards to the state health departments of Texas, Ohio, Tennessee, and Missouri.

*See* Table, *infra*.  Each of these State prime recipients exercised its own discretionary right—

based on its own decision to have the local government undertake specific work on the States's

behalf—to reallocate and subaward some (discretionary) portion of the funds, to the respective

four Local Government Plaintiffs ("subrecipients").  The State prime recipient executed a

separate sub-award agreement with the respective subrecipient (local government).  In this

arrangement, the Prime undertakes responsibility for administering and managing the subaward

(including obtaining reimbursement from CDC, when the sub-recipient seeks reimbursement

from the Prime).  For these indirect awards, CDC is not a party to the subaward agreements

between the Primes and the subrecipients, and CDC does not have a legal relationship with the

subrecipient local government for these indirect awards.  *See* May 23 Legier Decl. ¶ 6.  Second,

CDC also directly awarded some primary awards to Harris County, Nashville, and Kansas City.

*See* Table, *infra*.

---

[1] The CPRSAA, CARES Act, and CRRSAA have expired. *See* CPRSAA, 134 Stat. at 147 (funds
"to remain available until September 30, 2022"); CARES Act, 134 Stat. at 554 ("September 30,
2024"); CRRSAA, 134 Stat. at 1911 ("September 30, 2024").

CDC issued these awards in 2020 and 2021, and renewed and extended the grants, until it ultimately terminated the grants in March 2025, as explained below.  Shortly after the "public health emergency" ended in May 2023, *see* 42 U.S.C. § 247d, Congress enacted the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10.  That law rescinded some $27 billion in pandemic-era appropriations, but left undisturbed grants that already had been issued. *See* May 23 Legier Decl. ¶¶ 18, 22.

In March 2025, HHS conducted a review of COVID-19 related grants funded by the above appropriations statutes, and identified grants for potential termination.  Ultimately, CDC retained a number of COVID-19 related grants, including funds for the ongoing highly pathogenic avian influenza (HPAI) threat, and wastewater surveillance activities, which served broader infection disease control purposes.  *See* Declaration of Jamie Legier (Dec. 23, 2025) ("Legier Decl."), ¶ 6.  On or around March 24, 2025, CDC terminated the remaining COVID-19 era grants, including the specific ones at issue here related to the Local Government Plaintiffs— the eight indirect grants and four direct grants summarized in the Table further below.

The Termination Notices CDC issued to the Primes explained that the termination was "for cause" because of the end of the pandemic:

> The purpose of this amendment is to terminate this award which is funded by COVID-19 supplemental appropriations. The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of this award is effective as of the date set out in your Notice of Award.
>                                           ****
> No additional activities can be conducted and no additional costs may be incurred. Unobligated award balances will be de-obligated by CDC.

*See, e.g.,* AR00065-69, at 69.

The termination clause governing each primary award, as set forth in the General Terms and Conditions,[2] incorporated and parroted HHS's then-existing termination regulation, 45 C.F.R. § 75.372, allowing termination both "for cause" and for non-compliance:

**Termination (45 C.F.R. Part 75.372) applies to this award and states, in part, the following:**

(a) *This award may be terminated in whole or in part:*

    (1) By the HHS awarding agency or pass-through entity, if a non-Federal entity fails to comply with the terms and conditions of a Federal award;

    (2) By the HHS awarding agency or pass-through entity for cause;

**\*\*\*\***

*See* AR 00385 at 00392 (General Terms and Conditions for Non-Research Grant and Cooperative Agreements) (Rev'd March 2021).[3]  Also, for each award, the underlying Notice of Funding Opportunity ("NOFO") included a provision referencing 45 C.F.R. § 75.372, and likewise provided for termination both "for cause" and for non-compliance.  *See e.g.,* AR00051.

Importantly, at the time of the March 24, 2025 termination, the contractual performance period specified in each Prime agreement already was on the cusp of expiring for a number of the grants, as summarized in the Table below.  For example, CDC's direct award to Kansas City, which specified a performance period of June 1, 2021 to May 31, 2025, had just two months remaining (*i.e.,* less than 5% of the life of the 48-month performance period) when it was terminated on March 24.  Similarly, for one of Harris County's indirect grants, CDC's primary award to the Texas Department of State Health Services (the Immunization Cooperative Agreements ("ICA") award) had just about three months remaining when terminated—its performance period was July 1, 2023 to June 30, 2025.  *See* Table, *infra*.  Notably, in the case of

---

[2] Each award agreement expressly incorporated the CDC General Terms and Conditions for Non-research awards.  *See, e.g.,* AR00005 ("Incorporation"); AR00073; AR00162; AR00252.

[3] The identical language is used in the 2025 version of this document.  *See* AR00402 at AR00410.

indirect awards, the subaward agreement could have an even shorter performance period than the State primary award. For example, in the case of one of the indirect awards to Nashville, the CDC's award to State prime recipient Tennessee (Epidemiology and Laboratory Capacity for Infectious Disease-award ("ELC")) does not expire until July 31, 2027, but according to Plaintiffs, the subaward to Nashville expires a full year earlier, on July 31, 2026. *See* Second Sharp Decl. ¶ 7, ECF No. 46-6. Similarly, while the ELC award to Missouri does not expire until July 31, 2027, the performance period on the subaward ended on July 23, 2025. *See* Jones Decl. ¶ 8, ECF No. 46-4. The performance periods of the Prime awards are set forth below. Plaintiffs have not provided the subawards, so the information is limited to the Prime award.

| Plaintiff Local Government | Indirect Grants *(CDC Prime awards to respective State )* | Direct Grants |
|---|---|---|
| **Harris County** | **Immunization Cooperative Agreements ("ICA")** (6NH23IP922616) Perform. Period: 7/1/23 – 6/30/25 (AR 00345-347) | **Activities to Support [STLT] Health Department Response to Public Health or Healthcare Crises** Harris Cares "Embrace HOPE" grant 6NH75OT000026 Perform. Period: 6/1/21 – 5/31/26 (AR 00060-64) |
| | ***Epidemiology and Laboratory Capacity for Infectious Disease ("ELC")*** (6NU50CK000501) Perform. Period: 8/1/23 – 7/31/27 (AR 00353-355) | ***Community Health Workers for Public Health Response and Resilient Communities Grant ("CHW")*** NU58DP006986 Perform. Period: 8/31/23 – 8/30/25 (AR 00150-154) |
| **Nashville** | **Immunization Cooperative Agreements ("ICA")** (6NH23IP922617) *Immunization and Vaccines for Children* **("VFC")** Perform. Period: 7/1/23 – 6/30/25 (AR 00361-363) | ***Community Health Workers for Public Health Response and Resilient Communities Grant ("CHW")*** (6NU58DP006999) Perform. Period: 8/31/23 – 8/30/25 (AR 00239-243) |
| | ***Epidemiology and Laboratory Capacity for Infectious Disease ("ELC")*** (6NU50CK000528) Perform. Period: 8/1/23 – 7/31/27 (AR 00369-371) | |
| **Kansas City** | ***Epidemiology and Laboratory Capacity for Infectious Disease ("ELC")*** (6NU50CK000546) Perform. Period: 8/1/23 – 7/31/27 (AR 00329-331) | ***Activities to [STLT] Health Department Response to Public Health or Healthcare Crises*** [called Health Disparities award] 6NH75OT000012 Perform. Period: 6/1/21 – 5/31/25 (AR 00313-318) |

| | | |
|---|---|---|
| | **Immunization Cooperative Agreements ("ICA")** (6NH23IP922606) Perform. Period: 7/1/23 – 6/30/25 (AR 00337-339) | |
| **Columbus** | ***Epidemiology and Laboratory Capacity for Infectious Disease ("ELC")*** (6NU50CK000543) Perform. Period: 8/1/23 – 7/31/27 (AR 00377-379) | None |
| | ***Activities to Support [STLT] Health Department Response to Public Health or Healthcare Crises*** (Ohio Initiative to Address COVID-19 Health Disparities Among Populations Underserved and at High Risk) (6NH75OT000070-01-05) Perform. Period: 6/1/21 – 6/30/25 | |

## II.    Procedural History

### A.  The Preliminary Injunction Motion and Order

On April 24, one month after the March 24 grant terminations, Plaintiffs filed their complaint, asserting three APA claims against defendants CDC and U.S. Department of Health and Human Services (HHS), and also asserting constitutional and *ultra vires* claims solely against individual defendants Kennedy and Monarez (the Individual Defendants).  *See* Compl.. About a week later, on April 30, Plaintiffs filed a Motion for Preliminary Injunction.  *See* ECF No. 14.  The Local Government Plaintiffs sought reinstatement of the eight indirect grants and four direct grants, *see* Comp. ¶¶ 27-71 (*see also, e.g.,* ¶¶ 86-94; 106-30, *id.* Compl., Prayer for Relief ¶¶ C, D), while AFSCME sought nationwide relief by requesting an order that Defendants "resume the implementation of the grants . . . of states and local employers of AFSCME members that were affected by" the terminations.  *See* Proposed Order at 2, ECF No. 14-17.  On May 21, the Court held a hearing, and on June 17, the Court issued its Order, granting in part and denying in part Plaintiffs' motion.  PI Order, ECF No. 32.   In relevant part, the PI Order:

- Preliminary enjoined Defendants and their agents "from enforcing or otherwise giving effect to the March 2025 termination of any grants issued directly or indirectly" to the Local

Government Plaintiffs, except to the extent funded by the PPP or ARPA (which did not have appropriations deadlines); and

- Directed Defendants to "notify any state entities acting as pass-throughs for any indirect grants [as described in the PI Order] and file a status report by July 1, 2025, confirming that it sent these notices."

*See id.*.  The Court denied preliminary relief to AFSCME.  *See Harris Cnty. v. Kennedy*, 786 F.

Supp. 3d 194, 223 (D.D.C. 2025) (Mem. Op.).

Notably, at the time of the June 17 PI Order, the direct grant to Kansas City (Health

Disparities) *already had expired on May 31*, and only 13 days of the performance period

remained for each of the three Immunization and Cooperative Agreements ("ICA") grants

(performance period ending June 30).  *See* Table*, supra*.

In their complaint and preliminary injunction motion, Plaintiffs did not seek any

extension of the contractual performance period end dates—despite the impending lapse of those

dates in some of the terminated grants.  Instead, both the complaint and preliminary injunction

motion sought reinstatement of the grants, *with the contractual performance periods as-is. See,*

*e.g.,* Compl., Prayer for Relief ¶ D ("Enjoin Defendants to *reinstate Plaintiffs' grants for the*

*awarded project periods* and to continue to administer the grants to the same extent and in the

same manner as prior to the unlawful terminations . . ." (emphasis added)).[4]  Nor did Plaintiffs

seek to stay the performance period deadlines.

### B.  Defendants' Compliance with the PI Order

Defendants are in compliance with the PI Order. On July 1, CDC sent out required

notices to the State primes regarding the indirect grants, *see* Defs.' Status Report, ECF No. 35.

---

[4] *See also* Pls.' Mot. for Prelim. Inj. at 41-42, ECF No. 14-1 (Defendants shall "resume the implementation of the grants"); *see also* Proposed Order at 2 ("Defendants shall resume the implementation of the grants . . ."). And in their preliminary injunction motion and complaint, Plaintiffs did not argue that the passage of performance period end dates was a source of harm (let alone imminent irreparable harm). *See* ECF No. 14-1, pp. 34-39; *see generally*, Compl.

On July 10, CDC reinstated the four direct grants, *see* Mohan Decl., Exs. A-D, ECF No. 46-10, and on July 25, CDC reinstated to the States seven of the eight indirect awards (with the last indirect Prime reinstated on July 28, a grant to Missouri with $30,000 remaining). *See id*., Exs. E-L. In reinstating the awards, pursuant to Plaintiffs' request, Defendants voluntarily extended the performance period end dates by approximately 20 days in the case of directs, and approximately 40 days in the case of some of the restored grants to the State primes, to account for the time period between issuance of the Court's PI Order and reinstatement of the grants. *See id.;* Exs. A-L; Ex. N.

### C.  Plaintiffs' Attempts to Monetize the Reinstated Awards

Although CDC reinstated the twelve grants at issue in July, Plaintiffs claim in their summary judgment motion that they have been unable to 'monetize' and "spend-down" the grant funds. *See* Pl. Br. at 8.  Plaintiffs claim this is due to "delay and resistance from the federal government." *See id*. at 44.  The record, however, reflects other causes:

1.     Texas Department of State Health Services (Texas DSHS) to date has declined to reissue nearly $14 million total in subawards to Harris County.  See Exs. A, B, C (attached).  As reflected in its letters to CDC, Texas has declined to perform what it perceives to be "uncompensated work" in administering a subaward to Harris County—evidently calling into question whether the subaward would (sufficiently) serve the interests of Texas.  *See* Ex. C at p. 2. According to Texas DSHS, CDC should 'front' the $18,800 of administrative costs that it estimates "would necessarily be incurred by DSHS in reinstating these subawards" to Harris County.  *Id*. at p. 3.  Texas DSHS further states, "[i]f CDC is unable to adjust the amounts to cover costs associated with managing these subawards, DSHS will return the funds to HHS." Ex. A at p. 2.  Texas also requests that CDC issue a new award to Texas to replace the one that

originally expired on June 30, 2025 (but was voluntarily extended by Defendants to September 1, 2025).  Ex. C at p. 3.

2.       Nashville's difficulty accessing or spending-down its subaward appears to be due to the subaward's shorter performance period, as set by the State prime recipient (Tennessee), according to the declaration Plaintiffs provided.  That declaration explains that Nashville's subaward expires on July 31, 2026—whereas CDC's prime ELC award (to Tennessee) does not expire until July 31, 2027.  *See* Sharp Decl. ¶¶ 6-7, 10.

3.       For other grants, the performance period either already expired, or was on the cusp of ending, at the time of the PI Order.  Specifically, as noted above, the Kansas City Health Disparities award *expired on May 31, 2025*, and thus already had been expired for more than two weeks, at the time of the PI Order (yet Defendants voluntarily extended the performance period to August 2 to account for the time it took CDC to comply with the Court's PI Order).  *See* Pl. Br. at 8 (citing Pl. SOF ¶ 59, ECF No. 46-2 (citing Jones Decl. ¶ 5)).  *See* Table, *supra*; Mohan Decl., Ex. C.  Separately, Plaintiffs complain that "an artificially compressed timeline" constrains Nashville from spending its reinstated direct grant, *see* Pl. Br. at 8.  But the timeline *already was compressed*: only approximately ten weeks remained on that CHW award at the time of the PI Order (and Defendants voluntarily extended the performance period from August 30 to September 22 to account for the time between issuance of the PI Order and the date CDC reinstated the grant).  *See* Table, *supra*; Mohan Decl., Ex. C.  The indirect Vaccine for Children ("VFC") grant to Nashville (Pl. Br. at 4), and the indirect "OHIZ" award to Columbus (Pl. Br. at 41, 43) are similar.[5]

---

[5] In the case of the indirect VFC grant to Nashville, the Primary award to the State had a performance period end date of June 30, 2025—about two weeks after issuance of the PI Order— and when CDC reinstated this award on July 25, it voluntarily extended the performance period to

4.      Finally, in at least two cases, Plaintiffs do not clearly explain the alleged impediment. The declaration proffered on behalf of Harris County asserts that to date, the County "has not been able to access funding from the [direct] Embrace HOPE [grant]," but does not provide any reason.  *See* Williams Decl. ¶ 15, ECF No. 46-9.  Notably, the original performance period ran until May 31, 2026, and upon reinstatement, Defendants voluntarily extended it until *June 23, 2026*.  *See id.* ¶ 7.  Similarly, in the case of Columbus's indirect ELC award (which Plaintiffs refer to as the Enhanced Operations award), Plaintiffs do not clearly explain why they allegedly are unable to access the $3 million that CDC restored, where the primary award to Ohio does not expire until *July 31, 2027*.  *See* Table, *supra*.  Plaintiffs assert only that "Columbus also cannot access its Enhanced Operations grant to date, and Columbus continues to work with Ohio to regain access," *see* Pl. SOF ¶ 57 n.2, while elsewhere noting that this grant may have included PPP funds.  Pl. Br. at 26  n.9.

### D.  Relief Sought in Plaintiffs' Summary Judgment Motion

On summary judgment, Plaintiffs now request, in relevant part, that the Court:

- Vacate as unlawful the March 2025 decision by Defendants "to mass-terminate" all remaining public health grants issued under CARES, CPRSAA, PPP, CRRSAA, and APRA.

- Permanently enjoin Defendants and their agents "from enforcing or otherwise giving effect to the March 2025 terminations of any grants issued under the [aforementioned] statutes . . . , directly or indirectly, to the [four Local Government Plaintiffs] or to states and localities who employ AFSCME-represented public health workers."

- Require Defendants to "resume the implementation" of these grants that Defendants caused to be terminated.

- Require Defendants to "extend the performance period" of these grants "by the amount of time between the April 24, 2025 Complaint and this Order."

---

September 1, 2025 to account for the time it took CDC to reinstate the grant.  *See* Table, *supra*; Mohan Decl., Ex. G.  The same is true of the indirect OHIZ grant to Columbus (*see* Table, *supra*; Mohan Decl., Ex. K), and Columbus claims it was unable to access the $103,000 remaining on this award before the (as-extended) September 1 expiration date because the Columbus City Council was on recess and they were unable to get a new ordinance in time.  *See* Pl. Br. at 43.

- Require Defendants, in the case of subawards, to "cooperate and take all actions necessary to permit primary grantees to extend the performance period of any subaward," and order Defendants shall "not impair efforts by the primary grantees to extend the performance period of any subaward."

*See* Pl. Br. Proposed Order at 1-2, ECF 46-11 (emphasis added). The last two forms of relief warrant brief discussion here.

First, Plaintiffs incorrectly assert that they seek to "restore the status quo," in asking the Court to "extend the performance period" of the grants "by the amount of time between the April 24, 2025 Complaint and this Order." *See* Pl. Br. at 1. For example, at the time Plaintiffs filed their complaint, only five weeks remained on the performance period of CDC's direct award to Kansas City (performance period ending May 31, 2025). Even assuming the Court had authority to award that relief (and it does not, *see* Parts II-IV, *infra*,[6] Plaintiffs ask the Court to re-write that contract to provide Kansas City an entirely new, substantially longer performance period—in fact, Plaintiffs appear to seek *an entire year* (assuming for sake of illustration, the Court enters final judgment in Spring 2026).

Second, there is no basis for Plaintiffs' requested Order directing Defendants to take steps with respect to the performance periods of *subawards*. Defendants, when reinstating the awards in July, already explained to Plaintiffs that CDC is not a party to the subawards and has no ability or authority to extend the performance periods for subawards between the states and Local Government Plaintiffs. *See* Ex. D (July 25, 2025 email). Defendants explained to Plaintiffs that insofar as Local Governments Plaintiffs seek an extension of the *subaward* performance periods with the State prime recipients, the Local Government Plaintiffs should contact the State prime

---

[6] Defendants respectfully posit that they had no obligation to reinstate this grant because this award had expired prior to the entry of the PI Order, so the claim for relief on this award was moot. *See infra*. Nevertheless, Defendants reinstated this grant with an extension, as requested by Plaintiffs.

recipients directly to discuss any such extension (assuming any extension is within the performance period of CDC's direct grant to the State), and Defendants provided to Plaintiffs' counsel CDC's point-of-contact information for each of the four State primes. *Id*.

## LEGAL STANDARDS

On a motion to dismiss under Fed. R. Civ. P. 12(b)(1), plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and in making this determination the Court "may consider material outside the pleadings," *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to [this] presumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citation omitted).

In an APA case, the Rule 56(a) summary judgment standard, requiring the court to determine if there is a genuine issue of material fact, does not apply. *See EB5 Holdings, Inc. v. Jaddou*, 717 F. Supp. 3d 86 (D.D.C. 2024). "In this context, summary judgment instead serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id*. at 96. In that case, "the district judge sits as an appellate tribunal." *Id*. at 102 n.8 (citation omitted).

## ARGUMENT

### I.    The Tucker Act Divests This Court of Jurisdiction

Plaintiffs fail to establish this Court's jurisdiction because, by seeking to enforce contractual rights against the federal government and obtain contractual remedies for money, they trigger the exclusive jurisdiction of the CFC under the Tucker Act.  *See* 28 U.S.C. § 1491(a)(1) (granting jurisdiction to the CFC for "any claim against the United States founded . . . Upon any express or implied contract with the United States[.]").  The CFC is, as Congress intended, the "single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).  The D.C. Circuit has "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618-19 (D.C. Cir. 2017).  *See Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA.") .

At the preliminary injunction stage, this Court already determined that the Tucker Act likely divests the Court of jurisdiction over Plaintiffs' arbitrary-and-capricious claim, pursuant to *Department of Education v. California*, 604 U.S. 650 (2025)—observing that decision involved a "claim that appears in all material respects identical to the [arbitrary and capricious] one that plaintiffs press here," and contemplating that Plaintiffs' "contrary-to-statute and contrary-to-regulation claims under the APA . . . [similarly] are potentially foreclosed by *Department of Education*."  *See Harris Cnty.,* 786 F. Supp. 3d at 217-18.  Specifically, in *Department of Education*, the Supreme Court observed that "the APA's [limited] waiver of sovereign immunity does not extend to 'orders to enforce a contractual obligation to pay money along the lines of

what the District Court ordered here,'" so it stayed the district court order, which required the government to return to the pre-termination status quo. *See id.* at 216 (quoting *Dep't of Education*, 604 U.S. at 650-51).

The Supreme Court recently "doubled down" on *Department of Education*. In *NIH*, the Court stayed an injunction barring termination of various research grants, which plaintiffs likewise had challenged under the APA. 145 S. Ct. at 2660. In relevant part, the *per curiam* opinion held: "The [APA]'s 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction [1] to adjudicate claims 'based on' the research-related grants or [2] to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* at 2658 (quoting *Dep't of Education*, 604 U.S. at 651). One justice explained: "The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants. That is a breach of contract claim . . . . [which] must be brought in the Court of Federal Claims, not federal district court." *Id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part).

The D.C. Circuit, moreover, has instructed that, to determine whether its jurisdiction is proper, the district court should assess whether the claims "are essentially contractual." *Megapulse*, 672 F.2d at 967. Applying the so-called *Megapulse* test to the claims at issue, the Court must consider (1) whether "the source of the rights" asserted is contractual or is "based on truly independent legal grounds" and (2) whether "the type of relief sought" is of a contractual nature. Id. at 968–71. In applying this test, the D.C. Circuit emphasized the need to look past artful pleading designed to evade the Tucker Act: "[A] plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign

immunity, as under the APA." *Id.* at 967. *See Ingersoll-Rand*, 780 F.2d at 77-78; *Int'l Eng'g Co., Div. of A-T-O, Inc. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975). In the contract context, this "preserves the sovereign's immunity from being compelled to perform obligations it prefers to breach and compensate financially . . . ." *McKay v. United States*, 516 F. 3d 848, 851 (10th Cir. 2008). Here, there is no dispute that the grant agreements are contracts for Tucker Act purposes, and as explained below, application of *Megapulse* confirms that each of Plaintiffs' six claims is "essentially contractual" and therefore subject to the exclusive jurisdiction of the CFC.

### A.    This Court Lacks Jurisdiction over Each of the Three APA Claims

#### 1.    Arbitrary and Capricious Claim (Count VI)

This Court already concluded at the preliminary judgment stage that "*Department of Education* is the case that speaks, however tersely, most directly to the issues and facts underlying [P]laintiffs' arbitrary-and-capricious APA claim." *Harris Cnty.*, 786 F. Supp. 3d at 219. This Court explained that "[i]t was this [arbitrary and capricious] claim that the Supreme Court held likely belonged in the Court of Federal Claims"—"[a] claim that appears in all material respects identical to the one that [P]laintiffs press here," *id.* at 218—indeed, this Court observed no "meaningful distinction between [P]laintiffs' arbitrary-and-capricious claim and the one in *Department of Education*." *Id.* at 219. The Court concluded, "when the highest court in the land answers the same question now before this Court, in a similar preliminary posture and on facts materially identical to those in this case, this Court cannot but listen." *Id.* at 218.

Application of the so-called *Megapulse* test confirms this. Under the first prong, "the source of the rights" asserted by Plaintiffs are grant agreements themselves, including the contractual termination clause in each agreement. In other words, Plaintiffs' asserted right to the funds here arises solely from the grant agreements and "in no sense . . . exist[s] independently

of" those contracts. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Plaintiffs would have no claim absent the grants and the government's alleged breach. *Megapulse*, 672 F.2d at 967-68. The source of the right asserted is therefore not "truly independent" of the contracts, or not "based on truly independent legal grounds." *Id*. at 970.

Under the second prong of *Megapulse,* the relief sought, at base, is payment of money. In seeking reinstatement of awards (*i.e.,* by setting aside their grant terminations) the "essence of [Plaintiffs'] claim is a request for specific performance of the original contract." *Ingersoll-Rand*, 780 F.2d at 79-80. This is a "typical contract remedy" that indicates a claim is "founded upon a contract for purposes of the Tucker Act." *Spectrum Leasing*, 764 F.2d at 894-95. The payment of money, far from being merely incidental to or "hint[ed] at," is the principal object of their suit. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1112 (D.C. Cir. 2022). Indeed, Plaintiffs' briefing focuses on the inability to "spend down" their awards. Pl. Br. at 8, 43.

And *NIH* also confirms this. Plaintiffs seek adjudication of arbitrary and capricious claims that are "'based on' the research-related grants." *See NIH*, 145 S. Ct. at 2658 (quoting *Dep't of Education*, 604 U.S. at 651). And further, Plaintiffs seek "relief designed to enforce [an] obligation to pay money pursuant to those grants." *Id*. (citation omitted). Here, as in *NIH*, "[t]he core of [P]laintiffs' [complaint] alleges that the Government unlawfully terminated their grants," so "th[is] is a breach of contract claim," that cannot be heard here. *Id*. at 2665 (Kavanaugh, J., concurring in part and dissenting in part).

### 2.    Contrary-to-Regulation APA Claim (Count V)

The Tucker Act likewise divests this Court of jurisdiction over Plaintiffs' contrary-to-regulation claim under the *Megapulse* test. As the D.C. Circuit has explained in performing the *Megapulse* test, "[t]hat the termination also arguably violates certain other regulations does not

transform the action into one based solely on those regulations.  Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *Ingersoll-Rand,* 780 F.2d at 78.  "If the mere allegation of procurement [regulation] violations were to bring claims of this type within the jurisdiction of the district court, Congress's intent to limit contract remedies against the government to damages in the Claims Court would be effectively circumvented." *Id.* (citation omitted).

Under the "source of the rights"-prong, Plaintiffs here allege that Defendants violated the HHS regulation, 45 C.F.R. § 75.372, when terminating the grants on the grounds that the "pandemic has ended."  *See* Pl. Br. at 14, 34-36.  In fact, the termination clause in each grant, incorporated through the Terms & Conditions, explicitly references that termination regulation. The source of the rights is therefore the grant agreement.   The contrary-to-regulation claim therefore is not "based on truly independent legal grounds," *Megapulse*, or based "solely" on the regulations.  *Ingersoll-Rand,* 780 F.2d at 78.  *See, e.g., Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *4-5, *9-10 (D. Md. Apr. 14, 2025) (concluding under the *Megapulse* test that the grant agreements were the source-of-the rights, where the termination provisions in certain grants expressly incorporated the termination regulation at 2 C.F.R. § 200.340(a)(2)).

And under the second prong of *Megapulse*, the relief sought is contractual (specific performance), for the same reason as explained above with respect to the arbitrary and capricious claim:  Plaintiffs seek specific performance of the grant agreements, with revised terms.

### 3.    Contrary to Statute and Constitution Claim (Count IV)

Finally, Plaintiffs' contrary-to-statute-and-constitution claim is also "essentially contractual," and must be channeled to the CFC. Pl. Br. at 13. Under *Megapulse*, the source of the rights is contractual, because the underlying appropriations statutes provide for a

discretionary grant process to effectuate funding, which is the source of Plaintiffs' alleged right to payments. Absent the grant agreements, Plaintiffs would have no claim.

Decisions from other judges of this District specifically addressing contrary-to-statute-and-constitutional claims confirm this analysis. In *Appalachian Voices v. EPA*, for example, the Court explained why "the source of plaintiffs' rights is contractual":

> The Clean Air Act does not entitle grant funds to any particular entity "in the absence of the contract itself." *See Spectrum Leasing*, 764 F.2d at 894. Instead, it provides that EPA shall award grants to "*eligible entities . . . as defined by the Administrator.*" *. . . Thus, plaintiffs' "right to . . . payments arose only upon creation and satisfaction of its contract[s] with the government; in no sense did it exist independently of [those] contract[s].*" *Spectrum Leasing*, 764 F.2d at 894.

Civ. A. No. 25-1982, 2025 WL 2494905, at *7 (D.D.C. Aug. 29, 2025) (citation omitted) (emphasis added), *appeal filed*, No. 25-5333 (D.C. Cir. Sep. 19, 2025), *denying injunction pending appeal*, 2025 WL 2732746 (D.D.C. Sep. 25, 2025). *See also, Am. Ass'n of Physics Teachers v. Nat'l Sci. Found.*, ---F. Supp. 3d---, 2025 WL 2615054, at *11 (D.D.C. Sep. 10, 2025) ("*American Physics*") (explaining plaintiffs' "APA contrary-to-law claim . . . would fail the *Megapulse* test" because "Plaintiffs' claims to restored grant funding come from their grant awards, not from any statutory provision."); s*ee also, Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2205) ("[L]ike the grants in [*Department of Education*], the grants here were awarded by federal executive agencies to specific grantees from a generalized fund. While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds.").

Under the second prong of *Megapulse*, the type of relief is contractual too, for the same reason explained above with respect to the other two APA claims. The Tucker Act therefore divests the Court of jurisdiction over this claim.

### B. Plaintiffs' Tucker Act Counterarguments on the APA Claims are Unavailing

Plaintiffs assert a host of arguments under both prongs of the *Megapulse* test to try to salvage district court jurisdiction for their disguised breach-of-contract claims. All of Plaintiffs' arguments fail.

First, for the legal standard governing the source-of-rights prong under *Megapulse*, Plaintiffs argue that this Court should follow an earlier dissenting opinion in the D.C. Circuit, that "[i]f a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *See* Pl. Br. at 14 (quoting *Widakuswara v. Lake*, No. 25- 5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025)) (Pillard, J., dissenting). But this is not the law in this Circuit. Rather, only claims "based on *truly independent legal grounds*," or claims "based solely on" regulations (i.e., allegedly violated by termination) are essentially contractual. *See Megapulse*, 672 F.2d at 969-70 (emphasis added); *Ingersoll-Rand*, 780 F.2d at 78. *See also, e.g., Am. Physics*, 2025 WL 2615054, at *9 (explaining the "truly independent legal grounds"-standard (citation omitted)).

Second, the D.C. Circuit has rejected the Plaintiffs' argument here that the source of their rights is not the contracts, but rather "the right to be free from unlawful and arbitrary agency action (created by the APA)." *See* Pl. Br. at 15. *Richardson*, 512 F.2d at 580 ("We refuse to believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication." (citation omitted)). *Id.* ("[D]ecisions made by contracting officers pursuant to contract clauses fall outside the contemplation of the [APA]").

Similarly, there is no merit to Plaintiffs' argument that the Tucker Act does not apply where the grant agreements were allegedly terminated "without any individualized determination." *See* Pl. Br. at 37. As reflected above, the D.C. Circuit has rejected use of these types of arbitrary-and-capricious arguments to establish district court jurisdiction in what essentially are contract

disputes. *See Ingersoll-Rand,* 780 F.2d at 77-78; *Richardson,* 512 F.2d at 580. *See also, e.g.,*
*Appalachian Voices*, 2025 WL 2494905, at *6 ("Plaintiffs cannot artfully plead around the
Tucker Act by mounting a programmatic challenge to EPA's decision to cease a contractual
relationship with them." (citing *Crowley*, 38 F.4th at 1107)).

  Third, grantees cannot evade the Tucker Act by arguing that "none of [their] [APA]
claims require the Court to analyze the terms" of the terminated grants, as Plaintiffs argue here.
*See* Pl. Br. at 15. Another judge of this court recently rejected the plaintiffs' attempt "to
distinguish their claims from those at issue in *Department of Education* by pointing to how the
requested relief would not require paying past-due sums and [that] the terms and conditions of
each individual grant award are not at issue." *Am. Physics*, 2025 WL 2615054, at *11. The
Court explained, "those arguments are far less convincing after [*NIH*], in which the district court
only ordered vacatur of agency action, not the direct restoration of any grant." *Id.* .

  Plaintiffs' various 'type of relief'-prong arguments are also unavailing. For example,
Plaintiffs claim they "do not seek money damages but rather vacatur of the policy decision to
terminate all of the grants", and that "Plaintiffs' request for vacatur of this agency action is not
the same as seeking the payment of grants." *Id.* at 13, 15. But as noted above, "[t]he grantees
seek to set aside their grant terminations, which means they seek specific performance."
*Ingersoll-Rand,* 780 F.2d at 79-80. "This is a typical contract remedy that indicates a claim is
'founded upon a contract for purposes of the Tucker Act.'" *Spectrum Leasing*, 764 F.2d at 894-
95. Similarly, they contend they "are not seeking money damages, having 'expressly disavowed
any retroactive payments.'" *Id.* at 15 (quoting *Harris Cnty.*, 786 F. Supp. 3d. at 206). But as the
Federal Circuit explained, "a linguistic distinction between 'money damages' and a claim that
happens to be for money, [is] a distinction that is at best murky, and at worst without a

difference." *Suburban Mortg. Assocs. v. HUD*, 480 F.3d 1116, 1124-25 (Fed. Cir. 2007)

(explaining that "a claim seeking monetary relief, however defined, may nevertheless be within

the jurisdictional scope of the Tucker Act.").

There also is no merit to Plaintiffs' 'Catch-22'-argument, that Plaintiffs are unable to bring

their claims in the Court of Federal Claims, because, as they claim, it "has no equitable powers."

Pl. Br. at 16.  For one, the linchpin of Plaintiffs' 'Catch-22' argument is *Tootle*, which Plaintiffs

quote as having "categorically reject[ed] the suggestion that a federal district court can be

deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the [CFC]."  *See id.* at 13

(quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006)).  But the procedural posture

in *Tootle* is entirely different and inapplicable: that case concerned a serviceman who requested

only that the district court invalidate the findings of a physical evaluation board and correct his

military service record, where he first brought his claim in the CFC, and when the government

moved to dismiss the case, he then sought relief in the district court, where the government again

argued that it should be dismissed for lack of jurisdiction.  446 F.3d at 169-71.  As *American

Physics* explained, "[The Court of Federal Claims' jurisdictional] limitation does not transform

Plaintiffs' contract claim into one that this Court has jurisdiction over; it is another reason to bar

its entry.  That is because Congress established a scheme that included a deliberate limitation on

certain types of remedies, which was intended to foreclose specific performance of government

contracts.'" 2025 WL 2615054, at *9 (quoting *Ingersoll-Rand*, 780 F.2d at 80).

And relatedly, there is no merit to Plaintiffs' privity-based argument that the "Tucker Act

cannot deprive [AFSCME] of redress in this Court," where "AFSCME indisputably seeks relief

that is unavailable in the CFC" because the union does not have contractual privity with the

federal government on the grants.  Pl. Br. at 17.  In *American Physics*, the court rejected that

same argument:

> Plaintiffs argue that there must be jurisdiction over their claims in district court
> because some of them cannot sue in the [CFC]. . . .  Some of Plaintiffs' members . . .
> may lack privity with the federal government and cannot bring a contract suit in the
> [CFC]. . . . This Court cannot exercise jurisdiction where it does not otherwise have
> it because there are aggrieved parties who lack other options to seek relief. While it
> may be true that some Plaintiffs or their members cannot bring their own contractual
> suits in the [CFC]., the Court cannot expand the bounds of its jurisdiction to fill that
> gap.

2025 WL 2615054, at *10 (citation omitted).

### C.  This Court Lacks Jurisdiction over Plaintiffs' Other Claims

The Tucker Act also divests this Court of jurisdiction over Plaintiffs' separation-of-

powers, Spending Clause, and *ultra vires* claims.  A number of courts have concluded that the

Tucker Act precludes jurisdiction over constitutional and *ultra vires* claims, and jurisdiction is

precluded here for the same reasons.  "[T]he Tucker Act precludes [a district court] from

exercising jurisdiction over any claims pertaining to individual grant agreements (even if framed

as a constitutional action)."  *Bd. of Educ. for the Silver Consol. Schs. v. McMahon*, 791 F. Supp.

3d 1272, 1287 (D.N.M. 2025) (citing *Child. Trends, Inc. v. U.S. Dep't of Educ.*, 787 F. Supp. 3d

81, 93 (D. Md. 2025); *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, 2025 WL 1852762, at

*17, (D.D.C. July 6, 2025); *Validata Chem. Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 89

(D.D.C. 2016)).

This analysis is confirmed by the fact that Plaintiffs seek not only to set aside the grant

terminations, but also a court order directing CDC to re-write the contractual terms to enable

plaintiffs to further monetize the awards, including for grants for which the performance period

has passed.  These claims, although styled as constitutional and *ultra vires*, are "essentially

contractual" because, for relief, Plaintiffs seek to *retroactively* redress their alleged pecuniary

loss from grant termination.  Now, beyond seeking to require Defendants to release funds going forward (as they claimed at the preliminary injunction), they also seek, in essence, compensatory damages to recover on grants for which the performance period *already has passed.*

Alternatively, to the extent the Court views this requested relief as a form of specific performance—*i.e.,* 'very specific, specific performance'—that also compels jurisdiction in the CFC. The D.C. Circuit has repeatedly stated, "[A] complaint involving a request for specific performance must be resolved by the [CFC]."  *Ingersoll-Rand*, 780 F.2d at 80.

Plaintiffs' request that the Court rewrite the grant terms should change the analysis the Court undertook at the preliminary judgment stage when it determined it has jurisdiction over these claims.[7]  In concluding that these constitutional and *ultra vires* claims are not essentially contractual, the Court relied upon Plaintiffs' representations that they were seeking "injunctive, prospective relief."  *See Harris Cnty.*, 786 F. Supp. 3d at 206-07 ("the injunctive, prospective relief plaintiffs seek also supports district-court jurisdiction . . . . [a]s further evidence that plaintiffs are not seeking damages, they expressly disavowed any retroactive payments and request only vacatur of the allegedly unlawful terminations.").  But Plaintiffs no longer seek just vacatur of the grant terminations, they ask the Court to rewrite the parties' contractual terms. Whether viewed as damages or specific performance, that is a contract remedy.

Finally, there is no merit to Plaintiffs' argument that the Tucker Act is "irrelevant" for the constitutional and *ultra vires* claims because no waiver of sovereign immunity is necessary under the so-called *Larson* exception.  Pl. Br. at 10-12.  Because Plaintiffs' constitutional and *ultra*

---

[7] As this Court observed, the D.C. Circuit has left open the possibility of disjunctive application of the two-part *Megapluse*-test—*i.e., wh*ere "one of the two does the trick."  *See Harris Cnty.*, 786 F. Supp. 3d at 217.  And as the Court noted, at least one decision from this District supports that approach.  *See id.* (the type of remedy alone "is dispositive" (quoting *U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025))

*vires* claims are essentially contractual, *Larson* does not apply. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 704 (1949) ("The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right.").

## II.    The Local Government Plaintiffs Lack Standing to Challenge the Termination of Indirect Grants, and AFSCME Lacks Standing Altogether.

Standing presents another jurisdictional issue for both the Local Government Plaintiffs and AFSCME.  As explained below, there is a critical redressability defect in the Article III standing arguments of both the Local Government Plaintiffs with respect to their indirect awards and AFSCME with respect to all awards.

"The 'irreducible constitutional minimum' of standing has three familiar parts: injury in fact, causation, and redressability," and "[t]he party invoking federal court jurisdiction bears the burden of establishing each of those elements."  *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  And a party must have standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  These elements are assessed at the time of the filing of the complaint.  *See Barker v. Conroy*, 921 F.3d 1118, 1125 (D.C. Cir. 2019).

### A.    The Local Government Plaintiffs Cannot Show Standing with Respect to their Indirect Grants

The four Local Government Plaintiffs cannot satisfy the redressability requirement with respect to their terminated subawards, *vis a vis* the State prime recipients, because the States are third parties not before the Court.  "Redressability examines whether the relief sought will likely alleviate the particularized injury alleged by the plaintiff"—and "[t]he key word is 'likely.'" *Hecate Energy*, 126 F.4th at 665 (citations omitted).  "To determine whether an injury is

27

redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (citation omitted).   The Local Government Plaintiffs cannot show that CDC's reinstatement of the State prime awards "likely" would result in the State issuing a subaward that alleviates the Local Government Plaintiffs' alleged injury.   Indeed, Plaintiffs themselves emphatically argue in their summary judgment motion that CDC's reinstatement of the Prime awards (pursuant to the PI Order) has failed to result in the reissuance of their subawards.

First, a State may no longer have a need for a subrecipient to do work on its behalf.  *That appears to be what actually happened in this case*, with respect to Harris County's two indirect grants from Texas DSHS, as explained above.  To date, Texas DSHS has declined to issue subawards to Harris County, despite CDC's reinstatement of the prime awards to Texas this past July.  Texas DSHS even broached returning the funds (nearly $14 million total) to CDC, rather than issuing a subaward:  "If CDC is unable to adjust the amounts to cover costs associated with [Texas DHSH] managing these subawards, DSHS will return the funds to HHS." *See* Ex. A.

The State prime recipients (like Texas) "are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced."  *Murthy*, 603 U.S. at 73-74 (citation omitted).  The Supreme Court recently emphasized this:

> [R]edressability requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power. . . .  It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.

*Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023).  In *Haaland*, the Court considered standing in the context of challenges to a statute, the Indian Child Welfare Act (ICWA), and concluded there was a redress issue because "[t]he state officials who implement [the challenged statute] are

not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Id*. at 293.  Notably, Texas DSHS has made a similar argument in declining to reissue Harris County's subaward:  "DHS is not a party to the litigation between Harris County and HHS." *See* Ex. C, at p. 2 (Dec. 1, 2025 Letter).

Second, contractual performance period end dates may be an impediment.  Each subaward has its *own* performance period end date, set by the State prime (not CDC)—and the subaward may have a significantly earlier expiration date, which may frustrate redress.  The Local Government Plaintiffs have not provided copies of the subawards at issue, so there may be other impediments as well.

"If it is . . . just as plausible that the court's action will not redress the plaintiff's injury as that it will, Article III's redressability requirement is not met." *Hecate Energy*, 126 F.4th at 666 (citation omitted).  The Supreme Court has explained, "we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (citation omitted).  "Rather than guesswork, the plaintiffs must show that the third-party . . . will likely react in predictable ways to the defendants' conduct."  *Id*. at 57-58.  Specifically, the D.C. Circuit has explained:

> [S]tanding is *substantially* more difficult to establish when it depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict. . . . In such cases, the plaintiff must offer *substantial* evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress. . . .
>
> * * * *
>
> When redress depends on the cooperation of a third party, it becomes the burden of the [plaintiff] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Cierco v. Mnuchin*, 857 F.3d 407, 418-19 (D.C. Cir. 2017) (emphasis added).  *See Hecate Energy*, 126 F.4th at 667 (explaining that plaintiff "does not show that [a favorable decision]

would make it likely . . .—let alone substantially likely—that its requested relief would spur" the third party so as to redress plaintiff's injury).  *See also, Spectrum Five LLC v. FCC*, 758 F.3d 254, 260-61 (D.C. Cir. 2014).  The Local Government Plaintiffs cannot clear this bar.

### B.  AFSCME Cannot Establish Standing

A similar redressability defect is present in AFSCME's standing case, as Defendants previously explained in their opposition to AFSCME's Motion for Partial Reconsideration.[8]  In that Motion, AFSCME admitted that, even if the Court grants the relief it seeks—specifically, as identified in that Motion, an order that CDC reinstate its terminated grants with Alaska and Jackson County—then "[p]ublic officials in Alaska and Jackson County would retain the right to decline" funding from CDC.  Thus, as Defendants explained in their opposition to that motion, AFSCME effectively pleaded itself out of redressability.  *See* Defs.' Opp'n at 3-4, ECF No. 43.

Running the test for redressability, the court again "consider the relationship between the judicial relief requested and the injury suffered," *Murthy*, 603 U.S. at 73, and it is clear this defect dooms AFSCME's showing on both associational or organizational standing.  For associational standing purposes, the asserted injury is that AFSCME members "were let go because their employers lost grant funding," as the Court observed.  *See Harris Cnty.*, 786 F. Supp. 3d at 204.  For organizational standing, AFSCME's asserted injury is that the union has had to "divert resources to support impacted members" who lost their jobs, Pl. Br. at 22, and that it has suffered lost dues and diminished bargaining power, due to these lost jobs.  *See id*. at 22-23.  For both forms of standing, Plaintiffs cannot show that the judicial relief requested— reinstatement of CDC grants to the prime recipients—likely would alleviate AFSCME's injury,

---

[8] The AFSCME Motion for Partial Reconsideration briefing is at ECF Nos. 39, 43, and 44.  The Motion is pending with the Court.

because that would occur only if the prime recipients actually expend the (hypothetically) reinstated grants to rehire the terminated AFSCME members.

Moreover, AFSCME anticipates "indirect awards," as it now seek a permanent injunction covering, in relevant part, grants issued "directly or indirectly . . . to states and localities who employ AFSCME-represented public health workers."[9] Pl. Br. Proposed Order at 2.  These "indirect awards" would compound the redressability defect.  To the extent the proposed order contemplates, for example, an award from CDC to the State of Ohio (the so-called Prime recipient), which then issues a subaward to Jackson County (subrecipient), redress would be doubly speculative because it would depend upon the "unfettered choices" of *two* "independent actors not before the courts"—Ohio and Jackson County.  *See Cierco*, 857 F.3d at 418.

Plaintiffs argue it is "illogical" to think that a jurisdiction would "turn that money away." Pl. Br. at 24.  But the record in this case (with Texas DSHS in particular) refutes that.  And Plaintiffs misrely on *Diamond Alternative Energy, LLC v. EPA,* 606 U.S. 100 (2025).  *See* Pl. Br. at 23-24.  That decision illustrates that when a government (the State of California) mandates that automakers manufacture cars that use less gasoline (*i.e.,* through EV mandates), plaintiff gasoline producers have standing to sue to invalidate the regulation—"common sense" economic reality dictated that reduced gas sales were a likely and predictable effect of the challenged California regulation.  *See Diamond Alt. Energy*, 606 U.S. at 117. In fact, the Court pointed out that "record evidence [including declarations from the fuel producers] confirms what common sense tells us: Invalidating the regulations likely (not certainly, but likely) would make a

---

[9]  This scope is overbroad insofar as it is defined to include jurisdictions that "employ AFSCME-represented public health workers"—regardless of whether the grant terminations impacted those workers. Pl. Br. Proposed Order at 2.  Plaintiffs broadened the scope they previously used at the preliminary injunction stage, which covered "state and local employers of AFSCME members what were affected" by the terminations. *See* ECF 14-17.  *See* remedy section below, *see* Part V.

difference for fuel producers because automakers would likely manufacture more vehicles that run on gasoline and other liquid fuels." *Id*. at 118. Here, the "record evidence" (the various declarations submitted on behalf of the Local Government Plaintiffs concerning inability to access or "spend down" the awards) refutes AFSCME's standing argument, and Plaintiffs fail to show any similar "predictable chain of events" here, let alone the application of any "commonsense economic principles." *See id*. at 116-17.

### III.    Plaintiffs' Claims are Moot Insofar as the Contractual Performance Periods Have Expired and No Meaningful Relief is Possible.

Plaintiffs claims are moot, and the Court lacks jurisdiction, insofar as the contractual performance periods of the grants have expired, so that the relief requested in the complaint is meaningless. "If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot. This requirement applies independently to each form of relief sought" *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.,* 264 F.3d 52, 55 (D.C. Cir. 2000). "The expiration of a contract on its own terms constitutes such a mooting event." *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 58 (1st Cir. 2013). One reason for this "mootness is that a court cannot provide meaningful relief to the allegedly aggrieved party. This is clearest in cases where the only relief requested is an injunction. Once a contract has expired, there is no ongoing conduct left for the court to enjoin." *Id*. at 53 (citing *Columbian Rope Co. v. West*, 142 F.3d 1313, 1316 (D.C. Cir. 1998)). Here, the expired performance periods preclude further payout, insofar as the case is before this Court and subject to remedies under the APA (*i.e.,* set aside). For each expired grant, the relief requested is meaningless. As explained further below, there is no legal basis for the Court to re-write the performance periods, as requested by Plaintiffs. And "[t]he potential of declaratory

relief alone cannot save an action from mootness if the object of the suit is not some ongoing underlying policy, but . . . an isolated agency action." *Columbian Rope*, 142 F.3d at 1317 n.9.

## IV.    Even if the Court had Jurisdiction, Plaintiffs' Claims fail

### A.    Plaintiffs' Attempt to Challenge an Alleged "Mass Termination Decision" is Not Reviewable

Even if this Court had jurisdiction to hear Plaintiffs' claims, those claims fail to the extent they are predicated on an alleged "Mass Termination Decision"—rather than termination of individual grants.   *See* Compl., ¶¶ 154-72 (Count IV, V, and VI).  By framing their case as a challenge to an alleged "Mass Termination Decision"— which they define as "Defendants' decision to terminate the[] 'COVID-related' CDC grant programs *en masse*," *id.* ¶ 5—Plaintiffs seek to avoid casting this case as an "essentially contractual" dispute subject to the Tucker Act. But, as explained earlier, Defendants did retain numerous COVID-era grants that served broader infectious disease purposes, and Defendants therefore dispute the underlying allegations that "Defendants did not consider impacted grants individually[,]" but "[r]ather, they made a policy decision to end all purportedly COVID-related funding." Pl. Br. at 6.  In any event, even so styled, Plaintiffs' claims fail for multiple reasons.

As a threshold matter, Plaintiffs lack standing to challenge any alleged "Mass Termination Decision."  Any injury to Harris County (for example) stems from the notice of termination for each of *its* particular grants, not any alleged "Mass Termination Decision."  For similar reasons, vacatur of any alleged "Mass Termination Decision" would not provide redress to Plaintiffs.  Rather, redress (even assuming it were likely for the indirect grants) would require *reinstatement* of each individual terminated grant.  Perhaps recognizing this issue, the Court's PI decision does not refer to any alleged "Mass Termination Decision."  *See Harris Cnty.*, 786 F. Supp. 3d 194.

33

In addition, the alleged "Mass Termination Decision" is not final agency action. "Only 'final agency action for which there is no other adequate remedy in a court' is reviewable under the APA." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 224 (D.D.C. 2020) (Cooper, J.) (quoting 5 U.S.C. § 704). "The 'final agency action' requirement involves two discrete inquiries. First, Plaintiffs must identify an 'agency action.' . . . Second that agency action must be 'final.'" *Id.*

Under the first requirement, pursuant to "the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), and that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) ("*SUWA*"). In *Lujan*, the Supreme Court dispelled any notion that a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review [and] adversely affects [a plaintiff].

497 U.S. at 892-93. Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66. Here, the alleged "Mass Termination Decision" is insufficiently discrete, and would amount to an unreviewable "programmatic" decision under *Lujan*. *Lujan*, 497 U.S. at 891. Rather than challenging the specific grants at issue, Plaintiffs seek to "vacate[]" an alleged "decision . . . to mass-terminate all remaining public health grants issued under [specified statutes]." Pl. Br. Proposed Order at 1-2. In other words, rather than seeking to challenge any of these discrete decisions that may have caused them harm, Plaintiffs seek to dress up these "many individual actions" as a single decision in order to challenge all of

them at once—contrary to the APA. *See Lujan*, 497 U.S. at 893. The discrete agency action requirement precludes using the APA for this type of claim.

Under the second requirement, the alleged "Mass Termination Decision" also does not qualify as final agency action because no legal consequences would flow from it. "For an agency action to be final, it must be "*both* the consummation of the agency's decision making process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here, any alleged "Mass Termination Decision" would not qualify as final agency action, at minimum, because it would not determine Plaintiffs' rights and obligations. Rather, "legal consequences . . . flow" only from the termination of each grant, reflected in the termination notice for each individual grant included in the administrative record. *Bennett*, 520 U.S. at 178 (citation omitted). And the Administrative Record in this case includes the termination notices for each of the twelve specific grants at issue in this case, which an explanation for the reasons for the termination.

Thus, even if the Court had jurisdiction, Plaintiffs' attempt to challenge an alleged "Mass Termination Decision" is unreviewable and fails.

### C.    Plaintiffs' APA Claims Fail on the Merits[10]

#### 1.    Defendants' Actions Were Not Arbitrary and Capricious

As a threshold matter, Plaintiffs overlook that "arbitrary and capricious review entails a very deferential scope of review that forbids a court from substituting its judgment for that of the agency." *Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring). "[R]eview under the arbitrary-and-capricious standard is narrow; [courts] will

---

[10] Plaintiffs' unconstitutional-and-contrary-to-statute claim under the APA (Count IV) is discussed in Part IV.B.4, in connection with the constitutional and *ultra vires* claims.

uphold an agency decision 'of less than ideal clarity if the agency's path may reasonably be discerned.'" *Bloch v. Powell*, 348 F.3d 1060 (D.C. Cir. 2003) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 285 (1974)). Put differently, the agency need only articulate "a 'rational connection between the facts found and the choice made,'" *Bowman*, 419 U.S. at 285 (citation omitted), acting within a wide "zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Plaintiffs allege that Defendants failed to "provide even a basic explanation for its decision-making," Pl. Br. at 38, but the explanation in the Termination Notices—in short, that with the end of the pandemic, the grants' "limited purpose has run out" (*see supra*)—easily defeats that claim. And despite Plaintiffs' argument that Defendants made no individualized determinations with respect to the COVID-era grants, CDC did in fact retain numerous COVID-related grants serving broader infectious disease purposes, demonstrating individualized decision-making. *See* Legier Decl. ¶ 6.

Plaintiffs argue that "[a]n agency may not depart from a prior policy without providing 'good policy reasons for the new policy' . . ." Pl. Br. at 37 (citing *FCC v. Fox Television Stations, Inc*. 556 U.S. 502, 512 (2009)). But Plaintiffs are mistaken to assume that the "policies" they fault here—in contrast to the more formal policies at issue in *Fox Television*—are subject to this doctrine at all. In any event, the argument fails because HHS *did* explain its decision *vis a vis* the ending of the pandemic.

Plaintiffs also argue that "Defendants acted arbitrarily when they failed to account for the substantial reliance interests of grantees, who depended on Defendants' commitments in hiring employees . . .[and] entering into contract and subcontracts," among other things. *Id.* at 38-39. But the APA requires the weighing of only those interests that are "legitimate" and "serious." *See, e.g., Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1,

49 (D.D.C. 2020), *appeal dismissed*, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021). Here, the terms of the grants expressly permitted "for cause"-termination. So Plaintiffs fail to show they had a right to develop any reliance interest that their grant would not be terminated for cause, in the circumstances here. And with respect to Plaintiffs' work and expenditure of funds prior to the termination of the grants, HHS allowed Plaintiffs to draw down from funds for any work that they already had done prior to the termination date. *See, e.g.,* AR00069.

Last, Plaintiffs argue that, under *Spirit Airlines, Inc. v. U.S. Department of Transportation*, there is no evidence in the record that Defendants "consider[ed] responsible alternatives to [their] chosen policy and to give a reasoned explanation for [their] rejection of such alternatives." 997 F.3d 1247, 1255 (D.C. Cir. 2021). But this presupposes a formal "policy" here akin to that in *Spirit,* and improperly suggests that this doctrine would apply whenever an agency changes its mind about anything. The Termination Notices make clear that HHS viewed the grants as unnecessary—with the end of the pandemic, "their limited purposes has run out." *See, e.g.,* AR00065-69, at 69.

### 2. Defendants did not Violate HHS Regulations

Plaintiffs also argue that HHS violated the APA by contravening its own regulations, in terminating the grants "for cause," where its stated reason allegedly is not a permissible basis thereunder. Pl. Br. at 25. This claim fails.

The "Termination" section of the grants' terms and conditions expressly incorporates 45 C.F.R. § 75.372. At the time, that regulation permitted termination (1) "if the non-Federal entity fails to comply with the terms and conditions of the award," or, separately, (2) "for cause." *Id.* § 75.372(a)(1)–(2). The underlying Notice of Funding Opportunity also set forth these two distinct

bases. This language demonstrates that the agency may terminate grants "for cause," as distinct from any violation of the grant terms and conditions.

HHS regulations do not define "for cause." Pointing to "traditional rules of construction," this Court observed that Plaintiffs' interpretation of "cause," as non-compliance with the terms and conditions, "runs headlong into th[e] presumption" against reading regulations to avoid surplusage." *Harris Cnty.*, 786 F. Supp. 3d at 213. And the Court stated that "strong textual evidence suggests that 'cause' is not so limited as Plaintiffs espouse." *Id*. The Dictionary definitions (which the Court referenced as a potential aid) provide clarification. *Id*. For example, the Eleventh Circuit explained that Black's Law Dictionary "defines 'for cause' straightforwardly as '[f]or a legal reason or ground.'" *In re Piazza,* 719 F.3d 1253, 1261 (11th Cir. 2013). That opinion continued, "[t]his understanding of 'cause,' moreover, is not limited to legal dictionaries," and "the common thread among [non-legal definitions] is unmistakable: the ordinary meaning of 'cause' is adequate or sufficient reason." *Id.* at 1261-62.

So understood, the end of the pandemic provided "cause" to terminate COVID-related grants, as stated in the Termination Notices. The agency determined that the purpose for which the grants were awarded was superseded by the end of the public health emergency, and the Termination Notices reflect this determination by stating that the pandemic was over.

Plaintiffs primarily point to HHS's new regulation, at 2 C.F.R. § 200.340(a), which they assert "eliminates the [allegedly] duplicative 'for cause' provision." Pl. Br. at 35. But this regulation did not become effective until October 2025. The relevant grant awards here predated this period, and instead, expressly incorporated 45 C.F.R. § 75.372 into the contractual terms. This new regulation therefore is not controlling.

### A.    Plaintiffs' Constitutional and Ultra Vires claims also Fail.

Plaintiffs' separation of powers, Spending Clause, and *ultra vires* claims also fail. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *Global Health*, 153 F.4th at 13 (citation omitted). And there is "no cause of action to bring . . . freestanding constitutional claim[s]" where, as here, the case is controlled by *Dalton v. Specter*, 511 U.S. 462, 474 (1994), which distinguishes between "claims that an official exceeded his statutory authority, on the one hand [(as here)], and claims that he acted in violation of the Constitution, on the other." *See Global Health*, 153 F.4th at 17. Specifically, "[Plaintiffs] may not bring a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory," as is the case here. *Id*. at 7. This forecloses Plaintiffs' constitutional and *ultra vires* claims.

In *Global Health*, the D.C. Circuit "conclude[d] that *Dalton* controls this case and the grantees lack a cause of action to bring their freestanding constitutional claim," where plaintiffs asserted a separation-of-powers claim alleging that the government (in freezing foreign aid spending) impounded funds in violation of the 2024 Appropriations Act, the ICA and the Anti-Deficiency Act. *Id*. at 17. The court reasoned that "this dispute is fundamentally statutory [rather than constitutional] because the alleged constitutional violation is predicated on the underlying alleged statutory violations." *Id*. at 15 n.11 (emphasis added). "[S]uch claims must meet the standards governing review *of ultra vires* claims, and cannot be recast as constitutional claims through the mere invocation of the separation of powers." *Id*. at 17 n.14. *See, e.g., Am. Physics*, 2025 WL 2615054, at *16 (concluding that under *Global Health* Plaintiffs "lack a cause of action to bring their freestanding constitutional claim."); *Appalachian Voices*, 2025 WL 2494905, at *8-9 (same).[11]

---

[11] There is no merit to Plaintiffs' argument that *Dalton* is inapplicable here, which they contend based on their reading of *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). *See* Pl. Br. at 29. *See Appalachian Voices*, 2025 WL 2494905, at *9 (explaining, as set forth in

### 1. Plaintiffs Lack a Cause of Action for their Freestanding Separation-of-Powers Claim

Under this framework, the Court analyzes Plaintiffs' separation-of-powers claim as an *ultra vires* claim because "the underlying alleged violation and claimed authority are statutory." *See Global Health*, 153 F.4th at 7. Specifically, Plaintiffs claim that the Individual Defendants violated the five COVID-era appropriations statutes underlying the grants. *See, e.g.*, Pl. Motion. for PI at 20 ("[t]he Executive's actions here directly contravene Congress's appropriations for Plaintiffs' public health programming."); *Harris Cnty.,* 786 F. Supp. 3d at 205 (plaintiffs' separation-of-powers claim is "that the Executive Branch allegedly did not spend funds that it was required to spend."). Accordingly, "*Dalton* controls this case and [Plaintiffs] lack a cause of action to bring their freestanding constitutional claim." *See Global Health*, 153 F.4th at 17. The claim therefore must be analyzed as an *ultra vires* claim, which as explained further below, is a standard Plaintiffs cannot meet here.

### 2. Plaintiffs Lack a Cause of Action for their Spending-Clause Claim

Plaintiffs' Spending Clause claim also fails. As an initial matter, Plaintiffs do not challenge Congressional action, which is a predicate to such a claim. The Spending Clause is implicated only "when Congress imposes a spending or funding condition," and without challenging congressional action, Plaintiff "cannot state a claim under the Spending Clause." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,* 784 F. Supp. 3d 127, 162-63 (D.D.C. 2025), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *McMahon*, 791 F. Supp. 3d at 1288 (citing same); *see also Harris Cnty.*, 786 F. Supp. 3d at 212 ("At the outset, it is

---

*Global Health*, that *Reich* does not address the holding in *Dalton* that "statutory claims cannot be transformed into constitutional ones").

unclear that [the Spending Clause's] limitation on Congress's spending power applies to the Executive Branch.").

In any event, this "freestanding constitutional claim[]" fails for the same reason as the separation-of-powers claim: this dispute is "fundamentally statutory" because "the alleged constitutional violation is predicated on the underlying alleged statutory violation." *Global Health*, 153 F.4th at 15 n.11. Plaintiffs claim is that in the specific appropriations statutes underlying the grants, Congress imposed no "funding conditions," so the Individual Defendants allegedly violated those statutes by "conditioning the [grant] funding on the COVID-19 pandemic," when that limitation is allegedly absent from the appropriations statutes. *See, e.g.*, Pl. Br. at 30; *see also id*. at 1 (the "decision to override a congressional spending mandate violated constitutional separation of powers principles as well as the Spending Clause"); *see also* Compl. ¶¶ 146-47. To the extent there is any claim at all, it must be analyzed as an *ultra vires* claim.

### 3. Plaintiffs Cannot Meet the Stringent Standards for their *Ultra Vires* Claim

"To prevail on an *ultra vires* claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) "there is no alternative procedure for review of the statutory claim" and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Global Health*, 153 F.4th at 20. A defendant "violates a clear and mandatory statutory command only when the error is so extreme that one may view it as jurisdictional or nearly so." *Id*. (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)). As the Supreme Court put it, an ultra vires "claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025).

Plaintiffs cannot meet these "stringent" requirements for an *ultra vires* claim. *See Changji Esquel,* 40 F.4th at 722. Indeed, Plaintiffs do not even appear to try, as their summary judgment brief includes only a short conclusory, paragraph on the *ultra vires* claim, *see* Pl. Br. at 31, without any analysis of the elements or how Plaintiffs satisfy them. In any event, here, as in *Global Health*, "[plaintiffs] fail to satisfy the third prong of the *ultra vires* reviewability test," because the "grantees can point to no specific prohibition [in the underlying statutes that] the defendants have violated to an extreme and nearly jurisdictional degree." *Global Health,* 153 F.4th at 20. Here, Plaintiffs have identified no "specific prohibition" in the appropriations statutes that barred cancellation of the grants, due to the end of the pandemic. *See id.; see also NRC,* 605 U.S. at 666 (plaintiff can prevail on an *ultra vires* claim "only when an agency acts entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute"). At most, Plaintiffs argue that Congress' actions through the Fiscal Responsibility Act of 2023, in rescinding some COVID funds but not others, implies that Congress did not intend for the agency to cancel grants related to the latter. But Plaintiffs do not allege any "specific prohibition" on grant termination in the statutes. *See id*. And as noted *Global Health*, "the prohibition at issue must confer rights upon the individual seeking *ultra vires* review," 153 F.4th at 20, and Plaintiffs make no showing that the appropriations statutes confer any rights on them. Plaintiffs also fail the second prong of the *ultra vires* reviewability test, because "an alternative procedure for review" is available under the Tucker Act. *See id.* at 21 n.18.

### 4. Even if the *Ultra Vires* Standard is Inapplicable, Plaintiffs Cannot Establish any Constitutional or Statutory Violation

Finally, even if the *ultra vires* standard does not apply, Plaintiffs still fail to establish any constitutional or statutory violation, and therefore cannot support their unconstitutional-and-contrary-to-statute APA claim (Count IV). The five underlying COVID-19 supplemental

appropriations statutes at issue in this case directed HHS to allocate money for "grants" or "cooperative agreements" to "state, tribal, local, and territorial entities," not specifically to Plaintiffs or any particular entity.  These lump-sum appropriations statutes generally specified a minimum amount to be allocated to STLTs.  HHS obligated *more* to the STLTs than the amounts specified by Congress, by the dates specified in the relevant appropriations statutes, before cancellation.  *See* May 23 Legier Decl. ¶¶ 12-25.  That is, CDC entered the agreements prior to any appropriations deadline, and obligated the full amount required. *Then CDC subsequently terminated, for cause, as provided for in the grant agreements*—explaining that the grants and cooperative agreements were issued for a limited purpose, to ameliorate the effects of the pandemic, and now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out.

Plaintiffs fail to identify any specific statutory violation from this.   As the Court noted, two of the statutes, PPP and ARPA, have no appropriations deadline, and it is undisputed that these presently are not closed.  *See* Pl. Br. at 27.  Defendants also previously showed that for most of the appropriations statutes, Defendants actually spent more than the amounts specified in the appropriations statutes.

Congress subsequently revisited the appropriations statutes, when it enacted the Fiscal Responsibility Act of 2023, yet imposed no restrictions.  If Congress had intended restrictions on CDC's ability to cancel the grants after the end of the pandemic (as the grants allowed for), Congress had the opportunity to add these restrictions, but chose not to.  Because Plaintiffs cannot show that Defendants violated the underlying appropriations statutes, they fail to establish any constitutional violation. Therefore, their unconstitutional-and-contrary-to-statute claim under the APA (Count IV) fails.

43

## V.    Any Relief Should be Limited

To the extent this Court determines it has jurisdiction and Plaintiffs' claims have succeeded, then any relief should be limited to setting aside the individual grant terminations of the four Local Government Plaintiffs (to the extent the grants have not already expired).

Relief should not extend to AFSCME.  As a threshold matter, the Court should continue to respect the decision of the relevant jurisdictions, which have not joined this lawsuit.  *See Harris Cnty.*, 786 F. Supp. 3d at 223 ("[Neither Alaska nor Jackson County, Ohio] sued to recoup these funds, a decision their elected official were entitled to make for themselves and their constituents. The Court will not override that decision lightly….").  If the Court does extend relief to AFSCME, the Court should limit it to members that AFSCME has chosen to identify and who have standing.

Limiting a remedy to the members the associational plaintiffs have identified for standing purposes comports with the limitations on extending relief to nonparties. *See Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025). This Court cannot circumvent that prohibition indirectly by extending relief to nonparties who are represented by a party, other than through properly established associational standing or class certification under Rule 23. *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] properly conducted class action . . . can come about in federal courts in just one way—through the procedure set out in Rule 23."). No plaintiff has sought or obtained class certification, and AFSCME has identified just a handful of its thousands of members for standing purposes. *See* Compl. ¶¶ 131-32; *Harris Cnty.,* 786 F. Supp. 3d at 222 (observing "26 AFSCME members, almost all of whom are located in just one state, are not enough to warrant an injunction as to 27 states and hundreds of municipalities across the country"); *see generally* Toscano Decl. ECF No. 46-8.   AFSCME cannot end-run all three of

those limits—*CASA*, Rule 23, and associational standing requirements—by obtaining a nationwide injunction for members whose membership is unknown.

Limiting the remedy in this way also appropriately leaves the breadth of the remedy those plaintiffs can receive in their own hands. Nothing prevents AFSCME from naming as many of its members as it wishes so that each member can benefit from any relief the Court orders. Likewise, nothing prevents those Plaintiffs' members from seeking to litigate this case as a class action. Thus, any remedy should only extend to cover the specific members AFSCME has identified for standing purposes.

Finally, if the Court rule against Defendants, the Court should not require CDC to rewrite or extend the contractual performance periods in the grants. Plaintiffs did not request this relief in their complaint, and they provide no legal authority supporting it. *Cf. Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 220 (1st Cir. 1987) ("Although by rewriting the contract between the parties, the court may have arrived at what it considered a just result, we think it violated the basic principles of contract law."). Moreover, because it would effectively amount to a measure of compensatory damages, it would be inconsistent with the APA and the Tucker Act. *See Appalachian Voices*, 2025 WL 2494905, at *8 (explaining that "[a]n order reinstating plaintiffs' grants and extending their time for performance [(i.e., extension of performance periods specified in the grant agreements)] *compensates* plaintiffs for EPA's terminations." (emphasis added)).

## CONCLUSION

For all of the reasons stated, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion to dismiss and/or motion for summary judgment.

DATED: December 23, 2025                      Respectfully submitted,

45

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Director, Federal Programs Branch

*/s/ Steven M. Chasin*
STEVEN M. CHASIN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0747
Steven.M.Chasin2@usdoj.gov

*Counsel for Defendants*